1 | **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2 | Name  GUTIERREZ  JOSEPH  PHILIP
           (Last)         (First)         (Initial)

3 |

4 | Prisoner Number  D-02765

5 | Institutional Address  P.O. BOX 689, CTF II(C), Z-138L, SOLEDAD, CA.
      93960-0689.

6 |

7 | **UNITED STATES DISTRICT COURT**
      **NORTHERN DISTRICT OF CALIFORNIA**

8 | JOSEPH P. GUTIERREZ,
      (Enter the full name of plaintiff in this action.)

9 |

10 |                    vs.                          Case No. _____
                                                    (To be provided by the clerk of court)

11 | B.P.H. COMMISSIONERS & B. CURRY,
                                                    **PETITION FOR A WRIT**
12 | Warden, et al.                                 **OF HABEAS CORPUS**

13 |

14 | _____
      (Enter the full name of respondent(s) or jailor in this action)

15 |

16 |                    Read Comments Carefully Before Filling In

17 | <u>When and Where to File</u>

18 |        You should file in the Northern District if you were convicted and sentenced in one of these

19 | counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 | San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 | this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 | good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23 |        If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24 | one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 | District Court for the district in which the state court that convicted and sentenced you is located. If

26 | you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 | your petition will likely be transferred to the district court for the district that includes the institution

28 | where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS          - 1 -

1 | <u>Who to Name as Respondent</u>

2 |      You must name the person in whose actual custody you are. This usually means the Warden or

3 | jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4 | you are imprisoned or by whom you were convicted and sentenced. These are not proper

5 | respondents.

6 |      If you are not presently in custody pursuant to the state judgment against which you seek relief

7 | but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8 | custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9 | was entered.

10 | <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11 |     1. What sentence are you challenging in this petition?

12 |        (a)   Name and location of court that imposed sentence (for example; Alameda

13 |             County Superior Court, Oakland):

14 |      <u>SUPERIOR COURT OF LOS ANGELES, SANTA MONICA DIVISION</u>

15 |            Court                    Location

16 |        (b)   Case number, if known <u>A 088529.</u>

17 |        (c)   Date and terms of sentence <u>April, 1985; 9 yrs. to Life.</u>

18 |        (d)   Are you now in custody serving this term? (Custody means being in jail, on

19 |            parole or probation, etc.)        Yes <u>X</u>   No _____

20 |            Where?

21 |            Name of Institution: <u>Correctional Training Facility.</u>

22 |            Address: <u>P.O. Box 689, Soledad, CA 93960-0689.</u>

23 |     2. For what crime were you given this sentence? (If your petition challenges a sentence for

24 | more than one crime, list each crime separately using Penal Code numbers if known. If you are

25 | challenging more than one sentence, you should file a different petition for each sentence.)

26 | <u>Kidnap for Purposes of Robbery; Cal. P.C. §§ 209(b), 211; w/</u>

27 | <u>Gun Use Gun use allegation; P.C. § 12022.5</u>

28 |

1    3. Did you have any of the following?

2        Arraignment:                          Yes __X__    No _____

3        Preliminary Hearing:                  Yes __X__    No _____

4        Motion to Suppress:                   Yes __X__    No _____

5    4. How did you plead?

6        Guilty __X__    Not Guilty __X__    Nolo Contendere _____

7        Any other plea (specify) GUILTY TO § 211; NOT GUILTY TO 209(b).

8    5. If you went to trial, what kind of trial did you have?

9        Jury _____    Judge alone __x__    Judge alone on a transcript _____

10   6. Did you testify at your trial?              Yes _____    No __x__

11   7. Did you have an attorney at the following proceedings:

12       (a)    Arraignment                   Yes __X__    No _____

13       (b)    Preliminary hearing           Yes __X__    No _____

14       (c)    Time of plea                  Yes __X__    No _____

15       (d)    Trial                         Yes __X__    No _____

16       (e)    Sentencing                    Yes __X__    No _____

17       (f)    Appeal                        Yes __X__    No _____

18       (g)    Other post-conviction proceeding    Yes __X__    No _____

19   8. Did you appeal your conviction?            Yes __X__    No _____

20       (a)    If you did, to what court(s) did you appeal?

21              Court of Appeal               Yes __X__    No _____

22              Year: 1988?    Result: Conv. Aff.

23              Supreme Court of California    Yes __x__    No _____

24              Year: ?    Result: Review Denied.

25              Any other court               Yes __X__    No _____

26              Year: 93-94 ?    Result: H.C. Denied.

27

28       (b)    If you appealed, were the grounds the same as those that you are raising in this

1                    petition?                              Yes _____    No  X

2          (c)     Was there an opinion?              Yes  X     No_____

3          (d)     Did you seek permission to file a late appeal under Rule 31(a)?

4                                                           Yes _____    No  X

5                  If you did, give the name of the court and the result:

6          _____

7          _____

8  9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9  this conviction in any court, state or federal?              Yes  X     No_____

10      [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11 challenged the same conviction you are challenging now and if that petition was denied or dismissed

12 with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13 for an order authorizing the district court to consider this petition.  You may not file a second or

14 subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15 U.S.C. §§ 2244(b).]

16      (a)     If you sought relief in any proceeding other than an appeal, answer the following

17              questions for each proceeding.  Attach extra paper if you need more space.

18      I.      Name of Court: Habeas Corpus Petitions to all State
        and Federal Courts except U.S. Supreme Court.
19              Type of Proceeding: Habeas Corpus Petitions.

20              Grounds raised (Be brief but specific):

21              a. Cannot remember.

22              b. Respectfully; this Petition is against the

23              c. B.P.H., and does not deal with the commitment

24              d. offense except as to Parole suitability.

25              Result: Denied.                Date of Result: 85-04.

26      II.     Name of Court: All State & Federal Courts.

27              Type of Proceeding: Habeas Corpus Petitions.

28              Grounds raised (Be brief but specific):

1         a._____

2         b._____

3         c._____

4         d._____

5         Result: _____Date of Result:_____

6     III.    Name of Court: _____

7         Type of Proceeding: _____

8         Grounds raised (Be brief but specific):

9         a._____

10        b._____

11        c._____

12        d._____

13        Result: _____Date of Result:_____

14    IV.    Name of Court: _____

15        Type of Proceeding: _____

16        Grounds raised (Be brief but specific):

17        a._____

18        b._____

19        c._____

20        d._____

21        Result: _____Date of Result:_____

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                 Yes __X__   No____

24    Name and location of court: **Superior Court Monterey County,**

                        **Salinas, CA. & U.S. Ct. of App. 9th.**

25   B. GROUNDS FOR RELIEF     **Circuit; on H.C. Pet. v. the B.P.H.**

26      State briefly every reason that you believe you are being confined unlawfully. Give facts to

27  support each claim. For example, what legal right or privilege were you denied? What happened?

28  Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS     - 5 -

1  need more space. Answer the same questions for each claim.

2  [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5  — Claim One: **The "Some Evidence" Test Principle is the Improper,**

6  **Unconstitutional standard of Proof for the B.P.H. & Courts**

7  **on De Novo Review.**
   Supporting Facts: **Due to the use of this principle, less than 1%**

8  **of all parole suitability candidates can expect a suitabi-**

9  **lity finding at the hearing; or a Grant of Habeas Corpus**

10  **by any court in California. (Please see Addendum I, attch)**

11  Claim Two: **To continue the "No-parole policy" the BPH practices**

12  **creates a Protected Liberty Interest on Parole; and is a**
    **Due Process Clause violation; XIVth. Amend. US Const.**

13  Supporting Facts: **Petitioner has served 24 years in an excellent**

14  **manner for offenses which resulted in absolutely no bodily**

15  **harm to any victim. Petitioner has proved beyond a reason-**

16  **able doubt; not just "some evidence" that he is suitable**
    **for parole. Yet the BOARD refuses to find him even suitable.**

17  Claim Three:
    **No Parole is the Rule: "Some Evidence" is the tool!**

18  **Even the California State Courts are declaring that B.P.H.**
    **has a "No parole Policy". The B.P.H.'s actions are felonious.**

19  Supporting Facts:

20  **Please see the Order of Santa Clara Superior Court. Judge**

21  **Hon. Linda R. Condron, included in Claim Three: also exhs.**

22  **attached this Petition.**

23  If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  **All three Claims have been exhausted before the State's highest**

26  **Court.**

27

28

1       List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases In re Shaputis, 135 Cal.App. 4th 217, 229-230 (2005);

4    Khalifah E.D. Saif'Ullah, v. Tom Carey, No. CIVS022664MCEDADP.

5    In re Ramirez, 94 Cal.App.4th. 549 @ p. 554, fn. 5; In re Scott,

6    119 Cal.App.4th. @ 893; Sass v. California B.P.T., 461 F.3d.1123

7    (9th Cir.2006).McQuillon v. Duncan, 3-06 F.3d. @ 902) inter alia.

     Do you have an attorney for this petition?        Yes____   No____

8    If you do, give the name and address of your attorney:

9    _____ No. _____

10      WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11   this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on _August 5,_ 2008.

14            Date                              Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 7 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14                    ADDENDUM   1

15

16

17

18

19

20

21

22

23

24

25

26

27

28                    ADDENDUM   1

THE BOARD OF PAROLE HEARINGS AND THE CALIFORNIA
STATE COURTS ARE VIOLATING UNITED STATES SUPREME
COURT CLEARLY ESTABLISHED PRECEDENT-SETTING CASE
LAW AND STATUTES BY USING THE "SOME EVIDENCE"
TEST PRINCIPLE AT SUITABILITY HEARINGS AND ON
DE NOVO REVIEW FOR HABEAS CORPUS PETITIONS.

A.    The California Board of Parole Hearings uses the "Some

Evidence" test principle as a "standard of Proof": (a modicum of

proof), in its parole suitability hearings in the California De-

partment of Corrections & Rehabilitation, for DSL (Determinate

Sentence Law) parole suitability candidates sentenced to life-

top terms in the State's prisons. "Some Evidence" is described

in case law (any evidence). The Superior Courts often opine that;

"With the great deference due the B.P.H. in parole matters...,

the Court will deny the Petition because it finds there is "Some

Evidence" in the record to deny parole..." By so doing, Petition-

er asserts, the courts who do this are misinterpreting clearly

established United States Supreme Court precedent setting case

law, because the Court has abandoned the "Preponderance of Evid-

ence" standard of proof minimally required for all habeas corpus

petitions in State and Federal arenas.. (Please see, In re Powell,

(1988) 45 Cal.3d. 894; 248 Cal.Rptr. 431 (Cal. 1988); also see,

Superintendant v. Hill, 472 U.S. 2633, 2650-2651; Trantino v.

New Jersey State Parole Board, 764 A.2d. 943, 976 (2001); "Subs-

tantial Evidence required..."; and, Santovsky v. Kramer, (1982)

955 U.S. 745, 767-769, 102 S.Ct. 1388; Addington v. Texas, 441

U.S. @ 424, 99 S. Ct. @ 1868; Goldberg v. Kelly, 317 U.S. 259,

262-263, 90 S. Ct. 1011, 1017-18, 25 L. Ed. 2d 287 (1970);

"On any matter more important than merely money; the Standard

of Proof is Clear and Convincing Evidence;" See, Joint Anti-

1  Fascist Refugee Committee v. McGrath, 341 U.S. 125, 168 71 S. Ct.

2  624, 646, L.Ed. 817 (1951) [Frankfurtyer Concurring]; Davis v.

3  Board of Parole and Post-Prison Supervision, 200 Or.App. 366, 371

4  -373, 114 P.3d. 1138 (2005); [Clear & Convincing Evidence.]

5  B.      In fact, the constitutionally mandated standard of proof

6  has ALWAYS been "Preponderance of Evidence" on habeas corpus de

7  novo review in all the states of the Union and in Federal Courts,

8  (See, Rule 5 of Rules Governing Habeas Corpus   Petitions pursu-

9  ant to 28 USC §§ 2254-55. For matters dealing with such critical

10 issues as liberty and freedom, the standard of evidence must be

11 "clear and convincing". Never in all the law and statutes Peti-

12 tioner has read; except for cases dealing with the California

13 Board of Parole Hearings, has the standard of proof been other

14 than "Preponderance of Evidence" on habeas corpus and Civil Rights

15 Complaints Lawsuits; unless it were a higher standard. Only now,

16 in this aberration of the habeas corpus rules; has this "Some Ev-

17 idence " TEST Principle come into use. The paramount question be-

18 fore this Federal Court is; WHY did the California Supreme Court

19 adopt the "Some Evidence"Test Principle used by another state's De-

20 part. of Corrections on an administrative disciplinary action with-

21 in one of its prisons ONLY BECAUSE their institutions  did not

22 HAVE a  standard of proof in such matters. It was a very minor ..

23 question dealing with good time credits being returned or not.

24 (See, Superintendant v. Hill, 472 U.S. 445, 455 (1985) (Hill).

25      1.      On Information and Belief  this  Petitioner asserts

26 that the California Supreme Court adopted this test principle in

27 its Holding in the case of In re Powell, Supra, due to the Legis-

28 lative and Judiciary law making and law intepretating functions

6(b)

1 | Branches' reactions to Public Outcry when the former Death Row

2 | inmate was given a parole suitability grant by the then, B.P.T.

3 | Shortly thereafter, the film entitled, 'The Onion Field' aired,

4 | generating the aforementioned public outcry. Predictably, the

5 | Respondents used this ruling against a truly heinous murderer

6 | and applied it willy-nilly against all present and future Lifers,

7 | no matter what the factors of their own specific crimes are.

8 |     2. Contemporaneously, however, the continued use of the "some

9 | evidence" test principle is untenable. When <u>Powell</u>, @ 436-437,

10 | was ruled and decided upon by the California Supreme Court, it

11 | cited, <u>Hill</u>, <u>Supra</u>, <u>472 US 455 (1985)</u>; stating, "Some Evidence"

12 | trumps "independent judgment standard" in "administrative" ins-

13 | titutional hearings because, "That standard applies only when an admin-

14 | istrative decision affects a vested right." ( See, eg.; <u>Bixby v. Pierno</u>,

15 | (1971) 4 Cal. 3d. 130, 144-146, 93 Cal. Rptr. 234, 481 P.2d. 242)"

16 | "A prison inmate has no vested right in his prospective liberty on a parole

17 | release date." (<u>Fain I.</u>, Supra, 65 Cal. App. 3d. at p. 390, 135 Cal.

18 | Rptr. 543: See, <u>1n re McClain</u>, Supra, 55 Cal. 2d. 78, 87, 9 Cal.

19 | Rptr. 824, 357 P.2d. 1080)." But those statements are untrue now,

20 | in lieu of the Courts' findings in the cases of <u>1n re Dannenberg</u>,

21 | (2005) 29 Cal. 4th. 616 and 621; <u>1n re Ramirez</u>, 94 Cal. App. 4th.

22 | 549 @ p. 564 fn. 5; <u>1n re Ernest Smith</u>, at p. 683; <u>Biggs v. Terhune</u>

23 | 334 F.3d. 910 (9th. Cir. 2006); <u>Sass v. California Board of Parole Terms</u>. 461

24 | F.3d. 1123 (9th. Cir. 2006), <u>Trantino v. New Jersey State Parole Board</u>

25 | 764 A.2d. 940 (2001); and <u>Hamdi v. Rumsfeld</u>, 124 US 2633 and 2650-

26 | 2651; plus, <u>McQuillon v. Duncan</u>, 306 F.3d. @ 902,) <u>inter alia</u>.

27 |

28 |     **3.** Petitioner prays, that due to the fact that since it was

1  the California Supreme Court which adopted the "some evidence"
2  Test Principle for parole suitability consideration hearings in
3  the California Department of Corrections and Rehabilitation, back
4  in 1988, in the case of In re Powell, Supra, it is then, the court
5  of Original Jurisdiction on the issue presented herein, inasmuch
6  as this so-called 'Standard of Review', has also been adopted by
7  by the State and Federal Courts on Habeas Corpus up to and inclu-
8  ding the United States Court of Appeals For the Ninth Circuit,
9  because it must abide by State Laws and Supreme Court Case Law,
10  until and unless the State Supreme Court or the United States
11  Supreme  Court holds differently on such matters, they may Review.

12      As a matter of fact, the Board of Parole Hearings itself
13  was happy to adopt this Holding in its parole suitability hear-
14  ings, even though its own self-promulgated Rules and Guidelines
15  instruct it (the B.P.H.) otherwise; [See, Title 15,  Division Two
16  § 2000 (b)(50); Good cause decisions by the Board are to be deci-
17  ded by the "Preponderance of the Evidence"]. Nowhere in Title 15
18  is the "some evidence" standard acknowledged or ordered to be the
19  standard for denial or grant of parole. Therefore, it is obvious
20  the Parties are simply obeying the mandate of this High Court on
21  Hearings and on de novo review. That qualifies the California
22  U.S. Districts Courts (Nor.) as proper  Jurisdiction. Petitioner
23  respectfully submits this Court revisit the Powell Holding and
24  cures the infirmity which has made it all but impossible for any
25  Life Top inmate seeking parole in California; because we do now
26  have a Protected and vested Liberty Interest on Parole (See, cites)
27      As so often has happened in the past the Court has taken a
28  Ruling on some truly heinous or egrigious case, and later passed

1 the Holding down to all other lifers no matter the facts of their
2 specific case[s]. Often, the target case, in this case <u>Powell,</u>
3 <u>Supra</u>, is so truly heinous and 'egrigious, that no one cared that
4 a contract was being violated through the use of manipulative
5 legal language and case law. Predictably, the neglect to insist
6 on strict adherence to the constitution and laws already on the
7 books have come rumbling downhill in an out of control ava-
8 lanche of confusing convoluted 'new' rules and laws. in viola-
9 tion of <u>Stare Decisis</u>, i.e.; Once a law has been created it be-
10 comes a law Americans can count on...." Not the case here...!

11      Petitioner knows of no other state whose parole statutes
12 provide a protected liberty interest in parole, or any defined
13 liberty interest extinguishable by the mere presence of any evid-
14 ence whatsoever. In fact, the opposite is true. Why, even in the
15 case of an alleged Enemy Combatant, the U.S. Supreme Court, Just-
16 ice, Hon. Sandra Day O'Connor, wrote in the case of <u>Hamdi v. Rums-</u>
17 <u>feld, supra</u>, on page 2351, that; ¶"Because we conclude that due
18 process demands some system for a citizen detainee to refute his
19 classification, the proposed "some evidence" standard is inade-
20 quate. Any process in which the Executive's factual assertions
21 go wholly unchallenged or are simply presumed correct without
22 any opportunity for the alleged combatant to demonstrate other-
23 wise falls constitutionally short. As the Government itself has
24 recognized, we have utilized the "some evidence" standard in the
25 past as a standard of review, not as a standard of proof..."
26 See, <u>e.g.</u>, <u>St. Cyr</u>, 533 U.S. at 301, S.Ct. 2271. ("At its historical
27 core, the writ of habeas corpus has served as a means of reviewing the legali-
28 ty of Executive detention, and its in that context that its protections have

6(e)

1 "been the greatest..."); quoted in Hamdi, supra, on p. 2650.

2 Petitioner hereby petitions the Court for a Petition For
3 Review to revisit the Holding in the case of In re Powell, to ·
4 remedy his unlawful and unconstitutional confinement resulting
5 from the refusal of the Board of Parole Hearings to make a find-
6 ing of parole suitability and afford Petitioner a parole release
7 date. The instrument of its no-parole-policy being the aforemen-
8 tioned, "some evidence" test principle which effectively torpe-
9 does all but less than 1% of all eligible life top prisoners"from
10 ever seeing the light of day on parole..." (quote made by Mr.
11 James Tilton, Director of the California Department of Correc-
12 tions & Rehabilitation to the victims rights group members gath-
13 ered at Correctional Training Facility (CTF II) on September 25,
14 2007, during the protest against granting of a Parole Release
15 date to Inmate Kerry Conley, at this location.) Mr. Tilton, ad-
16 dressed the crowd and this speech was aired on KION TV, Channel
17 46. In that speech, the Director of the C.D.C.R. told the vic-
18 tims rights representatives that prisoners only have a due pro-
19 cess right to have a hearing; not parole [i.e. no Protected Lib-
20 erty Interest], and that "Of the 4000... hearings we'll hold
21 this year less than 1% of these men will ever see the light of
22 of day..." This is a Governor Wilson, Gov. Davis-like declara-
23 tion that all lifer hearings are pro forma and sub rosa, Tilton
24 reaffirmed the truth we all recognize as overt Executive Branch
25 policy. The goal is the same; NO Paroles; the tool is the "some
26 evidence" test principle declared law in Powell. But the real
27 travesty is that the State's Courts have allowed these political
28 machinations to contaminate the Constitutions and laws....

6(f)

1          WHEREFORE: for the foregoing reasons, Petitioner res-
2  pectfully requests this Court grant Review and revisit its rul-
3  ing in the case of In re Powell: 288 Cal.Rptr. 431 (Cal. 1988),
4  in which the California Supreme Court improperly adopted the
5  "some evidence" Test Principle, as presented in the case of
6  Superintendant v. Hill (1985) 472 U.S. 445, 105 S.Ct. 2768, 86
7  L.Ed.2d 356, cited in Powell p. 437; The Hill, court, considering
8  the standard of review for a prison disciplinary board's revocation of good
9  time credits," (emph. added) ; because "A prison inmate has no vested right in
10 his prospective liberty on a parole release date." (Fain 1, supra,65 Cal.App.
11 3d at p. 390, 135 Cal.Rptr. 543;" inter alia. But now we know that as
12 as far as prison inmates seeking suitability and parole dates,
13 we do now have a protected liberty interest in parole; as shown
14 ante. Continued use of the "some evidence" test principle cons-
15 titutes a violation of clearly established Supreme Court prece-
16 dent setting case law and statutes  and/   or an improper in-
17 terpretation of clearly established case law and statutes. As
18 long as the "some evidence" test is utilized at these hearings,
19 and as long as the Courts use the "some evidence" test principle
20 on de novo review, the quest for parole for life top prisoners
21 will remain an anti-democratic exercise in sub rosa pro forma
22 hearings and habeas corpus filings in their multi-thousands of
23 habeas corpus petitions filed in State and Federal courts. The
24 prison population of life top prisoners iminently qualified can-
25 didates for parole will continue to grow, burgeon and die off
26 in prison: which is the goal of the powers that be: that is also
27 clear: but the unconstitutional practices will in the end des-
28 troy the very systems which created them.

A.        Specifically, in the case at Bar, the Charade that is
the Board of Parole Hearings 75% former police officers Commis-
sioners, in combination with Board attorneys who should be aware
of the 'game' being run at the expense of the prisoner's life;
and probably are;(but as Officers of the Court, cannot advise
their charges except under the very test principle that is im-
possible to prevail over); in tandem with the courts systematic-
ally denying habeas petitions no matter how meritorious, because
under the 1% chance of winning provided by the "some evidence"
test principle, the Great Writ is watered down in potency until
it too is a meaningless exercise in cruelty; Petitioner prays
this Court will restore his Due Process rights (which aren't
just the right to have a B.P.H. Hearing...), and 'fix" the mess.

DATED:    August 5 , 2008                    Respectfully submitted,

                                            JOSEPH P. GUTIERREZ, Petitioner
                                            In Propria Personam,
                                            In Forma Pauperis

1    PETITIONER JOSEPH P. GUTIERREZ, HEREBY PETITIONS
2    FOR A WRIT OF HABEAS CORPUS TO REMEDY HIS UNLAWFUL
3    AND UNCONSTITUTIONAL CONFINEMENT RESULTING FROM THE
4    REFUSAL OF THE BOARD OF PAROLE HEARINGS TO MAKE A
5    FINDING OF PAROLE SUITABILITY AND AFFORD PETITIONER
6    A PAROLE RELEASE DATE DESPITE OVERWHELMING EVIDENCE
7    OF SUITABILITY: A DUE PROCESS CLAUSE VIOLATION OF THE
8    14TH. & VTH. AMENDMENTS TO THE UNITED STATES CONSTI-
9    TUTION, inter alia.

10   I.    Petitioner was convicted of two counts of kidnapping for
11   purposes of robbery, based on one incident occurring on 11/26/83,
12   and was sentenced to a term of 'simple' Life; which is equivalent
13   to 7 years to Life under the 'Old ISL Law'. Consecutive to that
14   sentence, for an incident that took place earlier on the same
15   date; petitioner was subsequently sentenced to 7 years for a
16   violation of Cal. P.C. § 211. Two years was also assessed for
17   the gun use allegation pursuant to F.C. § 12022.5; for a total
18   term of 9 years plus Life, yielding an M.E.P.D. of 06/27/96.

19        A.    During the 23 years of imprisonment between the time
20   of his offenses and his 7 parole suitability hearings: 1 Initial
21   and 6 Subsequents, beginning in 1995; Petitioner has been an
22   excellent inmate, conforming in overwhelming measure to institu-
23   tional regulations with but a few minor infractions early on, and
24   receiving numerous commendations for his participation in rehabi-
25   litation programs. At his subsequent hearings in October 1997,
26   July 2000, January 2002, September 2003, April 2005, September
27   2006, & in July 13, 2007, Petitioner was found not even suitable
28   based purportedly on the circumstances of the offense[s], not-

6(i)

1  withstanding the lack of any physical injuries or attempts to in-
2  jure anyone physically, in Petitioner's priors or commitment of-
3  fenses, whatsoever. In fact, Commissioner Eng, states, as part
4  of her reasons for denying Petitioner parole suitability on his
5  July 13, 2007 parole suitability hearing, that: (Exhibit A.)

6  "... So, in the matter of Joseph Gutierrez, CDC D02765, the Panel
7  has reviewed all the information received from the public. And
8  relied on the following circumstances in concluding that the prison
9  [sic] is not suitable for parole and would pose an unreasonable
10  risk of danger to society or threat to public safety if released
   from prison.

11  We go back to the commitment offense and we find it was carried
12  out in a very callous  rather cold and callous manner. We had mul-
13  tiple victims involved in two separate incidents on the same day.
14  We find that it was carried out, at least the kidnap
   for robbery, the initial one was carried in a very cal-
   culated manner.

15  In that, the inmate and his crime partner had targeted this
16  particular woman to basically rob. And they went to the hair solon
17  [sic], basically to get money. I'm sorry. Yeah, that was the first
18  crime. And apparently, not having been able to obtain the
19  few thousand dollars that they were hoping to, they end-
20  ed going on and committing the second crime, which hap-
21  pened to be the life crime. I'm sorry. Because the second
   one that happened at 10 p.m. that same evening, on Nov-
22  ember 26th, 1983, was the kidnap for robbery, which was
   the life offense. And they proceeded to basically jump
23  into a vehicle and commandeer this Mr. Sultan [sic] and
   this Ms. Stalmastr [sic] at gun point.

24  ¶Again, you know, the initial one was very, very calculated.
25  Both of these crimes were really carried out in a manner that
26  shows total disregard for human suffering. All of the people that
   were in the hair design shop, basically, were being victimized by
27  Mr. Gutierrez and his crime partner. Mr. Gutierrez, holding a load-
28  ed weapon at them. And same thing, holding a gun to the victim in".

1     "the kidnap for robbery.

2        The motive for this crime, for both of these crimes,

3   occurring was basically robbery and greed. In any event,

  very trivial in relation to this offense. These conclu-

4   sions are drawn from the Statement of Facts where it

5   does state that on November 26th, 1983, at approximately

6   16:20 hours, Mr. Gutierrez and his crime partner, McCord,

  went into the the hair design shop on Vineland Boulevard.

7        Where Mr. Gutierrez pointed a handgun at the victim

8   and let them know it was a hold up, he wasn't kidding.

9   Basically, he said, she's a dead woman if you don't

  listen to me. And there, he requested all of their money. And I'm

10   sorry, I correct that because Mr. Gutierrez said his crime partner,

11   Mr. McCord, was not in the store with him. He was waiting in the

12   get away [sic] car. So, it was Mr. Gutierrez alone. So he basically

  held them up, ended up receiving 94 dollars in currency. And when

13   one of the victims fled the store, <u>Mr. Gutierrez then left.</u>

14     Then later on that evening, about 10 p.m., Mr. Gutierrez, then

15   left.

      Then later on that evening, about 10 p.m., Mr. Gutierrez

16   and Mr. McCord approached Mr. Selton and Ms. Stalmastr [sic] as

17   they were seated in a vehicle. Mr. Gutierrez, again, produced a

18   handgun, entered the rear seat of the vehicle, and Mr. McCord got

  into the driver's seat. Mr. Gutierrez placed a handgun to the vic-

19   tim's head. And then, they drove off with the victims in the vehi-

20   cle and stated that we just want your jewelry and money. <u>And they</u>

21   <u>let them go....</u>"   (Underscoring added.)

22     1. The bottom line is, how long is Petitioner going to be

23 punished for his non-homicide, non-physical injury transgressions

24 as if he <u>in fact committed a very callous crime,...that shows</u>

25 <u>total disregard for human suffering...</u> Crimes where he insured

26 "no harm came to his victims"(Judge Leslie W. Light, at senten-

27 cing.)? How long will the Judiciary deny habeas corpus relief based

28 on the "Some Evidence" Test Principle, which is "Inadequate..?"

1
2
3
4
5

"This prisoner does have a record of violence. In
that, he had been arrested for explosives, unlawful pos-
session of explosives. And whereby, he ended up blowing
up a trailer at a trailer park. And he was also arrested.
Again this was a federal. Parole records show that he was
paid to set fire to a furniture store.

6
7
8
9
10
11

He does have an escalating pattern of criminal con-
duct. It goes  back to 1975, when he was first arrested
for possession of marijuana. He was also arrested for d
disorderly conduct, petty theft, possession of explosives.
He ended up being convicted of conspiracy and ended up
doing his first term in federal prison. All leading up
to this life crime. And it was actually in federal prison
where he met his crime partner for the life crime, Mr.
McCord.

12
13
14
15
16
17
18
19

We find that his misconduct, while incarcerated for
this life term, he has seven 128A counseling chronos. The
last one being in January '97 for storage of food. And
he has seven more serious 115 disciplinary, the last one
being July 1993 for a positive urinalysis. We find that
We find that the psychological report dated January 31,
2005, and authored by Dr. Terrini, T-E-R-R-I-N-I, I was
going to find something, is basically adequate. Even
though Dr, Terrini does state that this inmate presents
a low to moderate risk of future violence within the
historical domain. (underscoring added.)

20
21
22
23
24

Regarding parole plans. This inmate did present us
with, it seems, viable residential plans. It's not in
his county of legal residence or where the life crime
occurred. But I believe his wife has been residing in,
I believe it's Stockton, California for well over 10 years
and owns a home there.

25
26
27
28

¶So he does have a place to reside, but he did not provide
this Panel with any documented evidence of acceptable
employment plans. And he does have several vocations. But
again, we didn't see any documented evidence that he is
inquired into positions within any of those vocations."
(Trans, 2007, pp. 94-98.)

6(1)

1    B.    Petitioner respectfully reminds the Court that under
2  the "some evidence" test principle and the conspiracy by the
3  Respondents to not grant parole whenever humanly possible; no
4  amount of 'so-called' preparation would or will suffice to af-
5  ford him a parole suitability grant unless he 'wins' the 'lot-
6  tery', i.e.; the "figleaf few" allowed to parole (less than 1%)
7  so that Petitioners can never say there is a "no-parole policy."
8  However, assuming arguendo, there was a Just and lawful parole
9  policy for life term prisoners in California; the perennial use
10  of factors that will never change nullifies that theory; especi-
11  ally when the culpability level and "boilerplate" language used is
12  identical with horrendous first degree murders all over this
13  State. (please see Exhibits B & C.) Additionally, Petitioner says,
14  that even though he swears a Holy Oath before each and every
15  B.P.H. Hearing to tell the truth, the whole truth and nothing
16  but the truth; and has always been totally candid and truthful
17  with the Panels; he is invariably called a liar by the Commis-
18  sioners or the D.A. sometime during the Hearings. Also, even the
19  courts in their observance of "Due Deference" for the Board,
20  have in the past, declared that the Board is not obligated to
21  believe any-thing the prisoner says. Why then swear him in? (See
22  Exhibit D.) Therefore, Petitioner will use the words of people
23  who do have some credibility before the Courts to make his prima-
24  facie case. In this instance the words of his Board appointed
25  Counselor, Ms. Maryann Tardiff, Esq., in her closing arguments.
26  Ms. Tardiff is an Officer of the Court, and in the absence of
27  evidence contrary to such; must be believed in her testimony;
28  to wit:

6(m)

1    ATTORNEY TARDIFF:   "Thank you. First of all, in terms

2    of the remarks made by the District Attorney of the '05 psych.

3    eval, it does go into the historic domain in terms of his history.

     History of prior supervision failure. History of at least one prior

4    potential violent offense, arson. He got low to moderate in that

5    area. But it concludes that this score is not amenable to signifi-

6    cant change regardless of the number of years of his incarceration.

     So it's not deficient, I do not believe in that respect.

7        Mr. Gutierrez's pre-incarceration history has, as we've all

8    been made    .   aware of, has some very favorable factors of suit-

9    ability. He has no juvenile criminal history. He actually had an

     exemplary life style up until he was over 30 years old. An excel-

10   lent military history. A long term relationship he's been able to

11   sustain over extended periods of time up through incarceration,

     with his wife.

12       Since he's been incarcerated -- Actually, that '86 115, and

13   that would have been the last force in violence, was not on the

14   life term but on the prior term. So for the the life term, he

15   hasn't had any force or violence in his 115s at all. And actually

     should have only the four 115s, I believe. Because his CDC, this

16   term started in '89. So technically, actually, you need to get

17   rid of the first two, '86 and '87." (Underscoring Added. But of

18   course, the Panel ignored this technical reality and assessed

     Petitioner ALL the 115s regardless.) 'So then you've got posses-

19   sion of a hot pot, possession of dental material, and a positive

20   urinalysis. And that really would be it, the three. Unless I'm

21   doing something wrong here. And also the two 128s in '85 should

     probably be considered part of not this commitment incarceration.

22   So in either event, there has been no force or violence. And if

23   take in the '86, it's 23 years ago. So he has no force or violence.

24   within the last 23 years.

     ¶He's a good worker. We know that. He gets excellent work reports .

25   He has numerous marketable skills. He's made good use of his free

26   time as a writer. He continues to participate in self-help. Subs-

27   tance abuse issues are being taken care of. He's been continuous-

     ly involved in the 12-step program since '96, the vets group. His

28   psych eval since '97 are supportive of release, 10 years worth..."

1 (Please see, pp. 82-84; 2007, Transc.)

2       1. Ms. Tardiff then went on to outline ALL the Psych.

3 Reports he has been given since 1997 and Dr. Powell's which stat-

4 ed, in part: ¶"Mr. Gutierrez seems well aware of the distress

5 and damage he has caused to others in the past. And expresses

6 genuine regret for his past behaviors."(Id. @ p. 84.)

7 " In '99, the psych was also supportive. High GAF score of 85..."

8 "And then '04, which is the second most recent, states, "He ex-

9 pressed genuine remorse for his victim. Which seemed genuinely

10 authentic. His insight into the person that he was when he com-

11 mitted his instant offense is significant." ... "He has matured

12 significantly in regards to drug abuse. Appears to fully under-

13 stand the relationship of his drug dependency to previous criminal

14 behavior. (Id. p. 86) "Viable work skills, two psychological

15 instruments were administered. The HCR-20 indicated low prediction

16 of future violence..." (Id. p. 87.) ¶"And then of course we have

17 the most current one..." "It goes into the anti social persona-

18 lity disorder. And states that this evaluator found that, that

19 was not applicable..." "¶No known juvenile criminal history.

20 No gang involvement. No known failures. No known history of rela-

21 tionship instabilities. No significant employment problems..."

22 (Id. @ p. 87 "...Clinically, did not show signs of grandiosity,

23 pathol/ogical lying, manipulativeness, a lack of remorse, guilt,

24 parasitic lifestyle, poor behavior control, irresponsibility,

25 didn't show ANY sign of these. He has no significant attitude or

26 difficulties. Is emotional and behaviorablly stable...significant

27 insight into the commitment offense..."Future risk, he appears

28 very likely to follow parole recommendations..." (Id. @ p. 88.)

1          2.   Instead, Commissioners accused Petitioner of exactly
2    the opposite throughout; even strongly suggesting Petitioner
3    bring in a parole plan NOT INCLUDING residing or working with/
4    for his wife!! (Trans. @ pp. 100-102). [Comm. Eng.]. Incredible!
5    She did this because Petitioner's wife, was accusatory in her
6    support letter to the Panels. But if the Commissioners followed
7    their  own promulgated Rules and Title 15 Sections, and had in
8    place at least one member of the Panel who had sat in on the
9    previous  Panel, as they are supposed to do, she would have known
10   that, Mrs Brigitte Gutierrez, wife of Petitioner, has always de-
11   tailed exactly how we plan on living and working together. Plans
12   that have always been more than satisfactory to ALL other panels
13   since the Initial Hearing in 1995! Commissioner Eng displays a
14   blatant lack of training and professionalism in her interviews,
15   then blames the Petitioners/prisoners for frustrations and emo-
16   tions. This Panel has firstly, charged Petitioner with a callous-
17   ness and indifference to human suffering merited by multiple vic-
18   tim murder cases. She said they had reviewed all the Information
19   received from the public; but what the Panel did was aggravate
20   only any data which could be turned on its head and made to ap-
21   pear negative. Commissioner Eng, made a mockery of Title 15 §
22   2402 Factors in Aggravation/Mitigation. And all this in a case
23   where no person was killed, attempted killed, struck, or physi-
24   cally harmed in any way. Under these pro forma, sub rosa stand-
25   ards, Petitioner, and hundreds like him have had their commitment
26   offense titles turned into Life Without Possibility  of Parole, be-
27   cause; "prison[er] is not suitable for parole and would pose an
28   unreasonable risk of danger to the society or a threat to public"

1 "safety if released from prison." THAT is a 'new' titled offense
2 never adjudicated in any Court of Law; which turns the work, know-
3 ledge, and millions of dollars worth of fees, salaries and court
4 costs in a mockery because twenty years down the road, the prisoner
5 will have his well thought out term in prison doubled or even tri-
6 pled by persons who possess zero qualifications to abrogate the
7 laws of State, Nation and Constitutions, in an immune, hidden go-
8 vernment inside the Executive Branch of State Government, which
9 ignores all efforts at correcting their corruption of same at will.
10 (Please see Ground 3, herein.) Ms Eng was fired recently: (2008).

11      3.  In the event 'someone' will state Petitioner is mak-
12 "conclusiory" allegations, i.e.; "vague"; let the record show that
13 as early in the process as the 1997 First Subsequent Hearing,
14 Commissioner Guiaquinto stated to Petitioner, that : "he had much
15 more time to serve, because the Law (he stated), states the Life
16 term sentenced concurrently by Judge Leslie W. Light in 1985, will be
17 served consecutively." Now, Judge Light addressed this very issue
18 at sentencing when he said: "I believe, that, however, under these
19 circumstances of the case, the only aspect that gives some corern
20 is whether the life sentences should be concurrent or consecutive
21 to each other." (Underscoring added.) The sentencing Court 'con-
22 ciously' chose the concurrent scenario as appropriate over the
23 'consecutive' scenario, for P.C. § 654, as well as proportionali-
24 ly concerns. Who then, are the B.P.H. Commissioners to unilateral-
25 ly reverse the Superior Court's sentence and resentence Petition-
26 er to ,consecutive life terms; and this in addition to the other
27 'conjured' consecutive time illegally assessed unlawfully under
28 Title 15 Div. 2, B.P.H. Rules and Guidelines?

1    In fact, California Courts have long ago established the
2   proper role for the B.P.H.:   See. Ex Parte Bertrand, 61 Cal. App
3   2d 183, 142 P.2d 351 (1943); "Sen-tences imposed by the B.P.H. are
4   void. The B.P.H. is 'merely a ministerial body' of the Executive
5   Branch..."

6    C.            The B.P.H.'s perennial suitability hearing
7   denials violations constitute a State Quasijudicial determination
8   contrary to clearly estab+lished U.S. Supreme Court precedent-set=
9   setting case law and statutes. The evidence demonstrates these
10  last twenty years (See Exhibits B & C), that the Boards, when they
11  find for suitability, do so for the "figleaf" effect. One prison-
12  er may be found 'suitable' after great accomplishments in prison,
13  such as McQuillon, supra, 306 F.3d 895, 901 @ 904, while another
14  prisoner actually released on parole on a Secnd Degree Murder,
15  and subsequently deported to his country of origin from this loca-
16  tion, accomplished absolutely nothing in prison programs. The
17  Board releases whomever they want to; or not, regardless of what
18  they have accomplished in prison. Time in prison, remorse, parole
19  plans, level of culpability, etc., mean nothing to the Cabal of
20  Commissioners. Their Board actions are totally "arbitrary and
21  capricious", and Petitioner has proved that in all his petitions
22  to the State and Federal Courts through  the years. Assuming
23  arguendo the aforementioned is true, then it changes completely,
24  --the reasons for Petitioner's interminable imprisonment; even
25  though he has served  the maximum terms including the illegal
26  'consecutively' applied concurrent second life term and the six xtra
27  months consecutive for every subordinate counts sentenced in the
28  --Sentencing Abstract of the Reporter's Transcripts: plus the six

6(r)

extra months Title 15 Division 2, imposes for every prior for which

-- the candidate prisoner has already been sentenced at court, and for which he has already been enhanced at trial as prior convictions. PLUS: the Panel, if it ever finds for suitability, then in a cart before the horse twist on logic, goes into its own unilaterally conjured MATRIX, and 'decides' in which Box the 'suitable' candidate will fall for purposes of term setting. It is universally, the maximum for the Penal Code section violations for that MATRIX. For P.C. § 209(b): the MAX-MAX is 13-15-15 years. In Petitioner's case, in his 2005 Hearing, the L.A. County D.A. present, slipped up and went into the MATRIX before he was found suitable; and requested Petitioner be required to serve the 15 year MAX for his P.C. § 209(b) violation, after all those other enhancements were added on. Even so, Petitioner STILL; EVEN THEN, had served that time; plus some! EXAMPLE: Petitioner first served five years of nine for the determinate term he was sentenced to by Judge Light. He has also served that 15 year MAX the D.A. alluded. ·to in 2005. He has also served the six extra months consecutive for every prior felony and subordinate counts on his Principal Case. Three priors (Concurrently served in Federal Prison) = 18 months. The 6 extra months for the five robbery victims = 30 months. The $7\frac{1}{2}$ years consecutive for the (concurrently sentenced) life terms on the second victim in the § 209(b) violations. TOTAL: $7\frac{1}{2}$ + $7\frac{1}{2}$ + 5 + $1\frac{1}{2}$ + $2\frac{1}{2}$ + $1\frac{1}{4}$ = $25\frac{1}{4}$ years. Good time for the $24\frac{1}{4}$ years in prison, minus the $4$ years in which a CDC-115 RVR was suffered (even though two were suffered during his Determinate term) + $29\frac{2}{3}$/3 years good time at 4 months per year + 80 months good time; or $6\frac{1}{2}$ years. $25\frac{1}{2}$ years - $6\frac{1}{2}$ years + 19 years served in-house. Petitioner has served the absolute MAX; and $5\frac{1}{2}$ years beyond the MAX! This Draconian illegal, ex post facto, double

6(s)

1  jeopardy life long term is being imposed by an immune Cabal of Commis-

2  sioners, who are installed in the Executive Branch of State Government

3  as a mini-government of 75% former law enforcement personnel, crime

4  victims or defeated Republican politicians in need of a job ( See Exh.

5  D attched, Declaration of Former Chairman of B.P.H., Mr. Albert Leddy)

6  in violation of Cal. P.C. §§ 5075-5077, et seq., where the Governor is

7  instructed to select commissioners for the B.P.H., by an equal cross-

8  section of the professional, geographic, racial; etc., of California's

9  population.) This also a "sham and Farce" mandate; ignored as are any

10  laws, statutes, regulations, constitutions: State or Federal, written

11  over the years to insure a Fair, Just, and Impartial Board.

12  1. "A State Court determination is contrary to clearly es-

13  tablished Supreme Court precedent if the state court 'applies a rule

14  that contradicts the governing law set forth in [Supreme Court] cases, or if the

15  state court 'confronts' a set of facts that are materially indistinguishable from a

16  decision of the [Supreme Court] and nevertheless arrives at a result different from

17  [Supreme Court] precedent.' Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct.1495,

18  146 L.Ed.2d 389 (2000). A State Court decision is an unreasonable application of

19  Supreme Court precedent if the state court correctly identifies that governing

20  principle but applies it unreasonably to the facts of the case. Id. at 407-08, 120

21  S.Ct. 1495." fn; Tracegy v. Palmeteer, 341 F.3d 1037, 1042 (9th. Cir.).

22  The above is exactly what the B.P.H. Commissioners are doing continuously in

23  California. The Courts who review the habeas petitions de novo, then commit the same

24  violation when they utilize the "some evidence" test principle to deny these peti-

25  tions, in support of the B.P.H. and in direct violation of the following United

26  States Supreme Court long and clearly established precedent setting

27  case law, i.e.; the Separation of Powers; The U.S. Supreme Court, way

28  back in 1803, in the case of Marbury v. Madison, 5 U.S. 137; HELD:

1   with Chief Justice John Marshall, writing: "the words that finally

2   gave the Judicial Branch equal power and status to the Legislative

3   and Executive Branches of U.S. Government. He stated, in part,

4   that only the Legislative Branch may pass (create or promulgate) laws,

5   and only the Judicial Branch (Judges and Justices) may interpret

6   these laws to determine if they are legal and constitutional. But it

7   seems to Petitioner, that the State and Federal Courts have in a way

8   surrendered their power to supervise and overlook the B.P.H.'s "trash-

9   ing" of the "personal liberties protected by the Bill of Rights and

10  the XIVth. Amendment..." "a virulent conservatism." (Payne v.Tennessee,

11  501 U.S. 808, 115 L.Ed.2d 720, 111 S. Ct. 2595 [Stare Decisis], (1991)

12  ; and New York v. Harris, (1990) 495 U.S. 14, 109 L.Ed.2d 13, 110 S.Ct.

13  1640: former Associate Justice U.S. Supreme Court, Hon. Thurgood

14  Marshall's Dissents on Victim Impact Cases; which of course motivates

15  the B.P.H.'s actions as well. This great Jurist's words are full of

16  wisdom and prophesy, as covered herein, If we want to preserve our

17  system of justice, we should heed them.

18           2.  On another 'angle' on the Marbury ruling, U.S. District

19  Court Appointed Defender, Ms. Ann McClintock, spoke before the U.S.

20  Court of Appeals, Ninth Circuit, in the case of Irons v. Carey,

21  (Case No. 05257) from Judge Karlton's Court, Eastern Dist. of CA.;

22  she quoted: ¶"It is clearly contradictory not to grant relief once the

23  Court finds a constitutional violation." The comment was in reply to

24  the California Attorney General's Representative in that Hearing,

25  that; "It isn't enough to be unconstitutional. The State Courts'

26  rulings must also be an unreasonable application of established U.S.

27  Supreme Court Law, otherwise this Court has not [sic] to grant relief."

28  1st Judge: You're saying this Court can only refer a case back to the"

1

2 . . . "Board?" The A.G. retreated: <u>AG</u>: "Well, this Court has the Power to do
3 anything it wants."

4    Ms. McClintock replied: "They can't deny exclusively on the crime,
5 only consider it. If they could, they would have converted the sentence to Life
6 Without The Possibility of Parole..."

7    And that is the gist of Petitioner's Constitutional Due Process
8 Clause violations assertions, is it not? In Petitioner's 2005 Hearing
9 Habeas Corpus Petition in the U.S. District Court, Northern District
10 of California, Judge Illston rejected Respondents contentions that
11 Petitioner is not historically socially stable. She disagreed that
12 Petitioner needs more self-help therapy, or psychologic improvement,
13 or more insight; etc. What then, is left but the crime[s] where no
14 victim was physically harmed; and after 24 years imprison have been
15 honorablty served?

16    3.   What is left is the Board of PArole Hearing's unlaw-
17 ful trashing of the Bill of Rights and the Fourteenth Amendment,
18 U.S. Constitution, and the California Constitution's prohibitions
19 against Due Process violations? What is left is <u>de novo</u> review under
20 the "Some Evidence" Test Principle, where Petitioners have to prove
21 by 99½% of all doubt, that they are suitable for parole, instead of
22 the proper 51%-49% Preponderance of Evidence Standard on Habeas
23 Corpus and  Civil Law Suits. What is left is the impossibility of
24 prevailing before Board or Court: a rigged 'game'.

25    4.   After all is said and done; including that the District
26 Attorney's representative at the Hearing is <u>always</u>, in opposition to
27 parole; is that exemplary accomplishments and comportment in the State
28 prisons is irrelevant; unless one has a record of RVRs CDC-115s, those

will surely be held against the individual forever, and the B.P.H. will, in a violation of the <u>Double Jeopardy Clause</u> of the United States Constitution's Fifth Amendment, but require him to serve four more months than he was sentenced to at trial, and he can NEVER earn his lost good-time/work-time credits back again; as prisoners with determinate sentences can and do in most cases. Apart from that exception; any vocations, degrees, schools, self-help groups, letters of support from Staff, relatives or friends in the 'free-world', will never "outweigh the factors for unsuitability."

5.    The truth of the matter is, Petitioner is eminently qualified for parole suitability findings as of his last Hearing on July 13, 2007. He's been disciplinary-free since 1993. He has completed the vocations of Dental Prosthetics Lab Technician, OOCOBOL Computer Programming (4 year course; 12 months a year), Vocational Dry-Cleaning Course (2 year course), and he has as of this writing completed the Offset Printing Vocational Course (an 18 month course). Petitioner has been an active member of Narcotics Anonymous since 1995. He has completed 16 months of study of the Roman Catholic Catechism; is a Member of the Catholic Choir and participates in all Catholic services. Other self-help programs completed, include: two Veterans of Military Service Groups: served as Founding Chairman, Sergeant at Arms, and Commander of the Honor Guard for four years. He has completed "Cage Your Rage", "Framework For Recovery", Seven Habits of Highly Effective People", Life Without A Crutch"; and is an active Member of (BRAG); [Balanced Re-entry Activity Group]. His formal education includes a High School GED, and about 8 years of university undergraduate studies, in Geology (Major), World History,

6(w)

1.

2  (Second Major); Advanced High German (Minor); Special Education For
3  Children (Second Minor) and two years of Business College. But the
4  most important accomplishment for Petitioner is his refound Faith
5  in his God, in Whose hands he has put what is left of his Earthly
6  life.

7       6.  Petitioner, with the graceful assistance of his won-
8  derful wife, Brigitte, has a stable home waiting for him; and gain-
9  ful employment at her side: although job offers are NOT a require-
10 ment for parole suitability, but rather marketable job skills; See,
11 Title 15, Div. 2, § 2286). Additionally, Petitioner has the full
12 support of his two older, prosperous, accomplished brothers, and
13 his 22 year long friendship with Mr. Douglas Larson, of Modesto CA.
14 Petitioner has tried to make amends to society by donating small
15 donations to autistic childrens organisation; and he does pro bono
16 legal litigation for other prisoners when he can. He also serves as
17 Spanish Language Interpreter during Mass and Communion Serrices at
18 Chapel, working under Chaplain Christine McNamara, here at CTF II (C).
19 These are not boasts: Petitioner should have used his God given talents
20 before getting involved in crime; instead of participating in the
21 disgraceful conduct which has destroyed his and his family's lives,
22 and, of more importance, the damage he did psychologically, to his
23 victims. For that he is eternally sorry, and begs his God for for-
   giveness daily.

24      7.  After 24 years in prison, all the aforementioned, in
25 a non-homicide-non-physical injury commitment offense: Petitioner
26 finds it impossible to earn a parole suitability finding from 9 Panels,
27 and all the State and Fedral Courts he has petitioned, due he feels,
28 to the use of the "Some Evidence" test principle by the B.P.H & Courts.

6(x)

1  The point petitioner is advancing here is that the Federal

2  Authorities (The attorney General For The Central District

3  of Tennessee and the United States District Court For the

4  Central District of Tennessee, at Nashville, Tennessee), in

5  1979, prosecuted and convicted petitioner for the crimes

6  enumerated, as they occurred, they did not try to embellish

7  the offenses, or call them, or try them for what they were

8  not; i.e.; crimes of violence against persons; terrorist

9  acts, or what have you. But now, 29 years after the facts,

10  the cabal of commissioners in the BPH, perenially treat

11  petitioner like 'Lex Luther' in the Superman Comics series,

12  and will never allow him to go upon parole (actually, back

13  into Federal custody, to pay for his Federal Parole violation,

14  in the instant case.) There is no doubt in this petitioner's

15  mind, that these are abrogations of petitioner's rights against

16  Double Jeopardy (Vth. Amendment, U.S. Constitution,) and

17  his rights against Ex Post Facto applications of laws initiated

18  after his 1978-79 trial in another State and another Jurisdic-

19  tion. It is also Cruel and Unusual punishment pursuant to

20  the VIIIth. Amendment U.S. Constitution and the California

21  Constitution, Art. 1 § 9, to punish a prisoner for acts he

22  did not commit, or to make those acts more serious than

23  at the time he was convicted of them; (Please see, Collins v.

24  Youngblood, 497 U.S. 37, 43 (Citing , Calder v. Bull, 3

25  Dall, 391-392 (1798); Beazell v. Ohio, 269 U.S. 167, 169-

26  170 (1925).[Opinion of Chief Justice, Salmon Chase; citing,

27  Bull, supra.] There can be no doubt that the B.P.H. is bias-

28  ed against Petitioner, and all potential parolees and will,

1  "arbitrarily and capriciously", deny even the most deserving
2  prisoner a parole date. The "some evidence" standard has become
3  the 'new' wall to hurtle for all deserving prisoners.

### PROCEDURAL HISTORY

5  ___ The Original Abjudication.

6  A.  Petitioner was charged on March 19, 1984 in Information No.
7  A-088529 filed in Los Angeles County Superior Court with the Nov-
8  ember 26, 1983 robbery of Sandra Cullen and others at a place of
9  business, and with a second robbery on the same day of, Victor
10 Selton and Ms. Lynne Stalmaster. in addition to the robbery alle-
11 gations regarding Selton and Stalmaster, petitioner was charged
12 with a violation of Cal. Penal Code § 209(b); kidnap For robbery
13 [purposes], with respect to both victims, accompanied by a per-
14 sonal firearm use allegation pursuant to Penal Code (P.C., from
15 hereon) 12022.5. On November 7, 1984, petitioner pled guilty to
16 Counts 1-5, and had a court trial on the remaining counts, con-
17 testing only the sufficiency of the evidence of asportation to
18 establish an aggravated kidnap for the purposes of robbery. (See,
19 Daniels v. California, Supra).

20     On January 16, 1985, petitioner was sentenced to the upper
21 term of seven years for the robbery alleged in Count 1, plus two
22 years for the firearm use allegation. Counts 2 through 5 were
23 made concurrent to Count 1. Counts 7 and 8 were stayed pending
24 completion of the sentence in Count 1. Counts 7 and 8 were stayed
25 until completion of the sentencing in Count 9, for which petition-
26 er was sentenced to life in prison (simple life; the lowest life
27 term extant in California), plus the seven years on the P.C.§ 211
28 violations & the two years for the firearm use, consecutive to

1  Count 1. Count 10, the other kidnap for robbery because there were
2  two victims together, to run      concurrent with the sentence in
3  Count 9. All sentences were to be concurrent to any Federal Order
4  subsequently imposed pursuant to a parole revocation or other action.

5        The sentencing Judge further recommended that petitioner
6  be housed at a facility "where psychiatric and psychological treatment
7  is available in an effort to determine the cause of defendant's crim-
8  inal activity after leaving the military." (Clerk's Transcript, p.
9  190.

10        B.    Parole Proceedings.

11        Petitioner had his initial parole consideration hearing
12  on August 9, 1995, almost 12 years after the offenses, based on a
13  minimum eligible parole date of June 27, 1996. The Board of Parole
14  Hearings reviewed petitioner's CDC record as of then, and found he
15  had five disciplinary reports, including one for a "run-of-the-mill-
16  fight" in 1986, where petitioner was attacked and necessarily defended
17  himself, a possession of a hacksaw blade, but no others involving
18  any assaultive behavior, the last one,    being a positive urinalysis
19  in July 1993. Petitioner has now been disciplinary-free for 12 years
20  as of this writing. During his entire period of incarceration peti-
21  tioner has consistently recieved commendations as an "excellent work-
22  er" and has also been attending drug rehabilitation programs such as
23  Narcotics Anonymous where he served as 'President' until he was tran-
24  ferred to the instant institution. He still attends regular meetings
25  of N.A. He also completed numerous other self-help programs in every
26  institution he has been housed. Petitioner described his wife of
27  many years and her continuing support even up to the present day,
28  as well as her steady job with an International insurance conglomer-

1  ate.

2         Petitioner described his enlistment in the U.S.
3  Army, his service in the 101st & 82nd Airborne Divisions,
4  his service in Vietnam for which he was decorated, and his
5  subsequent rise to the rank of Captain. Petitioner acknow-
6  ledged getting involved in criminal conduct after he dis-
7  charged honorably from the military to attend college and
8  work. (Trans., p. 86.) The Panel declined to find him suit-
9  able and recommeded that during the ensuing two years, he
10 remain disciplinary-free, upgrade vocationally, and partici-
11 pate in self-help programs. (Trans. @ pp. 93-94.) The next
12 parole suitability hearing was held on October 16, 1997; Af-
13 ter nearly 14 years of incarceration; two months delayed. Pe-
14 titioner has now attended one initial hearing, and five sub-
15 sequent hearings. He has been delayed or postponed a total
16 of 32 months. During that time he has remained disciplinary-
17 free, and has completed innumerable self-help therapy pro-
18 grams and two vocational programs: Computer Programming (4
19 years); and Vocational Dry-Cleaning (2 Years). Additionally,
20 petitioner is qualified, if not certified, dental prosthe-
21 tics technician. Petitioner has always made a very positive
22 presentation under each of the eight factors enumerated as
23 favoring parole suitability in 15 C.C.R. § 2402 [a fact that
24 was used against him on his last hearing when the D.A.'s
25 representative stated: "Well, quite a polished presentation,
26 a little too polished in my opinion..."] Damned if if I do,
27 damned if I don't! Petitioner helps illiterate inmates on
28 their appeals, at times. One such friend had his hearing de-

6(ab)

1  layed because he had      an outdated although favorable

2  Psych Report in his file. After the six month delay, his

3  meeting was postponed again because the 'new' Psych Report

4  was "too favorable", and the Panel did not believe it!!]

5  (Please see, Transcript April 7, 2005 Suitability Hearing,

6  p. 58.) Also, there was no evidence of any of the six

7  enumerated circumstances that demonstrate unsuitability.

8  Now, 2½ years have passed since petitioner was placed

9  in County Jail then transferred to California from Tennes-

10 see, where he was on Federal Parole. His so-called life

11 sentence began in 1989 after the completion of the determi-

12 nate portion of his term (9 years). Petitioner is now

13 on his 19th year of that term for crimes which involved

14 no physical injury to anyone.

15 The factors favoring suitability were as follows:

16          1.    Absence of a juvenile record.

17          In spite of a difficult childhood, in

18 which his father died during the year of his birth, and

19 his mother died when he was eight years old, Petitioner

20 had no juvenile record whatsoever, much less one involving

21 any force or violence.

22          2.    Stable social history.

23          Petitioner demonstrated his capacity

24 for stable living by (a) an exemplary military career

25 from his enlistment in 1962 through two years of duty

26 in combat zones as a U.S. Paratrooper; the Dominican Repub-

27 lic with the 82nd. Airborne Division; and the Republic

28 of Vietnam with the 101st Airborne Division (Airmobile);

6(ac)

1   numerous commendations and decorations, rising  in rank to
2   Captain, having responsibility for 'numerous' "special" weapons,
3   and for live firing Persian Missiles at Cape Canaveral, and
4   as a "special" weapons Custodial Officer assigned to a German
5   Luftwaffe Rocket Firing Battalion (Nike-Hercules) in North-
6   Germany; and as the Artillery Liaisson Officer from the 101st
7   Airborne Division to XIIIth Airborne Corps maneuver headquarters
8   in CONUS, until his Honorable discharge from active duty as
9   a result of the reduction in force required after the end of
10  the Vietnam War in 1975, and 1977 from the reserves; and his
11  now 2 6 year marriage to his wife Brigitte Gutierrez, who has
12  in addition to her demonstrated faithfulness and loyalty to
13  this unworthy petitioner, has also maintained stable employment
14  through all those long years, and has provided constant and
15  loving support throughout petitioner's interminable incarcera-
16  tion.

17              3.    Indicia of remorse.

18              Petitioner has consistently demonstrated
19  remorse for his lapse into criminality from the time of his
20  guilty plea, through sentencing--"During the commission of
21  these robberies, even though I was intoxicated, I experienced
22  remorse, shame, and I was conscious..." (Reporter's Transcripts,
23  p. 173.) Petitioner's second Psychological Evaluation, in the
24  following terms:

25              "This 52 year-old inmate with a significant history
                of violent behaviors appears to have gained a reasonable
26              degree of insight into the nature of his past behav-
                iors and expresses what appears to be genuine remorse
27              for the consequences of his criminal behavior. "
                (Birnbaum Report.)
28

                              6(ad)

1  In the psych report from just prior to the April 7, 2005, hear-

2  ing, the psychologist   has evolved   substantially even   more

3  in favor of petitioner: [See Psych. Eval. attchd. as Exh. D.]

4        "In the "clinical" or more current and dynamic domain
      of risk assessment, the inmate did not present as glib

5        or superficial, and offered no other excuses or blame
      for his behaviors except for his own choices in life

6        (including to use substances), and as related to the
      offense. From a review of his records and given the results

7        of the interview for this evaluation, the inmate did not
      show signs of grandiosity, a need for stimulation, path-

8        ological lying, manipulativeness, a lack of remorse/guilt,
      shallow affect, callousness, a parasitic lifestyle, poor

9        behavioral controls, promiscuity, early behavior problems,
      a lack of long-term plans, irresponsibility, inability

10        to accept responsibility for own actions, and juvenile
      delinquency. He has no significant attitudinal difficul-

11        ties, has no major mental illness, and is emotionally
      and behaviorally stable. As noted in particular by Dr.

12        Stack, he has exhibited signs of significant insight
      into the index offenses. In this domain, the inmate

13        presents a low risk of future violence."

14      4.    Motivation for crime.

15         Petitioner recognizes his substantial diffi-

16  culties adjusting from military life to civilian life after

17  his Honorable Discharge in 1975: experienced great stress, and

18  did lapse into primarily economic criminality. The robberies  of

19  November 1983 were motivated by accumulated stress and a partic-

20  ular stressor in the form of a promising job opportunity in

21  California turning out to be a hoax.

22      5.    The absence of violent criminal history.

23         Petitioner's prior offenses--check forgery,

24  and insurance fraud--were economic crimes, although he did

25  possess explosives at one point, and perpetrated minor property

26  damage in the course of doing these crimes. However, the bottom

27  line is that Petitioner never physically injured anyone during

28  any criminal conduct; priors or commitment offenses; and instead

1   was denied for an additional year.

2        Petitioner's next hearing was held on January 10, 2002:

3   (six months after the 'scheduled' year). The evidence of insti-

4   tutional adjustment during this $1\frac{1}{2}$ year period was that of

5   a model prisoner. (See, Trans. of BPT Hearing 1/10/02.) At

6   the time of petitioner's 2002 hearing he had served 18 full

7   years in custody. He had not suffered a disciplinary violation

8   in 9 years. He had completed and been issued a completion certi-

9   ficate for his four year COBOL/OOCOBOL Language Programming

10  Course in Information Technology. He was well on his way to

11  completing a three (3) year dry-cleaning course in 18 months:

12  which he did in fact, graduate from, and for which he was award-

13  ed a Certificate of Completion in May 2002. As for self-help
14  programs, petitioner had been elected Chairman of the M.C.S.P.

15  Veterans of the Armed Forces Group. Petitioner also continued

16  his studies in the catacysm of the Catholic Church, and faith-

17  fully attended Mass. Nonetheless, petitioner was denied review

18  for an additional year based solely on the Panel's opinion

19  and eveluation of the commitment offense only, because petition-

20  er's parole plans were as solid on that hearing as they were

21  for his first , second , and now third hearings.

22       The next hearing was held on 25 September, 2003, nearly

23  8 full months from his one year denial date on the previous

24  hearing. Petitioner's institutional conduct and behavior during

25  this critical period was exemplary and entirely without blemish.

26  (See Exhibit A transcript of 9/25/03 BPT Hearing, pp. 35-36.)

27  Petitioner was disciplinary-free with positive work reports,

28  positive vocational accomplishments, laudatory chronos for

6(af)

1 participation in Narcotics Anonymous, and for saving a man's

2 life in an attempted suicide. (Trans. P. 45.) Also, petition-

3 er is a devout Christian and tries never to miss Mass. At

4 the time of petitioner's 2003 hearing he had served $19\frac{1}{2}$

5 full years in custody. He had not suffered a disciplinary

6 violation in 11 years, had completed the course and been

7 issued a Completion Certificate for Vocational Dry-Cleaning

8 to go with his COBOL/OOCOBOL Programming Computer Technology

9 Certificate. Petitioner was denied review for an additional

10 year (which turned into a predictable 19 month interlude

11 postponement) based solely on Commissioner Moore's opinion

12 and evaluation of the commitment offense[s] only, [except

13 he used 'new' descriptive language never before used in

14 petitioner's hearings , i.e.; "vicious and brutal"], because

15 petitioner's parole plans were as solid, if not more so,

16 than they were in his previous hearings. (See, Sept. 23,

17 2003 Trans. pp. 56-57.)

18 The next 'Subsequent Parole Suitability" "sham and

19 Farce" hearing was held on April 7, 2005, seven (7) months

20 from his one (1) year denial date on the previous hearing.

21 Petitioner's institutional behavior was exemplary, as usual,

22 and entirely without blemish. (See, Trans., 4/7/05 BPT Hear.,

23 attchd. herein as Exh. A.) Petitioner was disciplinary-free,

24 with positive work reports. He continues to attend church

25 regularly; is the lead vocalist in the church choir; is

26 the Sergeant at Arms in the Veterans Group of CTF; and

27 has been a Teacher's Assistant in Education more than two

28 years. At the time of petitioner's 2005 hearing, he had

6(ag)

1   served more than 21 full years of incarceration, including

2   County Jail time. He had not suffered a disciplinary infraction

3   in 12 full years. Petitioner was predictably denied review

4   for an additional 'pseudo' year based solely on the commitment

5   offense[s] alone; again. Again, in this hearing, 'new' descript-

6   ive language never before used in his hearings, was assigned

7   to his crimes, whose facts, on the other hand, never change:

8   e.g.; "DEPUTY COMMISSIONER HARMON: "...I'm trying to get a better under-

9   standing of your history, you know, the best way to describe you according

10   to the documents here if I could put or coin a word it would be thug, am

11   I right?" Now, at first impression, that is not an overly insul-

12   tive comment, but petitioner looked up the word in the New

13   College Dictionary, later on: and although petitioner has never

14   been accused of, suspected of, or formally or informally, for

15   that matter ever been accused of murder, that is precisely

16   what the word "thug" means. (Trans., 4/7/05): THUG: "1.a cruel or

17   vicious ruffian, robber or murderer. 2. one of a former group of profes-

18   fessional robbers and murderers in India." For some reason, the Com-

19   missioner felt compelled to 'demonize' petitioner. Why? Because

20   he realized that petitioner's crime[s] of commitment do not

21   rise to the penalties he is being subjected to? That is ex

22   post facto violative unlaw: Please see, Bouie v Columbia,

23   378 US 347, 12 L.Ed.2d 894, ,84 S.Ct. 1697 (1964):

24              p. 895; 4. "An unforseeable judicial enlargement of a
criminal statute, applied retroactively, operates precisely

25              like an ex post facto law, such as Article 1 § 10 of the
U.S. Constitution forbids; the principle that the requisite

26              criminal law must have existed when the conduct in issue
occurred applies to bar retroactive criminal prohibition

27              emanating from courts as well as from legislatures."
(Calder v. Bull, 3 Dall 386, 1 L.ed. 648, 650.) (Emph. Added.)

28

1    And in case the reader should believe that indirect accusat-

2    ion was inadvertent; not so! Commissioner Harmon, also asked

3    Petitioner questions which have never been in the record,

4    that he has never been formally charged, accused or suspected

5    of (until these commissioners have violated Federal law and

6    recharacterized Petitioner's commitment offense, his priors

7    and the fantastical illusionary ones.) i.e.;

8         COMMISSIONER HARMON: "What is your relationship
          with organized crime in your history?" (Trans.
9         6th. Sub. Hear., p. 51.)

10   ...and...

11        DEPUTY COMMISSIONER HARMON:  "Did you ever
          shoot anybody in Texas?"..."Never shot anyone
12        over a bad drug deal."

13   Again: Petitioner has never been approached, questioned,

14   suspected or accused in any indictment or information of

15   any homicide or attempted homicide in his life.

16        The next, sub rosa, 'Subsequent Parole Suitability

17   Hearing' was held on August 30, 2006, (4) months past his

18   due date from his last one (1 Year) denial on the 2005

19   Hearing. Petitioner's institu-tional behavior continued

20   clean. (See Sub. Hear. Trans., pp. 62-63, attchd. herein

21   as Exhibit A.) Petitioner is disciplinary-free with all

22   positive work and or self-help Group reports. He remains

23   a steadfast member of the Roman Catholic Church Community.

24   He was Commander of the Veterans Group Honor Guard, and

25   is the lead vocalist in the Church Choir. Additionally,

26   he is currently completing another vocational trade in

27   the Print Shop. Of course, Petitioner's still also attends

28   Narcotics Anonymous  meetings.

6(ai)

1    the nature of the crime, the fact that the crime[s] was committed,

2    over (24) years ago, and his subsequent institutional adjust-

3    ment demonstrates he does not qualify for <u>any</u> of the enumerated

4    unsuitability findings.

5         Regarding the "circumstances tending to show suitability,"

6    Petitioner qualifies on many of these.

7         1.    No juvenile record.  <u>"The prisoner does not have a</u>

8    <u>record of assaulting others as a juvenile or commiting crimes</u>

9    <u>with a potential of personal harm to victims."</u>

10        Petitioner has no juvenile record whatsoever, and thus doub-

11   ly qualifies for a pro-suitability finding.    The "some evidence

12   standard" is non-existent here.

13        2.    Stable social history. <u>"The prisoner has experienced</u>

14   <u>reasonably stable relationships with others."</u>

15        This is the mirror image of unsuitability factor 3, and

16   Petitioner's 24-year marriage, coupled with his continuing close

17   and supportive relations wih his siblings and children, demonstrates

18   his stable social history.

19        3.    Signs of Remorse. <u>"The prisoner performed acts which</u>

20   <u>tend to indicate the presence of remorse, such as attempting to repair the</u>

21   <u>damage, seeking help for or relieving suffering of the victim, or</u>

22   <u>indicating that he understands the nature and magnitude of the</u>

23   <u>offense."</u>

24        In the nature of the offense, in which Petitioner robbed

25   the victims and left them without injuring them in any manner,

26   the first two aspects of this factor do not apply. Regarding the

27   last, Petitioner has repeatedly and sincerely expressed remorse

28   for his actions and understanding of the magnitude of his crimes,

1   particularly according to the mental health professionals who have

2   examined him and submitted reports to the Board.

3       4.   Motivation for crime. "The prisoner committed his

4   crime as a result of significant stress in his life, especially

5   if the stress has built up over a long period of time."

6       Petitioner spent 13 years active duty, and two years reserves,

7   in a distinguished military career, from which he received an

8   honorable discharge at the age of 33. It was after his discharge,

9   and after he enrolled and studied for several years in university

10   that he succumbed to the stress addressed _infra._ Petitioner exper-

11   ienced difficulty adjusting to civilian life, evidently. He lapsed

12   into drug use and the lure of easy money through theft and relat-

13   ed criminality. The motive for these crimes was money. However,

14   this factor was to be used against him, if at all, by the BPT,

15   initially, and not each and every subsequent time Petitioner ap-

16   pears before the Board, forever. Petitioner acknowledges that

17   it is debatable whether this factor  weighs affirmatively as a

18   factor for suitability, as it appears more related to externally-

19   imposed stress, rather than the personal difficulties and problems

20   Petitioner experienced following his separation from the military.

21       5.   Battered woman's syndrome. [Not applicable]

22       6.   Lack of criminal history. "The prisoner lacks any

23   significant history of violent crime."

24       This factor is the mirror image of suitability factor 2,

25   and Petitioner qualifies here. The prior crimes for which he was

26   convicted involved theft and other acts to obtain money, none of

27   which involved the infliction of injuries on other individuals.

28   The most violent _sounding_ crimes, circa 1978, involved the pos-

1    flict unusual pain or fear upon the victim."

2        Totally inapplicable.

3        5.  Psychological factors.  "The prisoner has a len-

4    gthy history of severe mental problems related to the offense."

5        Petitioner has no history of mental illness related to the

6    offense, although he does acknowledge lapsing into drug use at

7    the relevant time. Petitioner's current psychological evaluation

8    refutes the current or past existence of any such severe mental

9    problems.

10        6.  Institutional behavior.  "The prisoner has engaged

11    in serious misconduct in prison or jail.

12        Petitioner has been disciplinary free for at least 15

13    years in prison, a major feat considering the great difficulty of

14    minding one's own business in the face of assaultive inmates and

15    the other inherent difficulties of prison life. Moreover, the

16    earlier disciplinary reports were not for any major infractions

17    such as gang warfare or assaultive conduct toward a guard, but

18    rather included one fistfight with an inmate in Petitioner's

19    overall successful attempt to _avoid_ gang involvement, and one

20    instance of a positive urinalysis indicating drug use, which

21    petitioner regrets and which he has repudiated: he has been clean

22    and sober from that day forth. Conspiciously absent is any sug-

23    gestion of gang activities, and this Court must recognize how

24    difficult it is for a California inmate, particularly one of

25    Hispanic ancestry, to avoid conscription into one of the cons-

26    tantly warring prison gangs and factions.

27        Thus, there are _no_ factors of unsuitability to weigh on

28    the scale. As to the priors in the record, Petitioner asserts pos-

6(a1)

1   session of explosives and arson, which Petitioner explained and
2   the records corroborated as involving property damage only, e.g.,
3   with respect to the arson in 1978, Petitioner agreed to burn an
4   isolated commercial building on behalf of the building owner, in
5   order for him to collect insurance money. He paid Petititoner
6   out of pocket the day after the fire. Obviously, care was taken
7   to insure that no persons were present or threatened when the
8   arson took place. Also, this is a prior convicted offense which
9   was extensively examined on Petitioner's Initial Suitability
10  Hearing, and on each Subsequent Hearing since, in contravention
11  of the Board's rules and regulations. (Please see, McQuillon,
12  supra, & Biggs, supra; further defined in the case of Masoner v.
13  State, Case No. CV 03-1261-ER, United States District Court,
14  Central District of California; page -2- "[4] Although the gravity
15  of the commitment offense and other preconviction factors alone may be suffi-
16  cient to justify the denial of a parole date at a prisoner's initial hearing,
17  subsequent BPT decisions to deny a parole date must be supported by some
18  post-conviction evidence that the release of the inmate is against the inter-
19  est of public safety."

20       7.    Age. "The prisoner's present age reduces the prob-
21  ability of recidivism."

22       Petitioner is now all of 63 years of age, and it is well-
23  recognized in criminological reality that apart from personal
24  understanding, remorse, and other internal factors, the mere
25  fact of age reduces the likelihood of criminality. Petitioner is
26  now a middle-aged man who realizes that he has one last chance
27  for a productive life in society, which reduces his likelihood of
28  recidivism to zero.

1           8.  .  Institutional behavior.

2        Not that it matters to the B.P.H. Commissioners: who
3  only use/institutional behavior to aggravate further, a prisoner's
4  term in the State's prisons; but this Petitioner has been disci-
5  plinary-free, since 1993; he has completed saturation-level
6  educational, vocational self-help, and spiritual courses and
7  classes. Petitioner has a viable, strong parole plan, no matter
8  where he is released on  parole· were that ineventuality were to
9  ever occur. Petitioner has demonstrated familial and friends
10 support in the community. He has. a home established and waiting.
11 He has abandoned the use or abuse of all alcoholic or narcotics
12 substances, long since. He has demonstrated by actions, thoughts
13 and deeds, his remorse and compassion for his former victims.
14 This Petitioner has shown beyond any doubt that he is suitable
15 for parole. It only lies to the  B.P.H., to be compelled to grant
16 him    his parole; or that is, make him available to the Federal
17 authorities, pay whatever debt is levied on him there, for his
18 parole violation , of 25 years ago; Conspicuously absent is any
19 suggestion of gang activities (of which the B.P.H. has taken, of
20 late, to asking him wnether he still has ties to organized crime).
21 And this Court must recognize how difficult it is for an inmate
22 in California prisons;  particularly one of Hispanic ancestry,
23 to avoid conscription; which to be honest, was not overly hard
24 for this Petitioner, since he has always been dynamic and independ
25 ant: never a follower, as far as anti-social activities are con-
26 cerned. That, is the main reason Petitioner never became enmeshed
27 in delinquency or gangs while a teenager; He has always followed
28 his own mind._ But the pressure was always there: until old age set in.

1    Thus, there are no factors of unsuitability to weigh on
2  the scale. The Petitioner was indeed convicted of the crimes, but
3  the non-homicidal nature of the offenses: in fact, the non-physi-
4  cal violent nature of his 'property offenses', and the fact that
5  these violations were committed 24 years ago, and his subsequent
6  institutional adjustment demonstrates he does not qualify for any
7  of the enumerated unsuitability findings.

8    But the revealing and most important 'thing' Petitioner has
9  presented and proved in this habeas corpus petition, is that more
10 than suitability or unsuitability factors in this Petitioner's case,
11 the violative, vindictive, felonious activities of the Cabal of
12 Commissioners on the Board of Parole Hearings, are the real reason
13 Petitioner nor the vast majority of his parole eligible peers, and
14 contemporaries presently serving, effectively, Life in Prison With-
15 out the Possibility of Parole, interminable sentences are found
16 'suitable' for parole.

17                    CONCLUSION

18    Petitioner satisfies the "some evidence standard" of proof
19 used by the Boards contemporaneously; See, Superintendant v. Hill,
20  472 U.S. @ 455; if it is utilized as interpreted  by the Judiciary,
21  and not in an "arbitrary and capricious" manner. Of the eight ap-
22  plicable suitability factors, all weigh strongly in favor of a find-
23  ing of suitability. The offense itself is 24 years old and paid in
24  full. Robbery kidnap without bodily harm is not a LWOP offense. As
25  wrong as Petitioner's actions were, they were motivated by strong
26  protective instinct towards his wife, from an attack by Mr. Zubovitch
27  and his henchmen. Twenty-five  years is enough. All of that occurred
28  in 1983. There is just not "some evidence" in this record that

1  Petitioner should'ntbereleased on parole forthwith. In the alterna-
2  tive, Petitioner requests, this Court should define and clarify
3  emphatically, the meaning and usage of the "some evidence" standard
4  for parole suitability findings by the B.P.H., and if the Board
5  continues to ignore the REAL law of the State of California and
6  the United States, cause an investigation and ultimately the
7  disbandment of the Board of Parole Hearings in this State, similar
8  to the Moratorium on the Death Penalty activated in several States
9  throughout the Union, to prevent the execution of actually innocent
10  condemned men, because to change a person's sentence from a term
11  where she/he can hope, pray and WORK to earn a parole, to one
12  where no matter what a prisoner does he can never satisfy the
13  illusionary goals invented by the Cabal; of Commissioners on
14  their Holy Quest for vengeance and Closure on behalf of victims'
15  rights groups and other ultra-conservative bodies in state govern-
16  ment who have decided that impartiality, equality, democratic
17  government, and Legal Justice, do not apply to any indeterminate
18  sentenced prisoner in the CDCR£ the days of 'Legalized Lynchings'
19  must come to an end; finally.

20  DATED: August    , 2008          Respectfully submitted,

21

22                                   JOSEPH P. GUTIERREZ,
                                     Petitioner, In Pro Per
23                                   In Forma Pauperis

24

25

26

27

28                        6(ap)

WHEREFORE: because Petitioner's due process clause rights have been violated by the Board Of Parole Hearings in that the B.P.H. not only violates its own Rules & Guidelines, which it promulgates unilaterrally but then misinterprets these rules at will in order to deny as many Prisoners parole suitability dates as humanly possible. That the Board's 'interpretation' of Title 15, Div. 2, § 2402's 'Information To Be Considered' is illegal and unlawful. That the District Court visit the Holding in the case of In re Powell, supra, and change the "Some Evidence" Test Principle back to the proper "Preponderance of Evidence" Standard of PROOF: NOT TEST: as the constitutionally acceptable standard on de novo review of habeas corpus actions in this State.

Finally, Petitioner prays this Court grant the Petition For a Writ of Habeas Corpus, and Order a New Hearing Before the B.P.H. decided under the "Preponderance of Evidence" Standard of Proof, as mandated by Title 15, Div. 2, § 2000(50); and verified by former Chairman of the B.P.T., Mr. Albert Leddy, in Declaration (see, Exh. B.)

DATED: August 5, 2008                    Respectfully submitted,


                                         JOSEPH P. GUTIERREZ, Petitioner,
                                         In Propria Personam
                                         In Forma Pauperis

1
2
3
4
5
6
7
8
9
10
11
12

THE PROOF IS IRREFUTABLE EVEN TO THE COURT, NOW, THAT
THE BOARD OF PAROLE HEARINGS IS ENGAGED IN A POLICY OF
NO PAROLE, AS MUCH AS POSSIBLE. EITHER THEIR ACTIONS
ARE PURPOSEFULLY UNLAWFUL AND MALICIOUS, OR THE BOARD
COMMISSIONERS ARE WOEFULLY INEPT IN THEIR KNOWLEDGE OF
THE LAW AND DUE PROCESS, AND THEREFORE ARE IN DIRE
NEED OF CORRECTIVE SCHOOLING, SUPERVISION AND OVER-
SIGHT IN THE PERFORMANCE OF THEIR CRITICALLY IMPORTANT
DUTIES AS BOARD COMMISSIONERS, IN ORDER TO STAY WITH-
IN THE LAWS OF STATE AND NATION, AND THE PARAMETERS
OF THE XIVTH. AMENDMENT TO THE UNITED STATES CONSTITUTION.

13  I.       As will be seen in the following quotations from the cited
14  case, many jurists are now convinced beyond any doubt that something is
15  seriously wrong with the manner in which the B.P.H. conducts its duty
16  to the citizens of the State of California under the auspices of
17  the Governor who selects them for this work, and the Executive Branch
18  of State Government of which they are members.

19          A.      Petitioner is personally of the opinion that the actions
20  of the B.P.H. are far from innocently ignorrant and arbitrary, but
21  rather, that they are planned, purposeful covert actions designed to
22  cripple and subvert the constitutions of State and Nation by insuring
23  life term prisoners in the C.D.C.R. are never paroled. Additionally,
24  many courts are sympathetic with that objective and consciously coop-
25  erate with the Executive Branch to water down the Petition For Writ
26  of Habeas Corpus so that it becomes a useless instrument in these mat-
27  ters. Some Jurists give the B.P.H. the benefit of the doubt, and the
28  following case Holding is a perfect example, to wit:

6(ar)

1  Please see, In re Jamieson Case No: 71194, Superior Court County of

2  Santa Clara (Aug 30, 2007), pp. 26-

### CONCLUSION

4  ..........."The conclusive nature of the proof in this case,

5  and the suggestion of institutional bias do not pre-

6  clude formulation of an remedy which will guarantee

7  adequate restrictions on, and guidance for, the Board's

exercise of discretion in making parole suitability

8  determinations. The Board can be made to lawfully perform its du-

9  ties if given explicit instructions.

As noted supra, a reason the proof in this case irrefutably

10  establishes constitutional violations is because the Board does

11  not, in actual fact, operating within the limiting construction

12  of the regulations. The Board's expansive interpretation allows

allows it to operate without any true standards. Although numerous

13  rulings of both state and federal courts of appeal have invalidated

14  the Board's application of the §2402(c) criteria to particular

15  facts, the Board does not take guidance from these binding prece-

dents and ignores them for all other purposes. In the most recent

16  of these cases, In re Roderick, (2007) ___ Cal. App. 4th ___

17  (A 113370) the First District held four of five §2402 factors

18  "found" by the Board to be unsupported by any evidence. At footnote

19  14 the court took the time to criticize the Board for its repeated

use of a "stock phrase" "generically across the state." The Court

20  also clarified that "at minimum," the Board is responsible for ar-

21  ticulating the grounds for its findings and for citing to evidence

22  supporting these grounds.

There is nothing in the evidence presented that would allow

23  any conclusion but that, without intervention of the Courts, the

24  Board will ignore the lessons of these rulings in the future and

25  continue to employ its formalaic approach of citing a criteria from

26  §2402(c)(1), repeating the facts of the crime, but never demon-

strating a logical connection between the two. This is the core

27  problem with the Board's methodology --- they provide no explanation

28  or rationale for the findings regarding the crime itself. This

"practise results in violence to the requirements of due process
and individualized consideration which are paramount to the appro-
priate exercise of its broad discretion.

The only solution is one that compels the Board to identify
the logical connection between the facts upon which it relies and
the specific criteria found to apply in the individual case. For
example, the Board often finds thaty an inmate's motive is "triv-
ial" without ever suggesting why, on these facts, that motive is
not just as trivial as the motive behind any other murder. What
motive is not trivial? By any definition, "trivial" is a word of
comparison and only has meaning when there can be examples that
are not "trivial."

Similarly, although the Sixth District made it plain four years
ago that "all [] murders by definition involve some callousness,"
(In re Smith (2003) 114 Cal.App.4th 343, 345,) the Board has con-
tinued to deny countless paroles labeling the crime "callous" with-
out ever suggesting what crime would not qualify as "callous" and
without consistently explaining why the individual case before it
demonstrates "exceptional" callousness.

Respondent has consistently refused to suggest what possible
instances of murder would not fit the Board's amorphous applica-
tion of the §2402 criteria. Citing Dannenberg, Respondent insists
such comparative analysis is unnecessary. Respondent fundamentally
misunderstands the Dannenberg holding.

The PC § 3041(b) exception to the rule can only be invoked
when the "gravity of the current convicted offense or offenses,
is such that the consideration of the public safety requires a
more lengthy period of incarceration for this individual." The
word "gravity" is a directive for comparison just as "more lengthy"
indicates a deviation from the norm. While Dannenberg held there
does not need to be intra case comparison for the purposes of term
uniformity or proportionality, there necessarily has to be some
sort of comparison for the purposes of adhering to the legislative
mandate that parole is available. This is implicit in §2402 be-
cause the qualifier "especially" in "especially heinous or atrocious
or cruel," requires that some form of comparison be made. While
the original drafters of § 2402 seemed to have recognized this fact,

"the on-going conduct of the Board has completely ignored it, and this is the essence of the due process violations Petitioners have asserted.

As noted in his dissent in the recent case of In re Roderick, supra, Justice Sepulveda would have deferred to the Board's 'exercise' of discretion because "Board members have both training and vast experience in this field. They conduct literally thousands of parole suitability hearings each year. The Board therefore has the opportunity to evaluate the egregiousness of the facts of a great number of commitment offenses. ... The Board's training and experience in evaluating these circumstances far exceeds that of most, if not all, judges," The evidence in this case, however, suggests a flaw in granting such deference. Since the Board continues to place every murder in the category of offenses "tending to show unsuitability," something is certainly wrong. Since the Board's vast experience is undeniable, the problem must be in the Board's training and understanding of the distinguishable features of guidelines and criteria. Although Justice Sepulveda presumes the Board members receive substantive training, there is no evidence before this Court to suggest that it does, and substantial circumstantial evidence that it does not.

In the vast numbers of Santa Clara County cases reviewed by this Court, the Board's formulaic decisions regarding the commitment offense do not contain any explanation or thoughtful reasoning. Instead, the Board's conclusionary invocation of words from §2402(c) (1) is linked to a repetition of the facts from the Board report by the stock phrase; "These conclusions are drawn freom the statement of facts wherein ..." Thereafter the inmate files a habeas corpus petition and Respondent, after requesting an extension of time, files a boilerplate reply asserting the Board's power is "great" and "almost unlimited" and and thus any "modicum" of evidence suffices. Respondent does not cite or distinguish the expanding body of case law that is often directly on point as to specific findings made. Thereafter, if the writ is granted, the Board is directed to conduct a new hearing "in compliance with due process" and that order

6(au)

.PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (Cont.):

1   "is appealed by Respondent. On appeal the order is
2   usually upheld with modifications and in the end,
3   after countless hours of attorney and Judicial time,
    the Board conducts a new two hour hearing at which their dis-
4   cretion and violate due process in some different way.

5      This system is malfunctioning: and must be repaired. The
    solution must begin with the sourse of the problem. The Board
6   must make efforts to comply with due process in the first ins-
7   tance. The case law published over the last five years provides
8   ample and sufficient guidelines and must be followed. Although
    the Board methods suggest it believes this to be optional, it
9   is not...."

10                          REMEDY

11     "Thus, it is the Order of this Court that the Board develop,
12  submit for approval, and then institute a training policy for
13  its members based on the current and expanding body of published
    state, and federal case law reviewing parole suitability deci-
14  sions, and specifically the application of §2402 criteria. In
15  addition to developing guidelines and further criteria for the
16  substantive application of §2402 the Board must develop rules,
    policies and procedures to ensure that the substantive guide-
17  lines are followed.

18     This Court finds its authority to impose this remedy to
19  flow from the fundamental principles of judicial review an-
    nounced over two centuries ago in Madison v. Marbury, (1803)
20  5 U.S. (1 Cranch) 137. Citing that landmark case, the Califor-
21  nia Supreme Court has recognized "Under time-honored princi-
22  ples of the common law, these incidents of the parole applica-
    nt's right to 'due consideration' cannot exist in any practi-
23  cal sence unless there also exists a remedy against abrogation."
24  (In re Sturm, 11 Cal. 3d 258, 268.)

25     In Sturm, the Court directed that the Board modify its
    rules and procedures so that thereafter "The Authority will
26  be required [,] commencing with the finality of this Opinion
27  to support all its denials of parole with a written, definitive
28  statement of its reasons therefor and to communicate such

                          6(av)

1    "(1) such a broadly all encompassing and universal application)
2    is that they have unwittingly invalidated the basis of the
     California Supreme Court's holding in Dannenberg. The reason
3    the four Justice majority in Dannenberg upheld the Board's
4    standard operating procedures in the face of the Court of Appeal
5    and dissent position is because 'the Board must apply detailed
     standards when evaluating whether an individual inmate is un-
6    suitable for parole on public safety grounds " (Dannenberg, at
7    p. 1096, footnote 16. See also page 1080: "the regulations do
     set detailed standards and criteria for determining whether a
8    murderer with an indeterminate life sentence is suitable for
9    parole.") However, Petitioners in these cases have proven that
10   there are no "detailed standards" at all. Instead the Board has
     systematically reduced the "detailed standards" to empty words.
11   The remedy this Court orders, that there truly be "detailed
12   -standards," requires the promulgation of further rules and
13   procedures to constrain and guide the Board's power's.
     This remedy differs in specifics, but not in kind, from what
14   courts have previously imposed and have always had the power
15   to impose.

16        The Board must fashion a training program and further rules,
     standards and regulations based on the opinions and decisions
17   of the state and federal court cases which provide a limiting
18   construction to the criteria which are applied.[8] The
     Board must also make provisions for the continuing
19   education of                                         its comm-
20   issioners as new case law is published and becomes
     binding authority. This Court will not at this point,
21   outline the requirements and lessons to be taken
22   from the above cases. It is the Board's duty, in
     the first instance to undertake this task. The train-
23   ing program, and associated rules and regulations,

24   ----------------------------
     [8]While the showing and analysis in this case was limited to §2402(c)(1), the
25   conclusions that the evidence compelled, that the Board has been carelessly
     distorting and misapplying the regulations, is not so limited. Accordingly,
26   the training program that is necessary for the Board can not reasonable be
     limited to just § 2402(c)(1). Thus, to the extent case law recognizes, cla-
27   rifies and establishes remedies for other due process violations they must
     also be incorporated into necessary rules and training the Board is required
28   to abide by.

                              6(aw)

1    "statement to the inmate concerned." (Sturm, at 273.)"

2        Similarly, in the case of Minnis, supra, the California
3    Supreme Court held the Board's policy of categorically denying
     parole to drug dealers was illegal. Based on its analysis the
4    Court there was clearly prepared to order that Board to modify
5    its rules and procedures however such was unnecessary because
6    the Board "voluntarily rescinded" the illegal policy. While
     the remedy in this case is of greater scope than that necessary
7    in either Sturm or Minnis, supra, so too has been the showing
8    of a systematic abuse of discretion and distortion of process.

9        The most recent case to address the Court's roles and
     duties in overseeing the parole suitability process has been
10   in In re Rosenkrantz, supra, 29 Cal.4th 616. In that case the
11   court explained that judicial review of a Governor's parole
     determination comports with, and indeed further, separation of
12   Powers principles because the courts are not exercising "com-
13   plete power" over the Executive branch and do not "defeat or
14   materially impair" the appropriate exercise or scope or execu-
     tive duties. (Rosenkrantz, at p. 662.) Citing Sturm, supra,
15   the Court reaffirmed that a life term inmate's "due process
16   rights rights cannot exist in any practical sence without a
17   remedy against its abrogation." (Rosenkrantz, at p. 664.)

18       The Rosenkrantz court also put forth what it believed was
     an extreme example but which, unfortunately, has been shown to
19   exist in this case. The court stated: "In the present context,
20   for example, judicial review could prevent a Governor from
     usurping the legislative power, in the event a Governor failed
21   to observe the constitutionally specified limitations upon pa-
22   role review authority imposed by the voters and the Legislature."
23   This is exactly what the evidence in this case has proven. As
     As noted above the Board has abrogated to itself absolute au-
24   thority, despite legislative limitations and presumptions,
25   through the mechanism of a vague and all inclusive, and thus
26   truly meaningless, application of standards, The remedy this
     Court is imposing is narrowly tailored to redress this consti-
27   tutional violation.
28       The consequence of the Board's actions (of giving § 2402(c)

1    "shall be served and submitted to this Court, in writing, with-
2        in 90 days. Counsel for Petitioners, and any other interested
3        parties, may submit briefs or comments within 30 days thereaf-
3        ter. After receipt and review of the materials this Court will
4        After receipt and review of the materialsthis Court will fina-
5        lizethe training program, and associated rules, and the Peti-
         tioners in these cases shall receive a new hearing before a
6        Board that does not operate by the evidence here presented."

7                                    ORDER

8            "For the above reasons the habeas corpus petition is granted and
9    it is hereby ordered that Petitioner be provided a new hearing which shall
10   comply with due process as outlined above. Respondent shall provide weekly
     updates to this Court on the progress of its development of the new rules
11   and regulations outlined above."

12   DATED:    30 Aug, 2007
                                        _____
                                        LINDA R. CONDRON
13                                      JUDGE OF THE SUPERIOR COURT

14       4.    Petitioner's Layman Assistant, would like to take this opportu-
15   nity to apologize to this Court, because he wrote three major and rather
16   lengthy quotes in their entirety, instead of citing the documents and pre-
17   senting his own analysis. However, in the past, from the B.P.H. Chambers,
18   to many of the Courts he has litigated in, the words"conclusory", "no evid-
19   ence in the record", "vague"; et cetera, crop up with regularity, and per-
20   haps with some correctness, as incarcerated Petitioner's are often handi-
21   capped in the institutions and find it difficult to access WESTLAW, and other
22   helpful research engines. But these three Jurists quoted herein, have it just
23   right and mirror Petitioner's sentiments exactly. It is no easy task to fight
24   the State with all its power and resources such as the Electronic media, etc.

25       Just so, included as Exhibit  C , there is a Flyer issued by the Sacra-
26   mento Bee, where Senior Assistant Attorney General Julie Garland, is complain-
27   ing that judges are violating the Separation of Powers Act, and are over-
28   ruling the Governor too often, (about 1% of the Lifer population), are actu-
29   ally getting out! This is an ironic statement, because this Writer, has been

1 ⎮ sounding the alarm on the Separation of Powers issue for years. It

2 ⎮ is the Governor and the Executive Branch: (inclusive, the B.P.H.),

3 ⎮ that have usurped the power of the Judicial and Legislative Branches

4 ⎮ all these years. In fact, there exista a mini-government inside the

5 ⎮ the State government of the State of California, which has granted

6 ⎮ itself immunity, and does not hesitate to flount the Rules, Guidelines

7 ⎮ and Statutes of the State and Nation regularly, without fear of repri-

8 ⎮ sal. This development verges on fascism and tyranny. It is an alarm-

9 ⎮ ing situation, and that must be stopped.

10

### PRAYER FOR RELIEF

11 ⎮     WHEREFORE: Petitioner has presented, he feels, a prima facie

12 ⎮ case for relief, in that he is illegally incarcerated by B. Curry,

13 ⎮ Warden, and the Board of Parole Hearings Commissioners, et al, at,

14 ⎮ Correctional Trgaining Facility, Soledad, CA. His Fourteenth and Fifth

15 ⎮ Amendment United States Constitution rights to Due Process have been

16 ⎮ abrogated because a pro forma, subrosa hearing does not satisfy that

17 ⎮ requirement. He has become a 'pawn' in the political 'game' of the

18 ⎮ "no-parole-policy". If any person is suitable for parole, it is the

19 ⎮ Petitioner in the case instant., for which he has already served $23\frac{1}{2}$

20 ⎮ years in-house. If there is a true parole policy in this State, then

21 ⎮ this man should be suitable for parole. Petitioner prays, therefore,

22 ⎮ the High Court revisit its Holding in the case of In re Powell, supra,

23 ⎮ Order Evidentiary Hearings to examine the particularities of this

24 ⎮ case specifically, and finally issue the Petition For Writ of Habeas

25 ⎮ Corpus, and take curative action to clean up the corruption that is

26 ⎮ now endemic in law enforcement, corrections, and parole in this State.

⎮ DATED: August 5 , 2008

27 ⎮                          JOSEPH P. GUTIERREZ, PETITIONER
                            IN FORMA PAUPERIS,
28 ⎮                          IN PROPRIA PERSONAM

6(az)

8. Did you appeal from the conviction, sentence, or commitment?   [X] Yes.   [ ]  No.  If yes, give the following information:

   a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

   COURT OF APPEAL STATE OF CALIFORNIA, SECOND APPELLATE DISTRICT.

   b.  Result _Judgment Affirmed_____   c.  Date of decision:  _1988?_____

   d.  Case number or citation of opinion, if known: _____

   e.  Issues raised:  (1) _____

       (2) _____

       (3) _____

   f.  Were you represented by counsel on appeal?  [X] Yes.  [ ]  No. If yes, state the attorney's name and address, if known:

   _____

9. Did you seek review in the California Supreme Court?  [ ] Yes  [X] No.  If yes, give the following information:

   a.  Result _____   b.  Date of decision: _____

   c.  Case number or citation of opinion, if known: _____

   d.  Issues raised:  (1) _____

       (2) _____

       (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   __This habeas corpus petition is presented against the Board of Parole

   Hearings in California, and does not deal with any appellate issues

   that were presented in the appellate courts 23 years ago.
11. Administrative Review.

   a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   There is no longer a requirement to appeal to the B.P.H. after a den-

   ial of parole suitability in one of its pro forma, sub rosa, hearings.

   _____

   _____

   _____

   _____

   _____

   b.  Did you seek the highest level of administrative review available?  [X] Yes.  [ ]  No.
       *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction,   **MC-275**
commitment, or **issue** in any court?   ☒ Yes. If yes, continue with number 13.   ☐ No. If no, skip to number 15.

13. a. (1) Name of court: Petitioner has filed habeas corpus petitions on his BOARD
Hearing denials in every court in the State, and into Federal Courts.
(2) Nature of proceeding (for example, "habeas corpus petition"): Please see habeas corpus petition
petition attached herein as Addendum 1.
(3) Issues raised: (a) _____

   (b) _____

   (4) Result *(Attach order or explain why unavailable):* _____

   (5) Date of decision: _____

   b. (1) Name of court: _____

   (2) Nature of proceeding: _____

   (3) Issues raised: (a) _____

      (b) _____

   (4) Result *(Attach order or explain why unavailable):* _____

   (5) Date of decision: _____

   c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949)
34 Cal.2d 300, 304.)

   This Petition is timely filed, as the Denial Decision was final as of
   November 13, 2007.

16. Are you presently represented by counsel?   ☐ Yes.   ☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court?   ☒ Yes.   ☐ No. If yes, explain:

   There is an appeal on a habeas corpus petition (2005s), in the U.S. Court
   of Appeals, Ninth Circuit, pending.

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California
that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief,
and as to those matters, I believe them to be true.

Date: August 5 , 2008                                 _____
                                                      (SIGNATURE OF PETITIONER)

# EXHIBIT A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life       )        CDC Number:  D-02765
Term Parole Consideration       )
Hearing of:                     )
                                )
JOSEPH GUTIERREZ                )        **INMATE COPY**
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JULY 13, 2007

11:45 A.M.

PANEL PRESENT:

JANICE ENG, Presiding Commissioner
DIANE LUSHBOUGH, Deputy Commissioner

OTHERS PRESENT:

JOSEPH GUTIERREZ, Inmate
MARY ANN TARDIFF, Attorney for Inmate
BRYANT BUSHLING, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____No       See Review of Hearing
_____Yes      Transcript Memorandum

Linda Esquivel, Capitol Electronic Reporting

2

# I N D E X

Page

Proceedings.......................................... 3

Case Factors......................................... 12

Pre-Commitment Factors............................... 27

Post-Commitment Factors.............................. 48

Parole Plans......................................... 55

Closing Statements................................... 81

Recess............................................... 93

Decision............................................. 94

Adjournment.......................................... 102

Transcript Certification............................. 103

1          **P R O C E E D I N G S**

2          **DEPUTY COMMISSIONER LUSHBOUGH:**  We're on record.

3          **PRESIDING COMMISSIONER ENG:**  Okay.  It's still

4    morning.  Good  morning.

5          **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Good morning.

6          **PRESIDING COMMISSIONER ENG:**  This is a Subsequent

7    Parole Consideration Hearing for Joseph Gutierrez, CDC number

8    D02765.  Today's date is July 13th, 2007 and the time is 11:45

9    a.m.  We are located at CTF, Soledad.  The inmate was received

10   on March 15th, 1985 from Los Angeles County.  His life term

11   began on June 21st, 1989 and his minimum eligible parole date

12   was June 21st, 1996.

13          The controlling offense for which the inmate has been

14   committed is kidnap for robbery with use of a firearm, case

15   number A088529.  Count nine, Penal Code 209B and Penal Code

16   12022.5.  Count one, Penal Code 211, robbery along with use of

17   a firearm, Penal Code 12022.5.  Non-controlling offense, count

18   ten, Penal Code 209B, again, kidnap for robbery.  There were

19   several other counts.  The sentences were stayed.  Counts two

20   through five, Penal Code 664-211, attempted robbery.  Count

21   six, Penal Code 12021, felon in possession of a firearm.

22   Counts seven and eight, Penal Code 211, robbery.  The inmate

23   received a total term of life plus nine years.

24          This hearing is being recorded.  So for the purpose of

25   voice identification, each of us will be required to state our

*Capitol Electronic Reporting*

1    first and last names, spelling out our last names.  So, sir,

2    when it comes to your turn, after you spell your last name,

3    please provide us with your CDC number.  So, I'll begin and

4    we'll move around the room to my left.  My name is Janice Eng,

5    E-N-G, Commissioner.

6        **DEPUTY COMMISSIONER LUSHBOUGH:**  Diane Lushbough, L-U-S-

7    H-B-O-U-G-H, Deputy Commissioner.

8        **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Bryant Bushling, B-

9    U-S-H-L-I-N-G, representing the LA County DA's Office.

10       **ATTORNEY TARDIFF:**  Mary Ann Tardiff, T-A-R-D-I double

11   F, attorney for Mr. Gutierrez.

12       **INMATE GUTIERREZ:**  Joseph P Gutierrez, D02765.

13       **PRESIDING COMMISSIONER ENG:**  Please spell your last

14   name.

15       **INMATE GUTIERREZ:**  G-U-T-I-E-R-R-E-Z.

16       **PRESIDING COMMISSIONER ENG:**  Two Rs, thank you.  I had

17   one.  All right.  For the record, we also have two correctional

18   officers present for security reasons.  And they will not be

19   participating in the hearing.  Before we go any further, sir,

20   I'm going to ask if you would read aloud the ADA statement

21   that's in front of you on the table.  And you can begin at any

22   time.

23       **INMATE GUTIERREZ:**

24           "Americans with Disabilities Act.  The

25       Americans with Disabilities Act, ADA, is a law to help

*Capitol Electronic Reporting*

1  people with disabilities.  Disabilities are problems

2  that make it harder for some people to see, hear,

3  breathe, talk, walk, learn, think, work or take care of

4  themselves than it is for others.  Nobody can be kept

5  out of public places or activities because of a

6  disability.

7    "If you have a disability, you have the right

8  to ask for help to get ready for your BPT hearing, get

9  to the hearing, talk, read forms and papers, and

10  understand the hearing process.  BPT will look at what

11  you asked for to make sure that you have a disability

12  that is covered by the ADA.  That you've asked for the

13  right kind of help.  If you do not get help or if you

14  don't think you got the kind of help you need, ask for

15  BPT 1074 grievance form.  You can also get help to fill

16  it out."

17  **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you, sir.  In

18 general, do you understand what your rights are under the

19 Americans with Disabilities Act?

20  **INMATE GUTIERREZ:**  Yes, I do.

21  **PRESIDING COMMISSIONER ENG:**  Okay.  Just to be sure,

22 we're going to cover a few more things.  For the record, I see

23 that you did sign a BPT 1073 back on April 10th, 2007.  Okay.

24 This form is a reasonable accommodation notice and request in

25 accordance with the provisions of the ADA.  And what that means

1    is, this is the form that you would fill out to identify if you

2    have any of the disabilities as defined under the ADA.  So on

3    this, you checked off that you do not and therefore you do not

4    need help for this parole hearing.  And that you also checked

5    off that you appear to understand what your rights are.  So is

6    this information current and correct?

7         **INMATE GUTIERREZ:**  Yes, ma'am.

8         **PRESIDING COMMISSIONER ENG:**  Okay.  Sir, do you have

9    any problems walking up or down stairs or for distances of a

10   hundred yards or more?

11        **INMATE GUTIERREZ:**  No.

12        **PRESIDING COMMISSIONER ENG:**  Okay.  And I see you've

13   got glasses.  Are those for reading and distance or just for

14   reading?

15        **INMATE GUTIERREZ:**  Yes, these are for everything.

16        **PRESIDING COMMISSIONER ENG:**  For everything.  Okay.  So

17   will those be adequate for you to get through the hearing

18   today?

19        **INMATE GUTIERREZ:**  Yes.

20        **PRESIDING COMMISSIONER ENG:**  Okay, good.  Do you have

21   any hearing problems, impairments?  Okay.  And have you ever

22   been included in the CCCMS or EOP programs?  Do you know what

23   those are?

24        **INMATE GUTIERREZ:**  Yes.

25        **PRESIDING COMMISSIONER ENG:**  Okay.  Have you taken any

1   psychotropic medications either in prison or on the streets?

2        **INMATE GUTIERREZ:**  No.

3        **PRESIDING COMMISSIONER ENG:**  Okay.  And how far did you

4   get in school?

5        **INMATE GUTIERREZ:**  I got about 10 years of college.

6        **PRESIDING COMMISSIONER ENG:**  Okay.  When you were

7   growing up, do you recall if you were ever enrolled in any

8   special education classes?

9        **INMATE GUTIERREZ:**  I was not.

10       **PRESIDING COMMISSIONER ENG:**  Okay.  So, sir, do you

11  suffer from any disability that would prevent you from

12  participating in the hearing today?

13       **INMATE GUTIERREZ:**  I do not.

14       **PRESIDING COMMISSIONER ENG:**  Okay, thank you.  Ms.

15  Tardiff, are there any ADA issues that you believe need further

16  discussion?

17       **ATTORNEY TARDIFF:**  No.

18       **PRESIDING COMMISSIONER ENG:**  Okay, thank you.  Sir,

19  this hearing is being conducted pursuant to the Penal Code and

20  the rules and regulations of the Board of Parole Hearings

21  governing parole consideration hearings for life inmates.  So

22  the purpose of today's hearing is to, once again, to consider

23  your suitability for parole.  And in doing that, we'll be

24  considering the number and nature of the crimes for which you

25  were committed, your prior criminal and social history, your

1   behavior in programming since your commitment, and your plans
2   if released.

3        So, we've already had an opportunity to review your
4   Central File. And you will also have a chance to make any
5   corrections or clarify the record for us. Okay. We will
6   consider your progress since your commitment, your counselor's
7   reports and your mental health evaluations. However, we will
8   focus on your progress and any new reports since your last
9   hearing. So if you've had any changes to your parole plans,
10   that should be brought to our attention. And I see that the
11   last time you were before a Panel was August 30th of 2006; is
12   that correct?

13        **INMATE GUTIERREZ:** Yes, ma'am.

14        **PRESIDING COMMISSIONER ENG:** Okay. Sir, we will reach
15   a decision today and inform you whether or not we find you
16   suitable for parole and of course the reasons for our decision.
17   So if you are found suitable for parole, the length of your
18   confinement will be explained to you at that time. Okay.

19        But before we recess for deliberations, the District
20   Attorney's representative who is present, your attorney, and
21   you, yourself, will all have an opportunity to make a final
22   statement to the Panel regarding your parole suitability. You
23   don't have to make a statement. But if you choose to, you
24   should focus on why you believe you are suitable for parole
25   today. Okay. Once that's completed, then we will go ahead and

1   we'll recess.  We'll clear the room and we'll begin our

2   deliberations.

3        Upon completing deliberations, we'll resume the hearing

4   and then announce our decision.  The California Code of

5   Regulations states that regardless of time served, a life

6   inmate shall be found unsuitable for and denied parole if, in

7   the judgment of the Panel, the inmate would pose an

8   unreasonable risk of danger to society if released from prison.

9        Sir, you do have certain rights.  Those rights include

10  the right to a timely of notice of this hearing, the right to

11  review your Central File, and the right to present relevant

12  documents.  Ms. Tardiff, so far have your clients rights been

13  met?

14       **ATTORNEY TARDIFF:**  Yes.

15       **PRESIDING COMMISSIONER ENG:**  Okay, thank you.  Sir, you

16  have the additional right to be heard by an impartial Panel.

17  You've been introduced to this Panel.  Do you have any

18  objections?

19       **INMATE GUTIERREZ:**  No, I don't.

20       **PRESIDING COMMISSIONER ENG:**  Okay, thank you.  Ms.

21  Tardiff, any objections to the Panel?

22       **ATTORNEY TARDIFF:**  No.

23       **PRESIDING COMMISSIONER ENG:**  Thank you.  Okay.  Sir,

24  you will receive a copy of our written tentative decision

25  today.  That decision does become final within approximately

1  120 days.  So, a copy of the final decision and a copy of the

2  hearing transcript will be sent to you later on.  Okay.

3       Please do note that on, what was it, May 1st, 2004, the

4  regulations regarding your right to appeal a decision made at

5  this hearing were repealed.  You basically have to go to court.

6  So if you have any questions about that policy, you should

7  discuss that with your legal counsel or review the policy at

8  your prison law library.  Okay.  Sir, your not required to

9  admit to or discuss your offense.  But this Panel does accept

10 as true the findings of the court.  So, do you understand what

11 that means?

12      **INMATE GUTIERREZ:**  Yes.

13      **PRESIDING COMMISSIONER ENG:**  Okay.  Commissioner

14 Lushbough, is there any confidential material in the file?  And

15 if so, will we be using it today?

16      **DEPUTY COMMISSIONER LUSHBOUGH:**  There is.  We will not

17 be using it today.

18      **PRESIDING COMMISSIONER ENG:**  Okay, thank you.  Sir,

19 I've already passed the hearing checklist over to your legal

20 counsel and to the Deputy DA.  This is labeled Exhibit 1.

21 We've all signed off on it.  We do this to make sure that all

22 of us are operating off the same set of documents for your

23 hearing.  Okay.  So, that goes in with the rest of the

24 paperwork.  Ms. Tardiff, any additional documents to be

25 submitted to the Panel?

1          **ATTORNEY TARDIFF:**  No.

2          **PRESIDING COMMISSIONER ENG:**  And any preliminary

3    objections?

4          **ATTORNEY TARDIFF:**  No.

5          **PRESIDING COMMISSIONER ENG:**  Will your client be

6    speaking with the Panel?

7          **ATTORNEY TARDIFF:**  You don't have to discuss

8    (indiscernible) of this crime.

9          **INMATE GUTIERREZ:**  No, I'll speak to the panel.  I'll

10   speak to you.

11         **PRESIDING COMMISSIONER ENG:**  Okay.  So Mr. Gutierrez,

12   I'll have to swear you in.  Please raise your right hand.  Do

13   you solemnly swear or affirm that the testimony you give at

14   this hearing will be the truth, the whole truth, and nothing

15   but the truth?

16         **INMATE GUTIERREZ:**  Yes.

17         **PRESIDING COMMISSIONER ENG:**  Okay, thank you.  Sit

18   back, relax a little.  What we're going to do is, first, read

19   into the record the Statement of Facts about the crime.  Okay.

20   And I'm going to take that from the -- It turns out it's from

21   the September 2004 Board report on page one.  I'm just going to

22   switch the order a bit.  And I'm going to start off reading

23   about the life crime and then go into the subsequent one.  So,

24   this states that,

25                    "On November 26, 1983, at approximately 10

1     p.m., Gutierrez and McCord approach victims Selton and

2     Lynn Stalmastr, S-T-A-L-M-A-S-T-R, as they were seated

3     in the vehicle.  Gutierrez produced a hand gun and

4     entered into the rear seat of the vehicle.  And McCord

5     got into the driver's seat.  Gutierrez placed a hand

6     gun to the victim's head.  And he and McCord drove off

7     with the victims in the vehicle.  Gutierrez stated,

8     quote, I got a gun to your head, the lady is going to

9     get it, we just want your jewelry and money, do as we

10    say and you won't get hurt, unquote.  After the

11    robbery, the victims were released.

12           "And then on January 16th, 1984, at

13    approximately 16:20 hours, Gutierrez and crime partner,

14    McCord, entered the hair design shop at 4402 Vineland

15    Boulevard.  Gutierrez pointed a hand gun at the victim

16    and stated, quote, this is a hold up, I'm not kidding,

17    she's a dead woman if you don't listen to me, I want

18    all your money, jewelry, and everything you've got,

19    unquote.  Victim, Collin, then handed Gutierrez

20    approximately 94 dollars in currency while the other

21    four victims present began to surrender their

22    valuables.  Victim, Sheryl Mckenzie, then fled the

23    store.  And Gutierrez observed this, then fled

24    himself."

25  I know this was quite a while ago.  It dates back to, you know,

1   1983, the kidnap one, and then in 1984.  But what I read, even

2   though it was brief, is that a pretty accurate description of

3   what occurred at both of those events?

4           **INMATE GUTIERREZ:**  They both happened on the same day.

5           **PRESIDING COMMISSIONER ENG:**  They did?

6           **INMATE GUTIERREZ:**  Yeah.

7           **PRESIDING COMMISSIONER ENG:**  The hair design one,

8   happened on the same day as the kidnap?

9           **INMATE GUTIERREZ:**  Yes, ma'am.

10          **PRESIDING COMMISSIONER ENG:**  So this Board report is

11  incorrect?

12          **INMATE GUTIERREZ:**  That's correct.

13          **PRESIDING COMMISSIONER ENG:**  Okay.  So I stand

14  corrected.  Let me double check because, you know, usually I

15  take a look at these things.  And I thought I compared it to

16  the probation officer's report.  It gets very confusing.  Okay.

17  So that I stand corrected.  The Board report is incorrect and

18  both of these did happen.  But it looks like, all right, the

19  hair design shop happened in the late afternoon.  Correct?

20          **INMATE GUTIERREZ:**  Yes.

21          **PRESIDING COMMISSIONER ENG:**  All right.  And then later

22  on that evening, you did the kidnap.  So thank you, sir, for

23  bringing that to our attention.  For the record, we've got that

24  set straight now.  Mr. McCord, your crime partner on this day,

25  how did you know him?

1        **INMATE GUTIERREZ:** I met Mr. McCord in federal prison.

2        **PRESIDING COMMISSIONER ENG:** Okay. And that's right

3 because you had done a prior term in federal prison. And when

4 was that?

5        **INMATE GUTIERREZ:** 1979 until 1982.

6        **PRESIDING COMMISSIONER ENG:** Okay. So, how did the two

7 of meet up again in order to do this?

8        **INMATE GUTIERREZ:** Mr. McCord and I became good friends

9 in federal prison. We both had the same job.

10        **PRESIDING COMMISSIONER ENG:** Okay.

11        **INMATE GUTIERREZ:** So after he got out, he disappeared.

12 He got out first and then I got out. And then, he contacted me

13 from Florida one day. And he told me that he had a job offer

14 for me in Los Angeles.

15        **PRESIDING COMMISSIONER ENG:** Okay.

16        **INMATE GUTIERREZ:** He owed me a favor because of

17 something that had happened in federal prison.

18        **PRESIDING COMMISSIONER ENG:** All right.

19        **INMATE GUTIERREZ:** So I told him I wasn't interested in

20 any illegal activities. And he said this was not an illegal

21 job, it was a legal job. But he had told me back when I helped

22 him that he wouldn't forget it. And that he would pay me back.

23 So he painted a pretty picture. I called Mr. Zuvavich. He

24 supported what he said. I was working about three jobs in

25 Nashville at the time. And I was pretty much exhausted.

1        It sounded like a good opportunity.  And I talked to

2   Mr. Zuvavich, had the job checked out.  It seemed to check out

3   fine.  They had a couple of buildings there.  American Printing

4   Corporation in North Hollywood and another building in

5   Hollywood.  And there was a group of people working down there.

6   It was a telephone thing.

7        So I accepted the job.  And I asked permission from my

8   parole officer.  He checked it out, put me in touch with the

9   Van Nuys parole people.  And I invested everything that we had,

10  my wife and I, thinking we had a good thing going.  Because we

11  were selling art, also.

12        **PRESIDING COMMISSIONER ENG:**  Okay.

13        **INMATE GUTIERREZ:**  And the Los Angeles Olympics were

14  coming up.  So we thought that we could set up our little shop

15  and do well doing that also.  We always worked more than one

16  job.  So we came out here and that's how I made contact with

17  Mr. Zuvavich.

18        **PRESIDING COMMISSIONER ENG:**  Okay.  All right.  So you

19  were pretty much in debt?

20        **INMATE GUTIERREZ:**  Actually, no.

21        **PRESIDING COMMISSIONER ENG:**  When you came out here.

22        **INMATE GUTIERREZ:**  No, we weren't in debt.  We were

23  doing, like I said, we were working.  I was working three jobs

24  and my wife was working two jobs.  We worked together selling

25  the paintings.  So that was one job.  I worked as an overseas

1  operator, multilingual for the telephone company.  And I also
2  worked making swimming pool heaters.  I was a welder, alligator
3  welder.  And she also had another job working for a company.
4  So we had money.  It was just that we were tired and there
5  wasn't enough money coming in from any of the jobs to satisfy
6  our desires.

7      **PRESIDING COMMISSIONER ENG:**  Okay.  So, what triggered
8  you to commit this robbery at the hair design shop?

9      **INMATE GUTIERREZ:**  After we got out here, everything
10  just fell apart.  Basically, things fells apart.  Things didn't
11  go right and it led to the point where I had to leave town.
12  Because my wife was in danger and I was in danger.  And that's
13  why I did those robberies.  In order to get --

14      **PRESIDING COMMISSIONER ENG:**  Wait, I'm sorry.  Let me
15  get this straight.  You did the robberies, why, to get money so
16  you could leave town?

17      **INMATE GUTIERREZ:**  So we could leave town.  Now, once
18  we got to LA, we got broke.  If that's what you were referring
19  to.

20      **PRESIDING COMMISSIONER ENG:**  That's why I said that.
21  That's why I couldn't understand.

22      **INMATE GUTIERREZ:**  I'm sorry.

23      **PRESIDING COMMISSIONER ENG:**  Okay.

24      **INMATE GUTIERREZ:**  When we got out here, about a month,
25  a month and a half, I'm not sure exactly anymore how much time

1   had passed.

2   **PRESIDING COMMISSIONER ENG:** Right.  Things fell

3   through --

4   **INMATE GUTIERREZ:** Things fell through and we used up

5   what little savings that we had brought with us.

6   **PRESIDING COMMISSIONER ENG:** Okay.

7   **INMATE GUTIERREZ:** And then we were basically destitute

8   and going to be on the street.  We were lucky that we had a

9   really nice van with beds and stuff.  And we were able to stay

10  at camping places.  And that way, we weren't on the street, per

11  say.

12  **PRESIDING COMMISSIONER ENG:** Okay.  Well, what was Mr.

13  McCord doing?  Because he was out in LA already.

14  **INMATE GUTIERREZ:** Mr. McCord went to Florida when he

15  got released.  He was from Indiana.

16  **PRESIDING COMMISSIONER ENG:** Okay.

17  **INMATE GUTIERREZ:** And he went to Florida where he met

18  an Israeli lady and they got married.  He was Jewish.  So, they

19  made him Israeli.  He met an Israeli down there and he got

20  married.  And her brothers were partners with Mr. Zuvavich in

21  Santa Monica, where Mr. Zuvavich was in North Hollywood.  And

22  that's where the LA connection comes in.

23  **PRESIDING COMMISSIONER ENG:** So that's how Mr. McCord

24  knew Mr. Zuvavich?

25  **INMATE GUTIERREZ:** Correct.

*Capitol Electronic Reporting*

18

1     **PRESIDING COMMISSIONER ENG:**  But Mr. McCord was out in
2   LA, correct?

3     **INMATE GUTIERREZ:**  He was in Florida and then he moved
4   to LA.

5     **PRESIDING COMMISSIONER ENG:**  Did he move to LA about
6   the same time that you had transferred?

7     **INMATE GUTIERREZ:**  He went first.

8     **PRESIDING COMMISSIONER ENG:**  Okay.  That's what I
9   meant.  He was already there when you came out.

10     **INMATE GUTIERREZ:**  That's right.

11     **PRESIDING COMMISSIONER ENG:**  And he was helping to set
12   this whole thing up.

13     **INMATE GUTIERREZ:**  Right.

14     **PRESIDING COMMISSIONER ENG:**  It fell through.  So does
15   this mean it fell through for him too?

16     **INMATE GUTIERREZ:**  I learned later that Mr. Zuvavich
17   was an informant for the DEA.

18     **PRESIDING COMMISSIONER ENG:**  Okay.

19     **INMATE GUTIERREZ:**  So he was on their payroll and under
20   their care.  And operating under law enforcement the whole
21   time.  So he had a totally different situation than mine.

22     **PRESIDING COMMISSIONER ENG:**  So, I'm just trying to
23   understand what led both you and Mr. McCord to commit these
24   crimes.

25     **INMATE GUTIERREZ:**  The one in the beauty salon was his

1  former fiancé's mother.  And according to Mr. McCord, she owed

2  him a debt of 3,000 dollars.  And as I said, I needed money

3  desperately.  So he said, hey I want that money.  And so I

4  said, well lets go ask her for it.  And so, that's how that

5  robbery took place.

6          **PRESIDING COMMISSIONER ENG:**  Where did you get the gun?

7          **INMATE GUTIERREZ:**  I brought it out from Tennessee.

8          **PRESIDING COMMISSIONER ENG:**  But you knew being that

9  you had already done a prison term in the federal prison, that

10  you weren't suppose to have a firearm.  Correct?

11          **INMATE GUTIERREZ:**  That's correct.

12          **PRESIDING COMMISSIONER ENG:**  But you did have a

13  firearm?

14          **INMATE GUTIERREZ:**  I did have one.

15          **PRESIDING COMMISSIONER ENG:**  Okay.  So you drove that

16  out.  So you used that.  You go into a hair shop.  Did you

17  really believe you needed a loaded weapon?

18          **INMATE GUTIERREZ:**  Well, it didn't turn out exactly the

19  way it was suppose to.  I went in there and asked for the

20  money.

21          **PRESIDING COMMISSIONER ENG:**  With Mr. McCord.

22          **INMATE GUTIERREZ:**  No, Mr. McCord did not --

23          **PRESIDING COMMISSIONER ENG:**  He wasn't there?

24          **INMATE GUTIERREZ:**  No, that's another mistake.  He

25  stayed out.  He was supposed to be the get away driver.

1      **PRESIDING COMMISSIONER ENG:**  Okay.

2      **INMATE GUTIERREZ:**  And he stayed outside in the

3    vehicle.

4      **PRESIDING COMMISSIONER ENG:**  All right.  So you went in

5    there alone and you knew who the woman was.  She was the owner

6    of the shop?

7      **INMATE GUTIERREZ:**  I had no idea who she was.  He told

8    me who she was.  He described her to me.  Is that what you

9    mean?

10      **PRESIDING COMMISSIONER ENG:**  So you recognized the

11   person that fit that description.  And that's who you went up

12   to?

13      **INMATE GUTIERREZ:**  I think I recognized her.  I'm not

14   sure.  I did go in there and I think I talked to the person

15   that was suppose to be the owner, initially.

16      **PRESIDING COMMISSIONER ENG:**  Okay.

17      **INMATE GUTIERREZ:**  Yes.

18      **PRESIDING COMMISSIONER ENG:**  And at what point did you

19   pull the gun out?

20      **INMATE GUTIERREZ:**  When I knew I wasn't going to get

21   any money from her.  So I, stupidly, decided to take the money

22   from everyone in there.

23      **PRESIDING COMMISSIONER ENG:**  Okay.  So did you get some

24   jewelry too?

25      **INMATE GUTIERREZ:**  Nope.

 1          **PRESIDING COMMISSIONER ENG:**  Okay.  Because one of the

 2   victims took off.  Was that true?  So you took off right after

 3   she left?

 4          **INMATE GUTIERREZ:**  Absolutely.

 5          **PRESIDING COMMISSIONER ENG:**  Okay.  So McCord was

 6   waiting for you in the car.  Right?

 7          **INMATE GUTIERREZ:**  He was in the car.

 8          **PRESIDING COMMISSIONER ENG:**  When you hopped in the

 9   car, what happened?

10          **INMATE GUTIERREZ:**  We took off.

11          **PRESIDING COMMISSIONER ENG:**  And did he ask you, did

12   you get any money?

13          **INMATE GUTIERREZ:**  Later on, I gave him half of that,

14   94 dollars.

15          **PRESIDING COMMISSIONER ENG:**  So how did you come to the

16   10 p.m. kidnap?

17          **INMATE GUTIERREZ:**  Well, 94 dollars wasn't going to get

18   me out of town.

19          **PRESIDING COMMISSIONER ENG:**  Okay.

20          **INMATE GUTIERREZ:**  That's how we came to that.

21          **PRESIDING COMMISSIONER ENG:**  So both of you were

22   planning this?

23          **INMATE GUTIERREZ:**  I don't think McCord was planning

24   anything.  I think I was in charge.

25          **PRESIDING COMMISSIONER ENG:**  He was just along for the

1  | ride?  Was it his car or your car?

2  | **INMATE GUTIERREZ:**  This was a one man stupid action.  I

3  | don't think that McCord -- I wasn't letting him take a lot of

4  | decisions.  I was really upset with him because he'd brought me

5  | out there and everything fell apart.  I was not happy with Mr.

6  | McCord.  So I wasn't letting him make any decision in this

7  | thing.  I did everything myself.  I'm guilty of all this

8  | myself.

9  | **PRESIDING COMMISSIONER ENG:**  So, what were you doing

10 | from the time that you fled the hair design shop up until the

11 | time that you basically kidnapped and robbed these other folks?

12 | **INMATE GUTIERREZ:**  You know ma'am --

13 | **PRESIDING COMMISSIONER ENG:**  What were you doing?

14 | **INMATE GUTIERREZ:**  -- I can't even remember that

15 | anymore.  I think we went to a park.  I might have gone back to

16 | the apartment.  I'm not sure, I'm not sure.  But at some point,

17 | we did go down there to -- See, when I first came out, he was

18 | at Marina del Rey, the apartments down there.  And I got a

19 | chance to see Santa Monica and Venice and everything.  And so I

20 | thought that would be a more likely spot to get more money

21 | instead of less.

22 | **PRESIDING COMMISSIONER ENG:**  Okay.  All right.  So you

23 | used a gun.  Both of you hop into the car.  How much did you

24 | get?

25 | **INMATE GUTIERREZ:**  Well according to the victims, it

 1  was a great amount.  But in actuality, it was very little.  I

 2  blundered there too.  And I think it was perhaps 30-40 dollars

 3  in cash, a couple of credit cards, and some glass beads.

 4          **PRESIDING COMMISSIONER ENG:**  That was it.

 5          **INMATE GUTIERREZ:**  That was it and I gave them the car

 6  back.  End of story.

 7          **PRESIDING COMMISSIONER ENG:**  Okay.  So after you did

 8  this kidnap for robbery, then what did you and McCord do?  Did

 9  you realize you still didn't have enough?  So, were you

10  targeting somebody else?

11          **INMATE GUTIERREZ:**  No, we headed out.  I headed out.

12  We knew we couldn't -- We didn't have any money for gas.  I did

13  use those cards.  But there wasn't enough money for gas or

14  anything.  And so he got a drive away car.  And I left my

15  vehicle with my wife, who wasn't aware of any of this.  I took

16  it back home and I said, hey you know what, when I call you, if

17  you want to come to me, I'll explain everything and then you

18  can, if not --

19          **PRESIDING COMMISSIONER ENG:**  What do you mean a drive

20  away car?  He stole a car for you guys to get away in?

21          **INMATE GUTIERREZ:**  No, no.  They have this little

22  thing, back in those days, where you can go to this agency and

23  sign up for a drive away.  They have their vehicles.  They want

24  to deliver them to another state.

25          **PRESIDING COMMISSIONER ENG:**  Right.  Okay, okay.

1          **INMATE GUTIERREZ:**  That's how he got that.  I didn't

2     even know that existed but he knew about that.

3          **PRESIDING COMMISSIONER ENG:**  That's right, that's

4     right.  So, you were going to transport somebody's personal car

5     --

6          **INMATE GUTIERREZ:**  We did that.

7          **PRESIDING COMMISSIONER ENG:**  -- from there to another

8     state.  So you were able to get a car.  And did you leave that

9     night?

10          **INMATE GUTIERREZ:**  We left immediately, yeah.

11          **PRESIDING COMMISSIONER ENG:**  You left right away.  And

12     where did you head to?

13          **INMATE GUTIERREZ:**  We went to Florida.

14          **PRESIDING COMMISSIONER ENG:**  Back to Florida, okay.

15     How long did it take until they caught up with you?

16          **INMATE GUTIERREZ:**  They never did catch up to me.

17          **PRESIDING COMMISSIONER ENG:**  They didn't?

18          **INMATE GUTIERREZ:**  No, they did not.  I reported back

19     to my parole officer.  All this was just a big mess and I saw

20     that I had blundered, criminally.  And I got sick of Mr.

21     McCord.  My wife said that if I didn't separate myself from him

22     that she was going to knock him on his head.  So, I mean, you

23     know she wouldn't have done that physically, but she was very

24     hot at me.  So I dumped him in Florida and we returned to

25     Tennessee.  I went back to my parole officer.

1        **PRESIDING COMMISSIONER ENG:**  Mr. Trammel?

2        **INMATE GUTIERREZ:**  Mr. Trammel.

3        **PRESIDING COMMISSIONER ENG:**  Okay.

4        **INMATE GUTIERREZ:**  And went back to him.  I told him

5   things hadn't worked out in LA and I wanted to come back and go

6   to work.  So I opened up at a company there cleaning carpets,

7   Genie Carpet Man in Nashville.  And started working that.  And

8   a couple months later, he called me up to the office.  He said

9   he needed to talk to me about the paperwork from LA.  And the

10  FBI said, hi Jo, how you doing, long time no see.  It took them

11  about two months to track it down.

12       **PRESIDING COMMISSIONER ENG:**  Well, did your parole

13  officer contact Los Angeles Police Department or anybody?

14       **INMATE GUTIERREZ:**  Everybody was in communication, I'm

15  sure.

16       **PRESIDING COMMISSIONER ENG:**  So they knew.  So your

17  parole officer, did he know that you had committed these crimes

18  or --

19       **INMATE GUTIERREZ:**  I think at the time he called me

20  back up, he did.  But not when I reported back to him,

21  obviously.

22       **PRESIDING COMMISSIONER ENG:**  You didn't tell him.  You

23  just said things didn't work out.

24       **INMATE GUTIERREZ:**  I didn't tell him nothing.

25       **PRESIDING COMMISSIONER ENG:**  Right.  Okay.  All right.

26

1    So it was a few months before all law enforcement finally

2    caught up with you.

3         **INMATE GUTIERREZ:** I think that's where that date 1-16-

4    84 comes in, ma'am.

5         **PRESIDING COMMISSIONER ENG:** Okay. And that's when

6    they sent you back to California.

7         **INMATE GUTIERREZ:** Yeah.

8         **PRESIDING COMMISSIONER ENG:** Okay. All for less than a

9    hundred dollars.

10        **INMATE GUTIERREZ:** All for less than a hundred dollars,

11   maybe 200.

12        **PRESIDING COMMISSIONER ENG:** Okay. And your wife, at

13   that time, is that your current wife too?

14        **INMATE GUTIERREZ:** Yes, ma'am.

15        **PRESIDING COMMISSIONER ENG:** So she stuck by you

16   through all this time.

17        **INMATE GUTIERREZ:** Thirty years.

18        **PRESIDING COMMISSIONER ENG:** What do you think that all

19   these women that were victimized by you and Mr. McCord, on that

20   day, what do you think that did to them?

21        **INMATE GUTIERREZ:** Well, Mr. Selton was there too.

22   That was Ms. Stalmastr's escort. He's the one that had the gun

23   pointed at him, not Ms. Stalmastr, who basically passed out.

24        **PRESIDING COMMISSIONER ENG:** Okay.

25        **INMATE GUTIERREZ:** What do they think of me? They

1  think I'm the devil, of course.  And they were right.

2      **PRESIDING COMMISSIONER ENG:**  They didn't know what was

3  going to happen to them that day.  Did they?

4      **INMATE GUTIERREZ:**  No.

5      **PRESIDING COMMISSIONER ENG:**  When you had that gun.

6      **INMATE GUTIERREZ:**  But I did.  I didn't know -- I knew

7  I was not going to shoot those people.

8      **PRESIDING COMMISSIONER ENG:**  But they had no idea.

9      **INMATE GUTIERREZ:**  They had no idea.

10      **PRESIDING COMMISSIONER ENG:**  Okay, okay.  Well, let's

11  take a look at your prior history.  Sir, did you ever have

12  contact with law enforcement as a juvenile?

13      **INMATE GUTIERREZ:**  No, I did not.  Well, I use to box

14  in the Police Athletic League in New York.

15      **PRESIDING COMMISSIONER ENG:**  Is that where you were

16  born and raised?  In New York.

17      **INMATE GUTIERREZ:**  Born and raised.

18      **PRESIDING COMMISSIONER ENG:**  In Manhattan?

19      **INMATE GUTIERREZ:**  Manhattan.

20      **PRESIDING COMMISSIONER ENG:**  Okay.  East side, west

21  side, south, north.  Where?

22      **INMATE GUTIERREZ:**  A hundred thirty fifth street,

23  Broadway.

24      **PRESIDING COMMISSIONER ENG:**  Okay.  So, no contacts

25  with law enforcement as a juvenile.  But then everything looks

1 | like it started when you were in Montgomery, Tennessee, 1975.
2 | How would you in '75? You were 30?

3 |     **INMATE GUTIERREZ:** I think so.

4 |     **PRESIDING COMMISSIONER ENG:** What happened?

5 |     **INMATE GUTIERREZ:** I don't know. I think I was angry
6 | after the war and I didn't like the south. I ran into a lot
7 | racism down there. I had black kids and a black wife at the
8 | time. And I think I was upset that I had left the military. I
9 | should have stayed in. I had an option. I got out and I went
10 | to college. And started working in law enforcement. And there
11 | wasn't any money down south. Law enforcement doesn't make much
12 | money down there. Maybe now, but not in those days. But I
13 | think I was upset.

14 |     And, you know, I bring up PTSD, Agent Orange, everybody
15 | laughs at me. I don't know but, you know, when you get -- When
16 | you see people dripping off the trees and arms and legs laying
17 | around, I think it affects you. You just don't realize that it
18 | does sometimes, you know. Anyway, it crept back into my life
19 | and I kind of went off the deep end.

20 |     **PRESIDING COMMISSIONER ENG:** You went total opposite,
21 | didn't you? You went totally opposite.

22 |     **INMATE GUTIERREZ:** Yeah.

23 |     **PRESIDING COMMISSIONER ENG:** Because you're sitting
24 | here and you're saying that, I mean, I see that you -- Did you
25 | join the army at 17?

1       **INMATE GUTIERREZ:** On my 17th birthday.

2       **PRESIDING COMMISSIONER ENG:** On you 17th birthday. And

3 you were in the army for, I can't read my own writing, how many

4 years? Quite a few, 13?

5       **INMATE GUTIERREZ:** Thirteen active and two in the

6 reserves.

7       **PRESIDING COMMISSIONER ENG:** Okay. So that could have

8 been a very good career for you. You did two tours in Vietnam.

9 Two tough tours in Vietnam. And then, you stated that you went

10 back. So when you left the service, is that where you were?

11 You were down in Tennessee?

12       **INMATE GUTIERREZ:** I was in Tennessee.

13       **PRESIDING COMMISSIONER ENG:** Okay. And is that where

14 you were also in law enforcement?

15       **INMATE GUTIERREZ:** Yeah.

16       **PRESIDING COMMISSIONER ENG:** Okay. So it's amazing

17 because here you're doing, you know, being the great American

18 and fighting for this country. And then go into law

19 enforcement. And then, bam, in '75, you start breaking the

20 law. Well that's what I mean about going total opposite and

21 you didn't stop.

22       **INMATE GUTIERREZ:** But I wasn't really, heavily,

23 breaking the law in '75. What was it, shopping lifting. I

24 think there was a little fight in the club one night, something

25 like that. I didn't get into anything serious until '78.

*Capitol Electronic Reporting*

1      **PRESIDING COMMISSIONER ENG:**  Right.  Because we see in
2   '75, we're talking about possession of marijuana.  You were
3   fined 50 dollars.

4      **INMATE GUTIERREZ:**  Yeah.

5      **PRESIDING COMMISSIONER ENG:**  And then in 1976,
6   disorderly conduct.  That was probably the fight.  You were
7   fined again, 72 dollars.  Then in '77, petty theft shop
8   lifting.

9      **INMATE GUTIERREZ:**  That's right.

10      **PRESIDING COMMISSIONER ENG:**  What did you take?

11      **INMATE GUTIERREZ:**  I was in college.  A bunch of
12   college kids.  And we decided to see who could take the most
13   food out of the supermarket.

14      **PRESIDING COMMISSIONER ENG:**  Okay.

15      **INMATE GUTIERREZ:**  So we did that one night.

16      **PRESIDING COMMISSIONER ENG:**  So you got three years
17   confinement?

18      **INMATE GUTIERREZ:**  No.

19      **PRESIDING COMMISSIONER ENG:**  That has to be a typo.

20      **INMATE GUTIERREZ:**  No, it's not a typo.

21      **PRESIDING COMMISSIONER ENG:**  No?  What does that mean?

22      **INMATE GUTIERREZ:**  When I got arrested in '78 for the -
23   -

24      **PRESIDING COMMISSIONER ENG:**  Check forgery.

25      **INMATE GUTIERREZ:**  Yeah, for the charges in '78.  That

1  | was one of them.

2  | **PRESIDING COMMISSIONER ENG:**  Okay.

3  | **INMATE GUTIERREZ:**  And they all ran concurrent.  And I
4  | got a 10 year sentence at the federal joint.

5  | **PRESIDING COMMISSIONER ENG:**  Yeah.  Because I'm looking
6  | at that.  We see 4-1-77, it was the petty theft shop lifting.
7  | Six months county work house, but suspended.  Then 12-12-78,
8  | forgery of a check.  You were convicted 5-24-79, three years
9  | confinement.  But then, that was on 12-12 and this says 12-15,
10 | unlawful possession of explosives.  That's where you were
11 | convicted, July 10th, 1979 for ten years confinement.  Okay.

12 | And it says that the federal parole records reflect
13 | that this offense involved the defendant's use of a C-4
14 | military explosive.  You had recruited two other persons to
15 | blow up a trailer in a trailer park in retaliation against the
16 | occupant of the trailer who had stolen diamonds from him, which
17 | he had previously stolen.  Is that true?

18 | **INMATE GUTIERREZ:**  Yes.

19 | **PRESIDING COMMISSIONER ENG:**  So you stole diamonds.
20 | Did you steal them off a person or out of an establishment?

21 | **INMATE GUTIERREZ:**  Just an establishment.

22 | **PRESIDING COMMISSIONER ENG:**  You needed money?

23 | **INMATE GUTIERREZ:**  I needed money.

24 | **PRESIDING COMMISSIONER ENG:**  So you stole diamonds and
25 | somebody ripped you off.

35

1      **INMATE GUTIERREZ:**  Yes.

2      **PRESIDING COMMISSIONER ENG:**  And you tracked them down

3    to this trailer.

4      **INMATE GUTIERREZ:**  No.  They ripped me off at the

5    trailer.

6      **PRESIDING COMMISSIONER ENG:**  At the trailer.  So you

7    decided you were going to blow them up?

8      **INMATE GUTIERREZ:**  Nope.  I went back to them and

9    invited them to fight.

10      **PRESIDING COMMISSIONER ENG:**  You got into a fight.

11      **INMATE GUTIERREZ:**  I invited them to fight.

12      **PRESIDING COMMISSIONER ENG:**  Okay.

13      **INMATE GUTIERREZ:**  But they were afraid to fight with

14    me.  So I told them you'll have to come out.  And they would

15    not.  So I used a very minuscule amount of explosives and put a

16    flash bang under their trailer.  And scared them.

17      **PRESIDING COMMISSIONER ENG:**  It says here, the trailer

18    was in fact blown up.  But due to the unavailability of

19    witnesses, defendant was convicted only of possession of

20    explosives.

21      **INMATE GUTIERREZ:**  Well, I think there was like 12

22    hundred dollars worth of damage to that trailer.

23      **PRESIDING COMMISSIONER ENG:**  Okay.  So the whole thing

24    didn't basically disintegrate into thin air?

25      **INMATE GUTIERREZ:**  Small hole in the floor.

1       **PRESIDING COMMISSIONER ENG:** Okay. Because if you read

2 this, one could think, yeah, there were nobody left as

3 witnesses.

4       **INMATE GUTIERREZ:** Yeah.

5       **PRESIDING COMMISSIONER ENG:** Okay.

6       **INMATE GUTIERREZ:** No one was injured.

7       **PRESIDING COMMISSIONER ENG:** All right. And it says,

8 defendant states the offense involved the trade of jewels for

9 cocaine, they shot me up so I blew them up. Okay. So, were

10 you dealing in drugs at that time too?

11       **INMATE GUTIERREZ:** No. I wanted some cocaine though.

12       **PRESIDING COMMISSIONER ENG:** For your own use or for

13 resale?

14       **INMATE GUTIERREZ:** I'd never tried it. And I heard it

15 was this great drug and I wanted to try it.

16       **PRESIDING COMMISSIONER ENG:** Okay.

17       **INMATE GUTIERREZ:** And I knew these guys had some. But

18 somebody told me that they didn't. That was a lie. And so

19 these jewels that we had, I tried to trade them. And what they

20 did was, they took the jewelries and opened fire on me.

21       **PRESIDING COMMISSIONER ENG:** Okay. So you went to

22 federal prison on this. This arrest warrant requested parole.

23 Let's see, I'm just checking all this. It says, explosive

24 violation, conspiracy to defraud the US government, convicted

25 of conspiracy in 1980. Forty month confinement, concurrent

1  sentence.  So this is something in addition to the explosive?

2       **INMATE GUTIERREZ:**  Yes.

3       **PRESIDING COMMISSIONER ENG:**  So, what did this have to

4  do?

5       **INMATE GUTIERREZ:**  Well, I had a friend on the police

6  force.  I was in law enforcement.  And he owned a furniture

7  store that wasn't doing well.  So he says, Joseph, burn it down

8  for me and I'll pay you 10 percent of what we get --

9       **PRESIDING COMMISSIONER ENG:**  Okay.

10      **INMATE GUTIERREZ:**  -- from the insurance.  And it was

11 way out in the country.  There was no people around.  No chance

12 of anyone getting hurt.  I burned it down.

13      **PRESIDING COMMISSIONER ENG:**  So you did it.  You burned

14 it down.  Yup, that's pretty much what it says.  That was the

15 arson.

16      **INMATE GUTIERREZ:**  That was the arson.

17      **PRESIDING COMMISSIONER ENG:**  Okay.  How much time, of

18 total time, did you do?

19      **INMATE GUTIERREZ:**  I did three years.

20      **PRESIDING COMMISSIONER ENG:**  Total time for --

21      **INMATE GUTIERREZ:**  Inside.

22      **PRESIDING COMMISSIONER ENG:**  Right, right, right.  And

23 then you paroled.

24      **INMATE GUTIERREZ:**  Yes.

25      **PRESIDING COMMISSIONER ENG:**  And that's when -- But you

1 | were doing pretty well with your parole agent in trying to get

2 | everything lined up to come out here.

3 |     **INMATE GUTIERREZ:** No.  I was working three jobs --

4 |     **PRESIDING COMMISSIONER ENG:** Okay.

5 |     **INMATE GUTIERREZ:** -- and this happened fast.

6 |     **PRESIDING COMMISSIONER ENG:** Okay.

7 |     **INMATE GUTIERREZ:** This thing about coming out here,

8 | within a month or two.

9 |     **PRESIDING COMMISSIONER ENG:** Okay.  So if we take a

10 | look at your personal background, you were born July 19th,

11 | 1945.  So you were 38 at the time that the life crime occurred.

12 |     **INMATE GUTIERREZ:** Either 38 or 39.

13 |     **PRESIDING COMMISSIONER ENG:** Okay.

14 |     **INMATE GUTIERREZ:** I'm not sure.

15 |     **PRESIDING COMMISSIONER ENG:** Yeah.  And you're now 62.

16 |     **INMATE GUTIERREZ:** I'm 62, what's today's date?  Six

17 | more days.

18 |     **PRESIDING COMMISSIONER ENG:** Six days and you'll be 63,

19 | okay.

20 |     **INMATE GUTIERREZ:** Sixty-two.

21 |     **PRESIDING COMMISSIONER ENG:** You'll be 62, I'm sorry.

22 | I'm going the wrong direction.

23 |     **INMATE GUTIERREZ:** It's all right.

24 |     **PRESIDING COMMISSIONER ENG:** Okay.

25 |     **INMATE GUTIERREZ:** I'm old.

36

| | |
|---|---|
| 1 | **PRESIDING COMMISSIONER ENG:** You're not that old. |
| 2 | Okay. And you stated that you were born and raised in New |
| 3 | York. Correct? |
| 4 | **INMATE GUTIERREZ:** That's correct. |
| 5 | **PRESIDING COMMISSIONER ENG:** Okay. And did you have a |
| 6 | lot of brothers and sisters or were you an only child? |
| 7 | **INMATE GUTIERREZ:** I've got two brothers but we didn't |
| 8 | live together. Except, Daniel and I did, my second brother. |
| 9 | We lived together until I was 13. |
| 10 | **PRESIDING COMMISSIONER ENG:** Was your family intact or |
| 11 | not? Did you have -- |
| 12 | **INMATE GUTIERREZ:** My father died in 1945. He was a |
| 13 | famous minister. So he died in 1945. And then my mother died |
| 14 | in 1954 of a heart attack in Puerto Rico. |
| 15 | **PRESIDING COMMISSIONER ENG:** Okay. |
| 16 | **INMATE GUTIERREZ:** And then I went with my brother |
| 17 | Daniel to my Uncle Joshua's farm in upstate New York, where I |
| 18 | learned how to farm. I stayed there for five years. And then, |
| 19 | I returned to New York City when I was 13. |
| 20 | **PRESIDING COMMISSIONER ENG:** Okay. |
| 21 | **INMATE GUTIERREZ:** And Danny stayed on the farm. |
| 22 | **PRESIDING COMMISSIONER ENG:** Okay. |
| 23 | **INMATE GUTIERREZ:** I have another brother in Puerto |
| 24 | Rico. He was born in New York but he was raised in Puerto Rico |
| 25 | after our father died. He was raised by our uncles and aunts |

1   there.  So I was alone in New York City.

2   **PRESIDING COMMISSIONER ENG:**  It's not very well laid

3   out in our Board reports about your family history.  And I was

4   looking at one of the prior psych evaluations to try to get a

5   little insight into it.  And it says you've had a series of

6   injuries since a young child; is that true?

7   **INMATE GUTIERREZ:**  Yeah.

8   **PRESIDING COMMISSIONER ENG:**  Okay.  Because I see here

9   and I had to go back in order to find some information.  I was

10  back in the September 7th, 1999 psycho social assessment

11  section, developmental history.  And it says here that when you

12  were three or four, you were hit by a car, sustaining multiple

13  injuries.

14  **INMATE GUTIERREZ:**  I was hit by a brick when I was

15  three or four.  And I fell into a cellar when I was about four

16  or five.  And I got hit by a car when I was five or six.

17  **PRESIDING COMMISSIONER ENG:**  All right.  So this is

18  good.  Because this says at three or four, you were hit by a

19  car.  It says at four or five, you were hit with a brick in the

20  head and suffered a skull fracture.

21  **INMATE GUTIERREZ:**  Right.

22  **PRESIDING COMMISSIONER ENG:**  Well let's suffice it to

23  say that.  How about we say these things happened before the

24  age of 10.

25  **INMATE GUTIERREZ:**  Well after the age of 10, I got run

*Capitol Electronic Reporting*

1  over by a bus.

2       **PRESIDING COMMISSIONER ENG:**  Right.  I see that, at 14.

3  Right?  This says at 14 you were hit by a bus and suffered a, I

4  guess you had another, fractured skull.

5       **INMATE GUTIERREZ:**  Correct.  It was a big bus.

6       **PRESIDING COMMISSIONER ENG:**  Head sutured, but you were

7  not hospitalized.

8       **INMATE GUTIERREZ:**  They wanted to.

9       **PRESIDING COMMISSIONER ENG:**  Okay.

10      **INMATE GUTIERREZ:**  I didn't stay.

11      **PRESIDING COMMISSIONER ENG:**  Okay.  So that's quite

12  significant.  You know, up until the age of 14 to have so many

13  series injuries.  You were hit by a car, you were hit in the

14  head with a brick, and then you were hit by a bus.

15      **INMATE GUTIERREZ:**  Then I fought in the PAL.

16      **PRESIDING COMMISSIONER ENG:**  In the what?

17      **INMATE GUTIERREZ:**  Police Athletic League.

18      **PRESIDING COMMISSIONER ENG:**  You fought?

19      **INMATE GUTIERREZ:**  Yeah.

20      **PRESIDING COMMISSIONER ENG:**  What do you mean by

21  fought?

22      **INMATE GUTIERREZ:**  (Indiscernible.)

23      **PRESIDING COMMISSIONER ENG:**  A boxer?

24      **INMATE GUTIERREZ:**  Boxer, yeah.

25      **PRESIDING COMMISSIONER ENG:**  So you were a boxer in the

1   Police Athletic League.  And how old were you?

2           **INMATE GUTIERREZ:**  In my teens.

3           **PRESIDING COMMISSIONER ENG:**  In your teens.

4           **INMATE GUTIERREZ:**  Hard kids in New York.

5           **PRESIDING COMMISSIONER ENG:**  Yeah.  Did you sustain any

6   serious head injuries from that?

7           **INMATE GUTIERREZ:**  No.

8           **PRESIDING COMMISSIONER ENG:**  Or you learned how to

9   fight pretty effectively.

10          **INMATE GUTIERREZ:**  I had a really good teacher.

11          **PRESIDING COMMISSIONER ENG:**  That's good.  Okay.  So

12  then at 17, joined the army.

13          **INMATE GUTIERREZ:**  I wanted to be airborne.

14          **PRESIDING COMMISSIONER ENG:**  Okay.  You couldn't, huh.

15  Or did you?  Were you in the airborne -- Okay.  And then you

16  were hit by a mortar round.  So you were injured?

17          **INMATE GUTIERREZ:**  No.  There was a phantom jet who

18  dropped three 750 pound bombs on our position.  And I was hit

19  by a piece of that.

20          **PRESIDING COMMISSIONER ENG:**  Okay.  Was that during

21  your first tour or your second tour?

22          **INMATE GUTIERREZ:**  First tour.

23          **PRESIDING COMMISSIONER ENG:**  First tour.  So you were

24  injured, but then you recovered.  And you signed up for a

25  second tour?

40

1          **INMATE GUTIERREZ:**  Six month at a shop.

2          **PRESIDING COMMISSIONER ENG:**  Okay.

3          **INMATE GUTIERREZ:**  That one you can go on R and R.

4          **PRESIDING COMMISSIONER ENG:**  Right.  Okay.  Do you feel

5   any of those old injuries coming back today?

6          **INMATE GUTIERREZ:**  Well, I've got arthritis all over my

7   body.  I think, probably, some of those injuries affected me.

8   But I've had a hard head.  I feel fine in the head except I'm

9   really sad.

10          **PRESIDING COMMISSIONER ENG:**  Yeah.  Well, okay.  You

11   got your GED while you were in the army.  Okay.  So, when did

12   you meet your wife?

13          **INMATE GUTIERREZ:**  In 1977, I was at Austin Peay State

14   University studying advanced German.  And there were 15 blondes

15   there from Europe studying German too.  And she was one of

16   them.

17          **PRESIDING COMMISSIONER ENG:**  Your wife's name is

18   Brigetta.

19          **INMATE GUTIERREZ:**  Brigetta.

20          **PRESIDING COMMISSIONER ENG:**  Brigetta, okay.  So you've

21   been married for close to 30 years, yeah.

22          **INMATE GUTIERREZ:**  No, we got married in '82.  We met

23   in '77.

24          **PRESIDING COMMISSIONER ENG:**  Okay.  All right.  But you

25   had a prior marriage.

1          **INMATE GUTIERREZ:**  Yes, I did.

2          **PRESIDING COMMISSIONER ENG:**  From '67 to '75.  Divorced

3    your wife after being discharged from the military.  Three

4    children from the union.

5          **INMATE GUTIERREZ:**  Two.

6          **PRESIDING COMMISSIONER ENG:**  Two children, okay.  All

7    right.  And where are they?

8          **INMATE GUTIERREZ:**  Well, I've got three kids.  But

9    those two children live in North Carolina.

10         **PRESIDING COMMISSIONER ENG:**  Okay.  Do you ever them or

11   hear from them?

12         **INMATE GUTIERREZ:**  I hear from them all the time.  We

13   write and call but they haven't been to see me.  My youngest

14   boy, who lives in Georgia, has been out to see me.

15         **PRESIDING COMMISSIONER ENG:**  Okay.  And your youngest

16   boy is that -- You had that with Brigetta?

17         **INMATE GUTIERREZ:**  No.  We had a child in '96, but it

18   died.

19         **PRESIDING COMMISSIONER ENG:**  Okay.

20         **INMATE GUTIERREZ:**  This is another person.

21         **PRESIDING COMMISSIONER ENG:**  Okay.  All right.  So you

22   have three children.  They're all alive and they're back east.

23   Okay.  All college educated.  Okay, okay.  Have I missed

24   anything in terms of you family history and your prior criminal

25   history?

1      **INMATE GUTIERREZ:**  You got the prior criminal history

2  down.

3      **PRESIDING COMMISSIONER ENG:**  Right.

4      **INMATE GUTIERREZ:**  We just touched the family history,

5  but that's all right.

6      **PRESIDING COMMISSIONER ENG:**  Well, there's a lot there,

7  I know.  But is there anything, a key, that you feel is

8  necessary to put it that I brushed over a little too much?

9      **INMATE GUTIERREZ:**  I'm a patriot and I love my country.

10  And so, I served a long time in the military.

11      **PRESIDING COMMISSIONER ENG:**  Yeah, you did.  Let me ask

12  you, why did you leave the military?

13      **INMATE GUTIERREZ:**  They had what they call a rift.  You

14  know, I was an enlisted man.  I came in as a private.  And

15  through boxing and hard work in the artillery airborne, I

16  worked my way up to staff sergeant by the time I was 20.  So I

17  was a staff sergeant in Vietnam for those tours.  And I came

18  back to the states.  And General Westmoreland, whom I knew,

19  told me, you'd make a good lieutenant.  And he asked me to go

20  OCS.  That if I'd applied, he would facilitate the entry.

21      So I went to OCS and graduated.  And then I went and

22  worked in the Pentagon.  And language school, I went to Germany

23  and served with the German Air Force, special weapons and

24  missiles.  I came back to the states and got out as a captain.

25  But they had this reduction in force.  And since I wasn't an

1   officer in Vietnam, I didn't have command in combat. So that

2   was a negative. Since I didn't get the silver star, I was put

3   in for, rather, the bronze stars.

4   Then, I couldn't stay in as an officer by decorations

5   because you had to have a silver star or higher if you didn't

6   have the command in combat or the degree. And because of the

7   duty stations, I had been assigned to German Air Force

8   custodial officer with special weapons. I spent all my time

9   trying to learn those weapons systems. And I didn't have an

10  opportunity to go to college the way I needed to.

11  So when '75 came around, the war was over. They told

12  me, guess what, you need to go back and be a sergeant first

13  class so you can retire as a major in five years or get out.

14  Here's some money and get out. So I said, give me the money

15  and got out. Another one of my blunders.

16  **PRESIDING COMMISSIONER ENG:** But you did go to college

17  for seven years. Right?

18  **INMATE GUTIERREZ:** Yes.

19  **PRESIDING COMMISSIONER ENG:** Around seven years.

20  **INMATE GUTIERREZ:** Yeah.

21  **PRESIDING COMMISSIONER ENG:** Okay. You went to

22  business school. So you were really doing a lot in terms of

23  education. Was that before?

24  **INMATE GUTIERREZ:** I was in college from -- I had a

25  couple of years before I got out of the military. And then, I

1   went to Austin Peay State University starting in '75.  I did

2   four years.

3         **PRESIDING COMMISSIONER ENG:**  Right.

4         **INMATE GUTIERREZ:**  I was on my last quarter to graduate

5   when I got busted on this federal stuff.  And then I've done a

6   couple of years since then in the joints.

7         **PRESIDING COMMISSIONER ENG:**  Okay.

8         **INMATE GUTIERREZ:**  And I finished a four year

9   programming course.

10        **PRESIDING COMMISSIONER ENG:**  Okay.  Again, is there

11   anything else that you feel is very, very important that I

12   missed?

13        **INMATE GUTIERREZ:**  Something that we never discuss in

14   these hearings is, and you kind of touched on it, but whenever

15   I bring up PTSD or Agent Orange or psychological problems, it's

16   always either minimized thrown out by the Panels.  But ask

17   yourself, please.  Here's a guy that's got this life going on.

18   A guy who comes from family that has never been arrested, ever.

19       All my family has served in the US military for a

20   hundred years, or have been ministers, or have been policemen.

21   And all of sudden, this happens to this guy.  Why?  Why is

22   that?  And we've got a legacy here of a family that has served

23   this country.  My uncle, my mother's brother, was in the death

24   march, the baton, served three years at Camp George in the

25   Philippines.  And I've got two cousins that served through

1   North Africa and the Italian boot.  They made the Normandy
2   landings.  My brother --

3   **PRESIDING COMMISSIONER ENG:**  Well, have you been -- Let
4   me ask you something.  Have you been through the Veterans
5   Administration services to go through the series of tests, or
6   whatever is required, to find out if you do, in fact, suffer
7   from post traumatic stress disorder and anything else?  Or any
8   of the latent affects from being exposed to Agent Orange.  Or
9   any of the other things from the Vietnam War.

10  **INMATE GUTIERREZ:**  Yeah.

11  **PRESIDING COMMISSIONER ENG:**  Have you gone through
12  that?

13  **INMATE GUTIERREZ:**  I did do that back in the federal
14  joint.  I knew there was something wrong because both of my
15  children are handicapped.  My boy has never had a job and my
16  girl can't have children.  She's overweight and her kidneys are
17  shut down.  And she's got a tumor in her brain now.  And all
18  that comes from Vietnam because they were born right after
19  Vietnam.  And then, the last boy is healthy.  And he's doing a
20  great job.  He's in charge of security for Clorox Corporation,
21  nationwide.

22      So I went to them at that time and I applied for Agent
23  Orange poisoning.  I applied for it because we were sprayed by
24  aircraft daily in Ashau Valley and in the Central Highlands.
25  And they told me back then that they were in denial and they

1    weren't giving action to anybody. Now they are, but they only

2    pay for spine bifida of the children.

3              **PRESIDING COMMISSIONER ENG:** Right.

4              **INMATE GUTIERREZ:** And PTSD, I tried on that also. And

5    they said well, he just doesn't have the symptoms. And I don't

6    know what the symptoms are and I'm not trying to fake any

7    symptoms. Something happened, but I'm much better now.

8              **PRESIDING COMMISSIONER ENG:** Than what you were before.

9    A part of me can really understand your frustration. But at

10   the same time, we're here. We're not doctors. We're not here

11   to find the reasons why you did the things that you did.

12   Because the bottom line is that you did commit a bunch of

13   crimes. And you did commit these life crimes. You were

14   convicted. And again, we're not here to retry it.

15             It's really to get a better understanding of what was

16   going on in your head. If you understand why you did the

17   things that you did. Have you put things in place today that

18   would prevent you, or stop you, or give you -- Would you

19   recognize any of the triggers that would cause you to break the

20   law again in the future? Okay.

21             We're here strictly to see if you are suitable for

22   parole. And that, in fact, you would not be any threat to

23   public safety in any way. So I can understand your

24   frustration. And believe it or not, we do have inmates that

25   are former military. All different types that have done their

1  time in Vietnam, coming from the Navy, the Air Force, a lot of

2  different places. And personally, I could say thank you for

3  what you did during the war. But at the same time, we have to

4  set that aside and really try to dig down to see where you're

5  at today. Does that make sense to you?

6  **INMATE GUTIERREZ:** Sure.

7  **PRESIDING COMMISSIONER ENG:** Okay. All right.

8  **INMATE GUTIERREZ:** Sure, it makes sense.

9  **PRESIDING COMMISSIONER ENG:** Okay. So, is there

10  anything else that's of terrific significance that you want us

11  to put into the record?

12  **INMATE GUTIERREZ:** Absolutely. I don't recognize that

13  guy 30 years ago. He had my name. He was in my other skin,

14  but that's not me today. I'm an old man now. Everything has

15  changed. You need to know that.

16  **PRESIDING COMMISSIONER ENG:** Well, Commissioner

17  Lushbough is going to over that. About the progress that

18  you've been making, the good and the bad. What you've been

19  doing since your commitment. And we'll talk more about that.

20  Okay. So, Commissioner Lushbough will bring us to date now.

21  **DEPUTY COMMISSIONER LUSHBOUGH:** Thank you. Mr.

22  Gutierrez, good afternoon.

23  **INMATE GUTIERREZ:** Afternoon.

24  **DEPUTY COMMISSIONER LUSHBOUGH:** You were received March

25  15th, 1985. And your life term began June 21st, 1989. Your

1   last hearing was August 30th, 2006, at which time you were

2   denied parole for a year.  And that was here at CTF.

3   Primarily, I'll be reviewing the period of time since August

4   30th, 2006 to the present.  But I will go back in some areas.

5        When you were received, you came in with a

6   classification score of 82 points.  You reduced that to zero by

7   2000.  And you currently carry the mandatory placement score of

8   19, which all life prisoners have as of 2003.  You have five

9   115s, none of which are within this period of review.  And in

10  fact, you've been free of those for approximately 14 years at

11  this point.  Your most recent one was July 1st, 1993, which was

12  a positive UA.  And I did see early on when you first came in,

13  you had a force in violence, a fight, in '86.  And a conspiracy

14  to escape in '87 at DVI.  Did you actually escape or you just

15  had the equipment to get out?

16       **INMATE GUTIERREZ:**  I had a hacksaw blade.

17       **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay, okay.  Had you

18  sawed through any metal or any bars?

19       **INMATE GUTIERREZ:**  I was trying to get out.

20       **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  All right.

21  Well, you have seven 128As and again, none within this period

22  of review.  You've been free of those about 10 years.  Your

23  most recent was January 31st, 1997.  That one had to do with

24  storage of food.  What was going on there?

25       **INMATE GUTIERREZ:**  Let's see, I was in, if I recall

*Capitol Electronic Reporting*

1    correctly, I think I was in that programming course I talked

2    about.  And you take your lunch to work.  And then at night

3    time, they didn't want to leave any food in the lockers.  So

4    you take your lunch with you.  I forgot my lunch.

5        **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  I did see you've

6    gotten your GED in the military.  And you've certainly spoken a

7    length about your college training.  And your 2006 reading

8    score was 12.9, which is as high as you can get on that TABE

9    score.  Are you currently in vocational printing?

10       **INMATE GUTIERREZ:**  Yes, ma'am.  I just finished it.

11       **DEPUTY COMMISSIONER LUSHBOUGH:**  You did.  When was

12   that?

13       **INMATE GUTIERREZ:**  I haven't officially finished it

14   because I didn't want to finish it just yet since they're

15   shipping so many people out.  And I didn't know what the Board

16   was going to do, etcetera.  But I've got a little portfolio.

17   I'm a printer now.

18       **DEPUTY COMMISSIONER LUSHBOUGH:**  All right.  Well hand

19   it to the officer, if you would.  We'd like to review it.

20   We'll look at it during the recess --

21       **INMATE GUTIERREZ:**  Sure.

22       **DEPUTY COMMISSIONER LUSHBOUGH:**  -- and give it back to

23   you before we --

24       **INMATE GUTIERREZ:**  Yeah, I've been there for about,

25   going on a year now.

1          **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

2          **INMATE GUTIERREZ:**  In the offset printing.  I basically

3    finished the course.

4          **DEPUTY COMMISSIONER LUSHBOUGH:**  So basically, yeah,

5    it's completed.  You just haven't gotten your certificate yet.

6          **INMATE GUTIERREZ:**  They've got some new technology

7    there.  That first photo there is of the new technology for

8    color.  I haven't finished it.  I've got to put two more colors

9    on that photo there.  And then I'll be finished with it.  I'm

10   doing the new technology, which is two points.  I've got 13 out

11   of the 15.

12         **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  Yeah, that's

13   getting close, 13 out of 15.  I know that you completed dry

14   cleaning back in 2002.  And it looked like you were about half

15   way through the vocational technology, the informational

16   technology, when the class got closed.  And no, it's not your

17   fault.  It just got closed in the year 2000.

18         **INMATE GUTIERREZ:**  Well, I wasn't half way through.  I

19   was totally through.  It was a four year course, which I

20   finished.  Five different oral examinations, which I took.  The

21   last oral examination, I did from memory in front of a monitor

22   civilian, by memory, entirely by, like, 15 pages and turned it

23   in to her.  The reason I wasn't able to graduate from that is

24   because they changed from CoVal to object oriented CoVal.

25         **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

1          **INMATE GUTIERREZ:** And they were not certified to

2     certify me for object oriented CoVal. Although, I did finish

3     the object oriented text books that they had. And so,

4     basically, I finished the course.

5          **DEPUTY COMMISSIONER LUSHBOUGH:** Okay. That portion of

6     it. Just not the CoVal, huh.

7          **INMATE GUTIERREZ:** Yeah. It's all CoVal.

8          **DEPUTY COMMISSIONER LUSHBOUGH:** You finished that too,

9     okay.

10         **INMATE GUTIERREZ:** Four years.

11         **DEPUTY COMMISSIONER LUSHBOUGH:** Okay.

12         **INMATE GUTIERREZ:** I've got that here too.

13         **DEPUTY COMMISSIONER LUSHBOUGH:** You were working in the

14    bridging program as a teaching assistant in 2005 and 2006. It

15    says you were an exceptional worker. What were you doing as a

16    teaching assistant? What areas were you teaching? I guess is

17    what I want to know.

18         **INMATE GUTIERREZ:** Well, I taught Spanish, German,

19    Algebra, and I've also just assisted ESL. And I've worked in

20    bridging, which is something like a pre-release program. So

21    through the years, those are the areas that I've worked.

22         **DEPUTY COMMISSIONER LUSHBOUGH:** I did see that you had

23    been a teaching assistant in ESL in 2003, specifically. Okay.

24    This is a certificate of completion. I'm glad you brought this

25    in today because I did not find this in the Central File.

1   Dated September 8th, 2000 and vocational information technology

2   and programming.  And it lists the various, specific areas, of

3   study that you had completed.

4        In terms of self-help, I did see that you had been

5   participating in NA in 2006 and 2007.  And that the record

6   indicates that you've been going since 1996.  Have you been

7   going consistently during that time?

8        **INMATE GUTIERREZ:**  Yes, ma'am.

9        **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  And are you

10  studying the 12 steps or do you apply them?

11       **INMATE GUTIERREZ:**  Yes, I do.

12       **DEPUTY COMMISSIONER LUSHBOUGH:**  Do you?

13       **INMATE GUTIERREZ:**  Try to.

14       **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  Have you ever

15  had any problems with any of the steps in terms of application?

16       **INMATE GUTIERREZ:**  Yes, I do.

17       **DEPUTY COMMISSIONER LUSHBOUGH:**  Which one?

18       **INMATE GUTIERREZ:**  I have a hard time making amends

19  because I can't contact my victims.  I believe they've probably

20  passed away by now.  They were at least in their 50s.  And I

21  can't do any volunteer work in the community because I'm here.

22  I can't demonstrate to my family that I am a new person.  And

23  try to help my kids, a legacy for them.  Earn some money for

24  them.  I'm a writer.  So I'm hoping to sell some books when I

25  get out.

1       **DEPUTY COMMISSIONER LUSHBOUGH:**  I noticed in one of the

2   reports that you were considering in your future plans, if

3   you're released, to write a novel.

4       **INMATE GUTIERREZ:**  It's finished.

5       **DEPUTY COMMISSIONER LUSHBOUGH:**  Good for you, good for

6   you.

7       **INMATE GUTIERREZ:**  Yeah.

8       **DEPUTY COMMISSIONER LUSHBOUGH:**  How recently did you

9   just finish it?

10      **INMATE GUTIERREZ:**  Not long ago.  This year.  But I've

11  already started the sequel.

12      **DEPUTY COMMISSIONER LUSHBOUGH:**  How many rewrites or

13  edits did you do on it?

14      **INMATE GUTIERREZ:**  On and on.

15      **DEPUTY COMMISSIONER LUSHBOUGH:**  That's big work, isn't

16  it.  You get it on paper and then you've got to revise it and

17  edit it.

18      **INMATE GUTIERREZ:**  Well, I'm assisted because I'm

19  writing non-fiction and fictionalizing it.  So all the events

20  happened.  All the commanders were there.

21      **DEPUTY COMMISSIONER LUSHBOUGH:**  Biographical?

22      **INMATE GUTIERREZ:**  It's the wilderness campaign.

23  Actually, the last year of the civil war with the army in

24  northern Virginia.

25      **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay, okay.  Well,

1  you've also been balanced re-entry activity group.  That was in

2  2006.  And you have ongoing participation in the veteran's

3  self-help.  And then you also have AA in 2005 and 2006.  Are

4  you still in AA as well?

5          **INMATE GUTIERREZ:**  I'm in all those programs still,

6  now.

7          **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  There was one

8  letter I wanted to summarize on the record.  This is at least

9  the second one.  I've seen one other in the file.  This one is

10  dated May 25th, 2007, signed by Chaplain Christine McNamara,

11  capital M, small C, capital N, A-M-A-R-A, a Catholic chaplain.

12  And the chaplain is writing on your behalf in the hope that you

13  will get a date for parole.  And also pointing out that your

14  accomplishments during the past 23 years.  And your effort put

15  in to seeking self-help and vocational training.

16          The chaplain felt you had a good heart, you're deeply

17  sorry for you're past actions, and trying very hard to learn

18  from your mistakes.  And understand your motivations and

19  actions to master personal skills and vocational trades so that

20  you'll be a productive member of society.  You regularly

21  participate in Catholic services and programs.  And tremendous

22  help with language skills as a Spanish translator.

23          The chaplain feels you're more than ready for parole

24  and deserves our consideration.  It's a nice letter.  And I

25  know it's not the first one that the chaplain has written.

1   Which tells me that there has been an ongoing relationship and

2   you continue to participate in these things with the Chapel,

3   for instance.  Have I left anything out in terms of your self-

4   help or post conviction since August 30th, 2006?  Because if I

5   have or haven't mentioned it, please bring it to the Panel's

6   attention.

7        **INMATE GUTIERREZ:**  I think that's it.

8        **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  In that case, I

9   want to thank you very much for your attention.  I'm going to

10  ask you to direct your attention now to Commissioner Eng.  If

11  you would, please.

12       **INMATE GUTIERREZ:**  Thank you.

13       **PRESIDING COMMISSIONER ENG:**  Well, let's talk about

14  your future plans.  I see here that you still -- Your primary

15  residential plan is to live with Brigetta Gutierrez, your wife.

16       **INMATE GUTIERREZ:**  That's correct.

17       **PRESIDING COMMISSIONER ENG:**  Who now lives in Stockton,

18  California.  Correct?

19       **INMATE GUTIERREZ:**  We own a home there.

20       **PRESIDING COMMISSIONER ENG:**  Okay, okay.  So, how long

21  has she been living there?

22       **INMATE GUTIERREZ:**  Fifteen years.

23       **PRESIDING COMMISSIONER ENG:**  Wow.  Okay.  And it says

24  here in the most recent Board report, the employment plans

25  remain the same.  And I can only go back, I think it's the '04.

1   Yeah, the '04.  Let me see.  Okay.  So your wife, she runs a

2   company out her home?

3       **INMATE GUTIERREZ:**  No.  Getty, works for a large

4   insurance conglomerate.  They own over 300 companies.  And

5   she's been with them for about 22 years now.  But we have our

6   own plans to work out of the home.  Based on her experience

7   there and my facility with computers and what administrative

8   abilities that I can contribute to the effort.

9       **PRESIDING COMMISSIONER ENG:**  Okay.  So you lost me.

10  Does she work out of the home?

11      **INMATE GUTIERREZ:**  She works out of the home.

12      **PRESIDING COMMISSIONER ENG:**  Okay.

13      **INMATE GUTIERREZ:**  But for this company.

14      **PRESIDING COMMISSIONER ENG:**  For this big company.

15  Okay.  All right.  And she can continue doing that.  Correct?

16      **INMATE GUTIERREZ:**  Yeah, she can.  But she's been with

17  them 22 years and she wants to try something else.  We want to

18  go into an appraiser type set up where she does the appraisals.

19  I stay away from peoples homes.  And I do the administrative

20  office work.

21      **PRESIDING COMMISSIONER ENG:**  Okay.

22      **INMATE GUTIERREZ:**  Computer work.

23      **PRESIDING COMMISSIONER ENG:**  So, is she waiting to make

24  this change until you come out?  Or is she transitioning now to

25  --

1 **INMATE GUTIERREZ:**  We're both studying the appraisal

2 course.

3 **PRESIDING COMMISSIONER ENG:**  Okay.

4 **INMATE GUTIERREZ:**  She sends it to me.  I finish them.

5 I send them back.  I'm on Chapter 18 now.  We've got two more

6 to go.  She finished hers long ago.  And she's waiting for me

7 to come home.

8 **PRESIDING COMMISSIONER ENG:**  Okay.  So at the same

9 time, this also says pursue novel writing.  So you're going to

10 try to get your novel published?

11 **INMATE GUTIERREZ:**  Absolutely.

12 **PRESIDING COMMISSIONER ENG:**  Have you been writing to

13 publishers?

14 **INMATE GUTIERREZ:**  I've got a publisher.

15 **PRESIDING COMMISSIONER ENG:**  You do.

16 **INMATE GUTIERREZ:**  Yeah.

17 **PRESIDING COMMISSIONER ENG:**  So, what are the

18 prospects?

19 **INMATE GUTIERREZ:**  It looks pretty good.  It's my

20 brother.  He is the dean of the University of Puerto Rico.

21 He's got a press there.  And he tells me, send it down and

22 we'll print it as a thesis for you.

23 **PRESIDING COMMISSIONER ENG:**  Okay.

24 **INMATE GUTIERREZ:**  So that's what we're doing right

25 now.  We're typing it, retyping it, and Getty is putting it on

*Capitol Electronic Reporting*

1   disk.   And then sending it over to him by pieces.

2   **PRESIDING COMMISSIONER ENG:**   Okay.   Then it also states

3   here that there's a possibility of opening a home based dental

4   prosthetics laboratory.

5   **INMATE GUTIERREZ:**   Just an option.   I do prosthetics.

6   I'm real good at it.   And if necessary, I'll do that.   Anything

7   honest.

8   **PRESIDING COMMISSIONER ENG:**   That could be expensive,

9   opening up a prosthetics lab in your home, though.

10   **INMATE GUTIERREZ:**   Not really.   I know the head lab

11   technician at old Folsom.   And he has the whole set up in his

12   garage.   And he tells me, Joseph, you're the best tech I've

13   ever had, this stuff is yours.   So I can just move it into my

14   garage and go to work.

15   **PRESIDING COMMISSIONER ENG:**   Okay.   Work with the

16   Catholic church groups to help the poor, the homeless, and the

17   less fortunate.   Okay.   So your first choice would be to branch

18   off and do this appraisal type position.   Well, that's for your

19   wife to do and you do the administrative.

20   **INMATE GUTIERREZ:**   But I'll dig ditches if necessary.

21   **PRESIDING COMMISSIONER ENG:**   Okay.   Well, have you

22   taken a look at or inquired on the outside as to where you

23   might be able to work upon release to at least get some cash

24   flow going?

25   **INMATE GUTIERREZ:**   Sure.   Getty has gone around and



1   checked on all the offset printing shops in Stockton.  And
2   there's about 20 of them.  And they have a steady rotation of
3   offset printing operators, printer operators.  And I'm pretty
4   good at that.  So if necessary, I can do that.  And I'll talk
5   to Dennis and see if they need some extra prosthetic help, if
6   necessary.  If I can get a job programming computers, once I
7   can get updated through the -- They've got a couple schools up
8   there in Stockton.

9       **PRESIDING COMMISSIONER ENG:**  Right.

10      **INMATE GUTIERREZ:**  I'll do that.  But we hope that we
11  can get this home based business off the ground.

12      **PRESIDING COMMISSIONER ENG:**  Well it's risky.  But at
13  the same time, if you're not given a date today, it might be
14  good for you to at least write to some places to find out how
15  viable it would be, you know, for you to possibly get an
16  appointment with them.

17      **INMATE GUTIERREZ:**  If I don't get a date today, I don't
18  know who's going to hire a 65 year old ex-convict.

19      **PRESIDING COMMISSIONER ENG:**  You don't ever know.  You
20  don't ever know, sir.  The thing is that the ex-convict part is
21  never going to go away.  So again, you have to see, you know,
22  what companies would not hold that against you.  And that's the
23  unfortunate reality.  Because you do have that.

24      **INMATE GUTIERREZ:**  Truthfully, I don't fear that.  I've
25  never been without a job.  I explained to you what happened out

60

1    here.

2            **PRESIDING COMMISSIONER ENG:**  Right.

3        **INMATE GUTIERREZ:**  But I've always been employed all my

4    life.

5            **PRESIDING COMMISSIONER ENG:**  Okay.

6        **INMATE GUTIERREZ:**  Ever since I was 13.

7        **PRESIDING COMMISSIONER ENG:**  It's not easy today.  Even

8    with people that have a lot of education and a lot of

9    experience.  It's still tough out there, okay.

10       **INMATE GUTIERREZ:**  I can milk cows.

11       **PRESIDING COMMISSIONER ENG:**  Well then, bring in a

12   letter stating that you're going to be hired making 10 dollars

13   an hour milking cows.  That's what the Board needs to see.

14   Okay.  Okay, let's see.  Let me read into the record these

15   letters.  We've got a current letter dated July 2nd, 2007 from

16   Brigetta Gutierrez, Mr. Gutierrez's wife.  And it's a very

17   supportive letter.

18           It states that she has sent a lot of previous letter

19   describing how her husband has a loving home to return to and

20   the support of family and friends.  And that, she says that she

21   has described his desire to, once again, become a productive

22   and contributing member of society.  And she states that how he

23   and his family have suffered as a result of your, quote, no

24   parole policy, unquote.  She states that you have served your

25   time and your parole is long overdue.

1    She's pretty insulting in her letter to the Board.   To
2   be honest with you.   The way I read this.   She states that she
3   understands that her letter and letters from family and friends
4   were never read into the record on his last parole hearing in
5   August 2006.

6        **INMATE GUTIERREZ:**   That's true.

7        **PRESIDING COMMISSIONER ENG:**   Okay.   Perhaps because a
8   lot of times we don't read the letters verbatim because we'd be
9   here until all hours.   And sometimes we get a hundred letters.
10  So what we do is generally address in general, if it's a
11  general support letter.   But I wanted to bring this up because
12  I'm going to be honest with you, sir.   I read that and I went,
13  huh, okay.

14       **INMATE GUTIERREZ:**   She's upset.

15       **PRESIDING COMMISSIONER ENG:**   Well you know what, she
16  has a right to be upset, okay.   Because of her situation.   But
17  she made the choice to marry you and be in this situation.   But
18  there's never any mention about the crime that was committed.
19  And what about all the victims.   So it's rather one sided and
20  it's attacking the Board.   And that's usually not a smart thing
21  to do, okay.

22       **INMATE GUTIERREZ:**   Well I'm doing the time, however,
23  not her.

24       **PRESIDING COMMISSIONER ENG:**   That's right, that's
25  right.   But you want a support letter.

1      **INMATE GUTIERREZ:**  Which she sent in last year and they

2   did not read it.

3      **PRESIDING COMMISSIONER ENG:**  Okay.  Every time though,

4   you know, you've been through this.  This is your seventh

5   subsequent, okay.  And you get different Panel members all the

6   time.  And different Panel members treat things differently and

7   look at things differently.  So again, I recognize that she's

8   frustrated but maybe she should write it out first and then

9   calm down, go back and rewrite it or something.

10     **INMATE GUTIERREZ:**  I think that was her third rewrite.

11  You should have seen the first ones.

12     **PRESIDING COMMISSIONER ENG:**  Okay.  So we've got a

13  letter there.  Unfortunately, she fails to say that she, you

14  know, that you would be coming home to her home and have a

15  place.  And then what she would be providing there.  But we do

16  understand it.

17     **INMATE GUTIERREZ:**  It's in last year's.

18     **PRESIDING COMMISSIONER ENG:**  I don't have it.

19     **ATTORNEY TARDIFF:**  Well it says, in previous letters I

20  have described to you how my husband has a loving home to

21  return to.

22     **PRESIDING COMMISSIONER ENG:**  Okay, yeah.  Exactly.

23     **ATTORNEY TARDIFF:**  So I guess that's --

24     **PRESIDING COMMISSIONER ENG:**  Yes.

25     **INMATE GUTIERREZ:**  She's described various times, our

1  business plans in her letters to the Board. They're there in

2  the record. She's described them various times.

3      **PRESIDING COMMISSIONER ENG:** Okay. You also need to

4  understand, a lot of people can write a lot of different

5  things. Okay. What's important is that this is just the first

6  line. If and when people are given a date, everything goes to

7  a decision review Panel. And they investigate a lot of stuff,

8  okay. And they don't see a person. They see black and white.

9  And some of these files do not read really great. And a lot of

10 it has to do with being able to meet with the person, being

11 able to look them in the eyes, being able to read the body

12 language, etcetera. Okay.

13      So it's very, very important that when any inmate comes

14 forward with documented evidence to their parole plans, that it

15 provides more answers and doesn't raise question. And I think

16 you can understand that. Because again, it's going off to

17 different people. The governor's office is going to take a

18 look at it. And they would say well, you know, we see

19 prisoners everyday. They're going to tell us, they're going to

20 write out and tell us what they think we want to hear just so

21 that they can get out. So again, it has to stand up under

22 scrutiny. And I'm sure you're a bright man. You can imagine.

23 If you're sitting here what would you be expecting to say?

24      **INMATE GUTIERREZ:** Well all I can say is that all the

25 previous Boards have said I've got excellent parole plans.

64

1      **PRESIDING COMMISSIONER ENG:**  And very well you might,
2  but you haven't gotten a date.

3      **INMATE GUTIERREZ:**  That's why she said you have a no
4  parole policy.

5      **PRESIDING COMMISSIONER ENG:**  Not true because there
6  could be a lot of other -- It's not always -- Parole plans are
7  not a major factor in determining suitability.  There's a lot
8  of other things, okay.  But it helps and it's in your best
9  interest to have really, really solid plans.  Because what if
10  your wife gives up her job at 22 years and you're betting on
11  the come line that this business is a go.  And if you're going
12  to have a tough time getting, you know, a paying job.  And both
13  of you are sinking your savings into one thing and it doesn't
14  happen.  What are you going to do?

15      **INMATE GUTIERREZ:**  I've got five vocations.

16      **PRESIDING COMMISSIONER ENG:**  But you don't have
17  something solid that's going to be giving you cash, okay.  What
18  we're concerned about is, you've been in that position before,
19  sir.  And that's what kicked off these robberies, these kidnap
20  for robberies.  That's what got you a life crime.  Okay.

21      **INMATE GUTIERREZ:**  And that was almost 30 years ago.

22      **PRESIDING COMMISSIONER ENG:**  Exactly.  But you've got a
23  history of breaking the law.  Okay.

24      **INMATE GUTIERREZ:**  I'm not arguing with you on that.

25      **PRESIDING COMMISSIONER ENG:**  Right.

*Capitol Electronic Reporting*

1       **INMATE GUTIERREZ:**  And I've served my quarter century.

2       **PRESIDING COMMISSIONER ENG:**  But this is why it's so

3  important for you.  Because of your history.  Because you have

4  shown that you did not adjust well when you came out of prison

5  the last time.  And you, boom, went back into breaking the law

6  to a point where you committed life crimes.  Okay.  Which ended

7  up, you in this prison with a life term.

8       **INMATE GUTIERREZ:**  You're exactly right.

9       **PRESIDING COMMISSIONER ENG:**  So you've got a lot to

10  overcome.  Yeah, you've been in prison for, you know, well we

11  see for this life term, about 22 years, even though you've been

12  in longer than that.  But at the same time, you know, we need

13  to feel comfortable.  And you need to know that you would never

14  resort back to the criminal activities if you find yourself in

15  a similar situation where you don't have the money.  What if

16  you're on the verge of losing a home that you and your wife

17  own?  Are you going to --

18       **INMATE GUTIERREZ:**  I'll starve first.

19       **PRESIDING COMMISSIONER ENG:**  Yeah.  But your history

20  shows you didn't hesitate to pick up a gun and go try to get

21  money.

22       **INMATE GUTIERREZ:**  But that was a quarter century ago.

23  And no one died.

24       **PRESIDING COMMISSIONER ENG:**  What has changed?  Besides

25  you being a quarter century older.

1          **INMATE GUTIERREZ:**  I'm a new man.

2          **PRESIDING COMMISSIONER ENG:**  In what way?

3          **INMATE GUTIERREZ:**  I now believe that my life is in the

4     hands of my Lord, God.  And I leave everything in his hands.

5     And I trust him.  And I trust my wife.  And I'm now 62, not 30,

6     or 38, or 35.  And I've got a quarter century of prison behind

7     me.  And my children grew up without me.  And I've destroyed

8     their lives and my life.  And I can go on forever with this.  I

9     think there's a waterfall that has happened.  And you can't

10    keep looking at me in 1984 eyes or 1983 eyes.  That time is

11    gone.

12         **PRESIDING COMMISSIONER ENG:**  But you've also told this

13    -- You just told this Panel a lot of things that we hear from

14    every prisoner.

15         **INMATE GUTIERREZ:**  Yeah.  Well, you have to make that

16    determination.  I can't tell you what to do.

17         **PRESIDING COMMISSIONER ENG:**  No.  What we're looking

18    for is you explain to us.  What have you learned about yourself

19    about the triggers that caused you to do what you did.  And

20    what tools do you use to stop yourself to prevent yourself from

21    ever being a threat to the public safety again.  But we'll get

22    to that, okay.  Because I want to finish reading these letter

23    in.

24         June 26th, 2007, Douglas Larson, who lives in Modesto.

25    This is a friend of yours.  That's what he says.  How long have

67

1  you know him?

2      **INMATE GUTIERREZ:**  He use to be my M-2 sponsor.  And

3  then he quit the M-2 sponsor business because he was being

4  taken advantage of by the --

5      **PRESIDING COMMISSIONER ENG:**  What's an M-2 sponsor?

6      **INMATE GUTIERREZ:**  You don't have anybody visiting you

7  in prison.  And these guys are Christians.  And they apply to

8  come down here.  And they marry us up.  And then you get visits

9  from these guys and they try to convert you, is what happens.

10     **PRESIDING COMMISSIONER ENG:**  Religious?

11     **INMATE GUTIERREZ:**  It's a religious thing.  But he

12 never attempted that with me.  He's a Protestant and I'm a

13 Catholic.  We just became fast friends.  And he didn't feel

14 like I was exploiting him over these years.  And we're now real

15 close friends.  And he's a very good friend with my wife and so

16 is his family.

17     **PRESIDING COMMISSIONER ENG:**  So he visits you often?

18     **INMATE GUTIERREZ:**  All the time.

19     **PRESIDING COMMISSIONER ENG:**  That's good.  Okay.  I've

20 got a letter dated June 27th, 2007 from Daniel Gutierrez, a

21 major retired in -- A major in the Army, Air Force, what is

22 that?  I don't know.

23     **INMATE GUTIERREZ:**  Army, United States.

24     **PRESIDING COMMISSIONER ENG:**  Okay.  So this is your

25 brother.  Okay.  And he's in Houston, Texas.  And he talks

```
 1  about the picture, the photograph with you standing at
 2  attention in front of our nation's flag in a military salute.
 3  Okay.  And it's a very, very supportive letter about the
 4  different things of what you've done in the past.  And how you
 5  should be able to rejoin society.  And he's just asking us to
 6  please give a genuine review of my brother's case.  Okay.  I
 7  just want to double check to see if there's any other letters.
 8  I didn't think there were.  No.  Okay.  Did I get the letter,
 9  sir?
10       INMATE GUTIERREZ:  Well, there was a letter from my
11  brother in Puerto Rico, Dr. Elias Gutierrez.  If you don't have
12  this one, last year's wasn't read.  I'd appreciate if you'd
13  read last year's.
14       PRESIDING COMMISSIONER ENG:  I don't have it.  All I
15  have are the updated information.  There's nothing in our
16  packets.
17       ATTORNEY TARDIFF:  The letter from last year should be
18  in his C File.
19       DEPUTY COMMISSIONER LUSHBOUGH:  What was the first
20  name, sir?
21       INMATE GUTIERREZ:  Elias Gutierrez, Dr. Elias
22  Gutierrez.
23       DEPUTY COMMISSIONER LUSHBOUGH:  Thank you.
24       INMATE GUTIERREZ:  I'm sure he sent his letters.  They
25  just didn't get into the record this year.
```

1   **PRESIDING COMMISSIONER ENG:** Did you bring a copy with

2 you?

3   **INMATE GUTIERREZ:** No, I just got a fax on those that

4 you just read right there. But his came in separate. He's

5 coming in from Puerto Rico. So I'm sure he sent them to the

6 Board. They just didn't get down here.

7   **PRESIDING COMMISSIONER ENG:** They would have been in

8 here, had they come in after his August '06 hearing.

9   **INMATE GUTIERREZ:** Well it's more of the same thing.

10   **PRESIDING COMMISSIONER ENG:** While we're searching for

11 that, lets let her search for it. And I need to address that

12 we also sent out Penal Code section 3042 notices. And those

13 notices go to agencies that have a direct interest in your

14 case. And now I've got to double check all this updated

15 material to see if we have a letter from law enforcement. I

16 don't recall seeing it. Wait a minute. No, we already did

17 that letter, the Chaplain's. That's the one I couldn't find.

18   But while I'm looking, we also have present with us a

19 representative from the Los Angeles County District Attorney's

20 Office, who I'm sure will be making a statement regarding

21 suitability. We do not have a current letter from law

22 enforcement. And there's nothing in the file. Commissioner,

23 have you found anything yet? It would have been, probably,

24 right on top as the most current.

25   **DEPUTY COMMISSIONER LUSHBOUGH:** No. Actually, this

1  whole section is not tabbed. And so it's all -- I have to go

2  back chronologically. And I will surely find it.

3           **PRESIDING COMMISSIONER ENG:** Okay.

4           **DEPUTY COMMISSIONER LUSHBOUGH:** If it's in here, I will

5  find it.

6           **PRESIDING COMMISSIONER ENG:** Okay. Well if it's in

7  there, then at that time before -- If she finds it before we

8  recess then we'll go ahead and read that. But in the interim,

9  let's go ahead and move on and see if there's any subsequent

10  questions that the Panel might have.

11          This is an opportune time for you to explain to this

12  Panel, besides giving the words out that we hear from everyone.

13  And I'm being honest with you. I'm being totally honest with

14  you, that's what we hear from everybody. But what we're

15  looking for is what have you discovered about yourself. What

16  do you think caused you, okay, to make the choice and do these

17  illegal activities. And pull a gun on people and threaten

18  their lives like that. What caused you to do that?

19          **INMATE GUTIERREZ:** Well I'll just keep as simple as I

20  can. I think stupidity is probably the top word to use. Greed

21  and poor judgment at the time.

22          **PRESIDING COMMISSIONER ENG:** You weren't that young

23  either. You were 38. You should have known better. You know,

24  you had served your country. This is what's very, very

25  troubling. This could be why other Panels saw that too. This

1   is very troubling.  You weren't a 16, or an 18, or a 20 year

2   old kid.  You were 38, 13 years to 15 years of military

3   service.  All right.  I didn't see that in the file.  But you

4   stated after that, you were in law enforcement.  And then for

5   you to totally go the opposite way and then start a new, shall

6   we say, career in crime is very, very troubling.

7        So you know, everybody can say, well yeah, it was

8   stupid, it was bad judgment.  A lot of people kill, you know,

9   and do all kinds of crimes.  And yeah, they're stupid moves and

10  it's bad judgment.  But again, what's to make us believe that

11  given another scenario where you're frustrated.  I don't care

12  how old you are because we see 70 year olds that commit murder

13  today.  So, I mean, age doesn't have anything to do with it,

14  okay.  Why should we believe that you are changed.  And that

15  you would be pro-social and not get yourself into a situation

16  such as this or worse, or worse.

17       **INMATE GUTIERREZ:**  Well first of all, there was no

18  killing ever in my life.  Except what I did in combat under

19  orders.  Second of all, we talked about the pressures and the

20  strains that I lived under at the time, which no longer exist.

21  Third of all, I haven't hurt anybody in all these years.  Nor

22  have I threatened anyone.  Nor have I been caught with any

23  weapons.  And my behavior has been almost exemplary.

24       I did try to escape in '87 because I was trying to be

25  recruited into prison gangs.  And it was either hurt them, get

1   killed, or do something. And I wasn't going to snitch so I

2   made an attempt to get out of there. But apart from that, you

3   know, a guy attacked me. I fought back. That was it.

4         I think that if you have a pit bull who runs around

5   eating everybody's dog in the neighborhood, then that pit bull

6   has to be put away forever. You've got to get rid of it. He's

7   killing things. He's hurting things. Tearing things to

8   pieces. But if you've got a man in front of you who hasn't

9   done any of those things for 25 years, or going on 25 years.

10  Then at some point, you have to say well, what is he here for?

11  Did he rip off somebody's arms, like the *Polly Klaas* case. Or

12  rape somebody's child. Or beat some child to death.

13        A guy just got a date up here who beat his child to

14  death, or something like that. No. He did some terrible

15  crimes. He robbed. Then he took these people from where they

16  were located. And now, he has tried to renew himself

17  spiritually as well as mentally. Hopefully got over whatever

18  sickness I was suffering from back there.

19        As I was saying, before I try to make the point, the

20  Panels don't seem to say to themselves well, why did that

21  happen to him at that particular time. Here, you've got a guy

22  who doesn't have that history. And all of a sudden, in a

23  period of his life, this happens. Now it hasn't happened

24  anymore. So what do you do? Life without? Or has this guys

25  served his time? He has proven, by his activity and his

1    actions and his expression, that he's not that person anymore.

2         That's what I had said a while ago about amendments,

3    amends.  Making amends to people.  I can't do anymore than I'm

4    doing now to show that I'm a changed human being until I get

5    chance to go out there and prove that by my work.  And by my

6    sacrifice to the community work which I plan on doing.  And by

7    my productivity in the community.  And by helping my family.

8    And I'm not a kid anymore.  I've had a couple of heart attacks.

9    I've got arthritis.  There's no reason for you to believe that

10   I'm going to take weapon to anybody anymore because it hasn't

11   happened in almost a quarter century.

12        **PRESIDING COMMISSIONER ENG:**  Sir, you've been in prison

13   for a quarter century.  Okay.

14        **INMATE GUTIERREZ:**  I've seen a million murders since

15   I've been down --

16        **PRESIDING COMMISSIONER ENG:**  Wait, wait, wait, wait.

17   You left.  You got out of federal prison.  And you carried a

18   firearm with you across state lines, came out to California and

19   committed a life offense, okay.  So the times that you were

20   free, you were bad.  Okay.  You've been in this prison for --

21        **INMATE GUTIERREZ:**  Well up until, you mean --

22        **PRESIDING COMMISSIONER ENG:**  -- twenty five years.

23        **INMATE GUTIERREZ:**  In that time that you're talking

24   about, that's true.  But you just finished saying that I had

25   this whole other life.  Well that didn't take place in my life.

*Capitol Electronic Reporting*

1    So something happened to me then and I'm guilty of all that.

2    And I've paid for it as honorably as I could.  Now I'm saying

3    to you, what's my sentence?  Is my sentence is what you've got

4    there in front you or is it life without parole?

5         **PRESIDING COMMISSIONER ENG:**  Your sentence is exactly

6    what I'm looking at, life plus nine.

7         **INMATE GUTIERREZ:**  Yeah.

8         **PRESIDING COMMISSIONER ENG:**  It's life plus nine.

9         **INMATE GUTIERREZ:**  Yeah.

10        **PRESIDING COMMISSIONER ENG:**  That doesn't mean that

11   it's a determinate sentence.  But you have to prove, you know,

12   that you're not going to be a threat.

13        **INMATE GUTIERREZ:**  And I haven't done that.  I haven't

14   done that all these years?  That's what my life is about,

15   trying to prove that.

16        **PRESIDING COMMISSIONER ENG:**  Have you thought about

17   this?  That all those years prior to you going down this other

18   route of crime, you were in pretty structured environments.

19        **INMATE GUTIERREZ:**  Not in New York City when I was

20   living alone from the time I was 13 until I was 17.

21        **PRESIDING COMMISSIONER ENG:**  That's right.  But it's

22   what you entered into.  At a young age, you entered into the

23   military very structured.

24        **INMATE GUTIERREZ:**  Yeah.  And I saw kids going into the

25   military --

1       **PRESIDING COMMISSIONER ENG:**  So maybe you do fine --

2       **INMATE GUTIERREZ:**  -- left and right.

3       **PRESIDING COMMISSIONER ENG:**  So, wait a minute.

4       **INMATE GUTIERREZ:**  And they couldn't hang for six

5  months and a year.

6       **PRESIDING COMMISSIONER ENG:**  Okay, wait a minute.

7       **INMATE GUTIERREZ:**  And they got kicked out as

8  undesirables.

9       **PRESIDING COMMISSIONER ENG:**  Okay, wait a minute.

10       **INMATE GUTIERREZ:**  I didn't.

11       **PRESIDING COMMISSIONER ENG:**  Just wait and listen.  You

12  were in a structured environment.  And you did very, very well

13  in the military.  Thirteen, 15 years is when you came out of

14  that structure environment that things fell apart.  You've been

15  doing, according to your words, very, very well in another

16  structures environment.  You said that you haven't done

17  anything in the last 25 years.  Because you've been in prison

18  in a structured environment.  There could be a pattern there.

19       And I already stated and you can be as stubborn as you

20  want.  I really don't care because this is your life.  And this

21  is your future.  You know and I'm just saying that I see

22  something here that with your plans with your wife.  I think

23  that, although admirable, that you could find yourself in the

24  same situation that you did 20, what is it, 24 years ago, 25

25  years ago.

1       **INMATE GUTIERREZ:** And I'm saying that's impossible.

2       **PRESIDING COMMISSIONER ENG:** You'll find yourself in

3 the same situation where if you don't have regular income. You

4 know, you're going out on a limb here because you don't have

5 anything solid.

6       **INMATE GUTIERREZ:** I don't get paid in here and I don't

7 sell drugs.

8       **PRESIDING COMMISSIONER ENG:** Sir, you don't need to.

9 You're being provided for 24-7 here. You're getting you food,

10 you've got your housing, you're getting your medical.

11       **INMATE GUTIERREZ:** There's crime left and right in this

12 place. And not with me.

13       **PRESIDING COMMISSIONER ENG:** Okay. Well, we're not

14 going to argue about this. Commissioner, have you found what

15 we were looking for?

16       **DEPUTY COMMISSIONER LUSHBOUGH:** I found one letter from

17 Elias.

18       **PRESIDING COMMISSIONER ENG:** Okay.

19       **DEPUTY COMMISSIONER LUSHBOUGH:** I found five or six,

20 maybe more than that, from Mrs. Gutierrez and almost as many

21 from his brother, Daniel. But the only one from Elias was

22 dated May 23rd, 2004.

23       **PRESIDING COMMISSIONER ENG:** 2004.

24       **DEPUTY COMMISSIONER LUSHBOUGH:** So nothing recent.

25       **INMATE GUTIERREZ:** He writes each time I come to the

1   Board.  I'll get them for you guys.

2         **DEPUTY COMMISSIONER LUSHBOUGH:**  That may be but it's

3   the only one I could find in here.

4         **INMATE GUTIERREZ:**  Okay.

5         **DEPUTY COMMISSIONER LUSHBOUGH:**  I did go through page

6   by page.

7         **PRESIDING COMMISSIONER ENG:**  Sir, it also doesn't help

8   to be argumentative with the Board, okay.  And I'm going to

9   give you some slack here because it's apparent that you're

10  frustrated.  But it doesn't do you any good to get

11  argumentative, okay.  Okay.  Commissioner, do you have any

12  follow up questions?

13        **DEPUTY COMMISSIONER LUSHBOUGH:**  No, I have no

14  questions.  Thank you.

15        **PRESIDING COMMISSIONER ENG:**  Okay.  Mr. Bushling, do

16  you have any questions you would like posed to the inmate?

17        **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Yes.  If I could

18  ask the Board to pose a couple.  Was the gun that he used in

19  the life crime loaded?

20        **PRESIDING COMMISSIONER ENG:**  Sir, was it loaded?

21        **INMATE GUTIERREZ:**  The gun was loaded.

22        **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Now, the inmate

23  eluded to possibly Agent Orange as contributing to his

24  criminality.  I noted in the probation report that he eluded to

25  post traumatic stress disorder as possibly contributing to it.

1  Has he look into the post traumatic stress syndrome or disorder
2  as having any impact on him?

3      **PRESIDING COMMISSIONER ENG:**  Okay.  Do you want to
4  reiterate?  Because we briefly went over that but maybe not
5  enough.

6      **INMATE GUTIERREZ:**  Yeah.  I knew something was wrong
7  back then.  And I did go to the doctors.  And I explained to
8  them my experiences.  And I asked for help.  And they gave me
9  an interview and said, well there's just nothing in this
10  interview that would lead us to believe that this man suffers
11  from PTSD or Agent Orange poisoning.  Although, I've got my two
12  kids right there that are idiots right after I came back from
13  Vietnam.  Because they were in denial, they weren't paying in
14  those day.

15      That's just been something recent that they're doing.
16  And now they're saying that if you're not suffering from spinal
17  bifida, or your children, then they're not going to give you
18  any money.  Although, I've got letters and I'll be glad to
19  provide those to the Board, where they're saying that yes, your
20  service has been verified and you were exposed to Agent Orange
21  on numerous occasions.  And there may be something wrong with
22  you with the Agent Orange.  But since it's not spinal bifida,
23  we're not going to pay you any money.  And so, I don't know
24  whether those things, PTSD, or the Agent Orange poisoning, or
25  the psychological affects of the war, are the things that

1  caused me to do what they were.

2       I just saw a program last night talking about the GAR.

3  That means the Grand Army Veterans after the civil war.  These

4  are the guys that instituted the first Veterans Administration.

5  They just got together to give themselves support and help each

6  other out.  Because they suffered from all manner of mental

7  disorders as a result of the exposure that they had to the

8  experiences that they went through.  So I don't know, but

9  something happened.  And I was wrong.  And thank God that no

10  one was hurt.  And now I've done this time.  And I'm just

11  wondering when's enough, enough.

12       **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Just one other

13  question.  What the highest rank the inmate achieved?

14       **PRESIDING COMMISSIONER ENG:**  Sir, what was your highest

15  rank?

16       **INMATE GUTIERREZ:**  I went in as a private and I came

17  out as a captain.

18       **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Okay, thank you.

19       **PRESIDING COMMISSIONER ENG:**  Okay.  Ms. Tardiff, any

20  follow up questions?

21       **ATTORNEY TARDIFF:**  If things didn't work out when

22  you're on parole, financially, if the plans you have don't work

23  out, what would you do in the alternative?

24       **INMATE GUTIERREZ:**  How do you mean if they don't work

25  out?

1    **ATTORNEY TARDIFF:**  Well if the business fails, that you

2    want to have with your wife, what would you do then?

3    **INMATE GUTIERREZ:**  I've got five vocations.  I'll get a

4    job.  And I'm going to get a job regardless until that business

5    is rolling properly.  I'll do anything necessary to make an

6    honest dollar.  Even if I have to go to my brothers and ask

7    them for money.  They're rich gentleman.  My friend, Mr.

8    Larson, is also a millionaire.  And he has also said in the

9    past that he would be supportive to me in any way that's

10   necessary.  He lives in Modesto, right next door to me.  A

11   retired gentleman now.  He just sold two pharmacies.

12       I don't think it's going to be a problem with money.

13   But if one happened then I would do everything under the sun to

14   make an honest buck.  And if I couldn't make an honest dollar,

15   for some reason or another.  And I had to curl up on the street

16   corner and die of starvation then I'll do that before I hurt

17   another human being.

18   **ATTORNEY TARDIFF:**  Are you entitled to any veteran's

19   pensions?

20   **INMATE GUTIERREZ:**  Now and days, you can retire from

21   the military after 15 years of service.  But in those days you

22   had to do the 20 years.  So am not entitled to any military

23   benefits.

24   **ATTORNEY TARDIFF:**  Okay.  What about social security?

25   Have you built that up?

 1 |      **INMATE GUTIERREZ:**  Well, I've worked since I was 13
 2 | years old.  I've been employed since I was 13 up until 1978.
 3 | So I've got those benefits.
 4 |      **ATTORNEY TARDIFF:**  Do you have any idea how much that
 5 | would come to?
 6 |      **INMATE GUTIERREZ:**  About a thousand dollars a month.
 7 |      **ATTORNEY TARDIFF:**  What about your wife.  She probably
 8 | has social security.
 9 |      **INMATE GUTIERREZ:**  Yeah.  She's got a lot of social
10 | security.  She's making about as much money as these
11 | Commissioners make.
12 |      **ATTORNEY TARDIFF:**  And how old is she?
13 |      **INMATE GUTIERREZ:**  Getty is 55.
14 |      **ATTORNEY TARDIFF:**  She's got a ways to go for it.
15 |      **INMATE GUTIERREZ:**  Yeah.
16 |      **ATTORNEY TARDIFF:**  Okay.  I have nothing further.
17 |      **PRESIDING COMMISSIONER ENG:**  Okay.  Let's move into
18 | final statements, Mr. Bushling.
19 |      **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Thank you.  I'll
20 | try to be brief.  This inmate is an enigma.  You have him just
21 | an extremely accomplished individual on one hand and then
22 | extremely accomplished on the other hand in a very negative
23 | way.  His record indicates, basically, extremes.  And one of
24 | those extremes, unfortunately, is extreme dangerousness.
25 |      He was involved with a C-4 explosives in blowing up

1   those rivals of his.  He was involved in an arson, not to

2   mention the life crime.  As Commissioner Eng pointed out a

3   short time ago, this Board needs to look at that the inmate

4   understands the causes of criminality.  And I'm not sure that

5   the inmate has come to terms with what caused his criminality.

6   Was it Agent Orange?  Was it post traumatic stress disorder?

7   Was it stupidity, as he said?  I don't know that he's answered

8   those questions in a way that will show that he is not a

9   danger.  And he has shown in the past that he certainly can be

10  a danger.

11      The psychiatric report is somewhat supportive but I

12  think it's very deficient.  I don't know what this Board thinks

13  of it.  But it doesn't explore any of these potential causes of

14  the inmate's criminality.  Also as was noted earlier, this

15  inmate wasn't a youngster at the time that he committed these

16  crimes.  His character should have been pretty well formed by

17  the time he was 39 years old.  And all I can say is, it seems

18  to be of character that goes from one extreme to the other.

19  And until this Board can feel assured that he will not swing to

20  that other extreme, the negative extreme, I submit that he

21  should not be found suitable for parole.  Thank you.

22      **PRESIDING COMMISSIONER ENG:**  Okay, thank you.  Ms.

23  Tardiff, final statement.

24      **ATTORNEY TARDIFF:**  Thank you.  First of all, in terms

25  of the remarks made by the District Attorney of the '05 psych

1  eval, it does go into the historic domain in terms of his
2  history.  History of prior supervision failure.  History of at
3  least one prior potential violent offense, arson.  He got low
4  to moderate in that area.  But it concludes that this score is
5  not amendable to significant change regardless of the number of
6  years of his incarceration.  So it's not deficient, I do not
7  believe in that respect.

8      Mr. Gutierrez's pre-incarceration history has, as we've
9  all been made aware of, has some very favorable factors of
10  suitability.  He has no juvenile criminal history.  He actually
11  had an exemplary life style up until he was over 30 years old.
12  An excellent military history.  A long term relationship he's
13  been able to sustain over extended periods of time up through
14  incarceration with his wife.

15      Since he's been incarcerated -- Actually, that '86 115,
16  and that would have been the last force in violence, was not on
17  the life term but on the prior term.  So for the life term, he
18  hasn't had any force or violence in his 115s at all.  And
19  actually should only have the four 115s, I believe.  Because
20  his CDC, this term started in '89.  So technically, actually,
21  you need to get rid of the first two, '86 and '87.  So then
22  you've got possession of a hot cot, possession of dental
23  material, and a positive urinalysis.  And that should really be
24  it, the three.  Unless I'm doing something wrong here.  And
25  also the two 128s in '85 should probably be considered part of

1   not this commitment offense incarceration.  So in either event,
2   there has been no force or violence.  And if you do take in the
3   '86, it's 23 years ago.  So he has had no force or violence
4   within the last 23 years.

5       He's a good worker.  We know that.  He gets excellent
6   work reports.  He has numerous marketable skills.  He's made
7   good use of his free time as a writer.  He continues to
8   participate in self-help.  Substance abuse issues are being
9   taken care of.  He's been continuously involved in the 12-step
10  program since '96, the vets group.  His psych eval since '97
11  are supportive of release, 10 years worth.  In '97, the psych
12  stated that,

13          "Mr. Gutierrez seems well aware of the distress
14      and damage he has caused to others in the past.  And
15      expresses genuine regret for his past behaviors.  It
16      concludes this 52 year old inmate, with a significant
17      history of violent behavior, appears to have gained a
18      reasonable degree of insight into the nature of his
19      past behaviors.  And expresses what appears to be
20      genuine remorse for the consequences of his criminal
21      behavior.  He has a social support outside of the
22      criminal justice system which may provide him a degree
23      of safety from returning to criminal behavior if
24      paroled."

25      In '99, the psych was also supportive.  High GAF score

1   of 85.  Under insight, she states, Dr. Powell, P-O-W-E-L-L,

2              "His insight into his past behavior and his

3   response to stress appears to be good.  The prognosis

4   for success on parole is good.  Within the correctional

5   institution, he certainly has not been dangerous.  His

6   assessment of dangerousness at this time, both in and

7   out of the institution due to his age, maturity, and

8   support system he has, as well as his intelligence, and

9   ability to pursue educational pursuits, is less than

10   the average inmate.

11              "If he were to remain clean and sober and

12   actively involved in educational pursuits, as well as

13   his own business pursuits, he would no doubt represent

14   a low risk of dangerousness to the community.  He has

15   made significant changes over the years.  His judgment

16   has improved significantly.

17              "He has participated well in a variety of

18   programs.  He remains disciplinary free and has

19   progressed in his insight into his past behaviors and

20   the rumination of his own life.  He seems to have

21   understanding and insight into the destructive and

22   negative forces of illegal substances on his life.  It

23   is unlikely he would become involved in criminal

24   activity should he be released."

25              And then '04, which is the second most recent,

1    states,

2    "He expressed genuine remorse for his victim.

3    Which seemed genuinely authentic.  His insight into the

4    person that he was when he committed his instant

5    offense is significant."

6    High GAF score of 85.  It goes into the anti social

7    personality disorder which is diagnosed in the '04 psych.  But

8    states,

9    "Research indicates that persons who suffer

10    from anti social personality disorder become less

11    impulsive and less anti social as they age.  This

12    decline is frequently significant at the age of 40 and

13    tends to continue throughout the rest of the inmate's

14    life.  This appears to be the case for inmate

15    Gutierrez.  It appears that as he ages, he has done a

16    better job of complying with the Department of

17    Corrections restrictions and requirements.  It can be

18    assumed that the older inmate Gutierrez becomes the

19    less of a threat to society he will be."

20    That the older, I guess, he becomes, he'll become less of a

21    threat.

22    "He has matured significantly in regards to

23    drug abuse.  Appears to fully understand the

24    relationship of his drug dependency and previous

25    criminal behavior.

1          "Viable work skills, two psychological

2     instruments were administered. The HCR-20 indicated a

3     low prediction of future violence. The hair

4     psychopathy checklist suggests the presence of

5     sociopathology. However, this is based on static

6     factors related to inmate Gutierrez's earlier history

7     and not on dynamic factors related to his history since

8     he has been incarcerated. His early history has been

9     significantly modified by his competent and responsible

10     behaviors since his incarceration. If released to the

11     community, no more than the average citizen is his

12     level of risk."

13     And then of course, we have the most current one. And

14     much of that has already read into the record. It does go into

15     the anti social personality disorder. And states that this

16     evaluator found that, that was not applicable. And goes into

17     that more extensively on page two. It goes into the historic

18     domain.

19     And there are some positive factors as well as the

20     negative ones. No known juvenile criminal history. No gang

21     involvement. No known school failures. No known history of

22     relationship instabilities. No significant employment

23     problems. I guess that might not be quite accurate. No major

24     diagnosis of a major mental illness. And no history of early

25     maladjustment.

1          And then it does go into the negative things.  Taking

2    into account his criminal history, his substance abuse.

3    Therefore he gets a low to moderate.  Which, again, cannot be

4    changed because it's historic in nature.  Clinically, did not

5    show signs of grandiosity, pathological lying,

6    manipulativeness, a lack of remorse, guilt, parasitic

7    lifestyle, poor behavior control, irresponsibility, didn't show

8    any of those signs.  He has no significant attitude or

9    difficulties.  Is emotional and behaviorally stable.  He has

10   exhibited signs of significant insight into the commitment

11   offense.  In this domain, the clinical domain, a low risk.

12              "Future risk, he appears very likely to follow

13          parole recommendations.  Presents as being very

14          amenable to any recommendations or requirements set

15          forth by the Board.  And the inmate presents a low risk

16          for future violence in that category.  Overall, a low

17          likelihood to become involved in a violent offense.

18              "That substance abuse is a risk factor.  That

19          could be a precursor to violence for this inmate.  But

20          again, his strong social support should aid him in

21          remaining abstinence from the substances.  As

22          abstinence from drugs and alcohol is a necessary and

23          important goal for this man."

24       So I think that if drugs had a part in this commitment

25   offense, I'm sure added to any other prior stress he may have

1    incurred in his life and added to that.  That's a factor that's

2    no longer present.  Which, obviously, would lower his risk of

3    recidivism based on the psych evals.

4         He does have parole plans.  Well, he doesn't have a

5    specific job offer.  He's got job plans.  But he has marketable

6    skills and that's all that's required by the codes.  He's done

7    research into the community regarding jobs.  He's been

8    incarcerated a long time on this crime.

9         Again, not to diminish the criminal acts themselves, it

10   is not a murder conviction.  And based on the factors of

11   suitability, I do believe that Mr. Gutierrez has obtained those

12   factors.  And they certainly out weigh any unsuitability

13   factors.  Thank you.

14        **PRESIDING COMMISSIONER ENG:**  Okay, thank you.

15        **DEPUTY COMMISSIONER LUSHBOUGH:**  Commissioner, before we

16   go an further.  If you would excuse me, Mr. Gutierrez, just for

17   a moment.  It's feast or famine.  Now I found three copies of

18   the same letter from Elias dated August 28th, 2006.  And it

19   looks like the top copy is date received August 30th, which

20   would have been the date of your hearing in 2006.  Correct?

21   Are you saying that it didn't get read into your hearing?

22   Okay.  It is not on letterhead as the one in 2004 was.  And

23   that was from the graduate school.  Is he still employed there?

24        **INMATE GUTIERREZ:**  He's the dean of the university.

25        **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  All right.  So

1  would you like to get that into the record?  Since it wasn't

2  read in last time.

3       **PRESIDING COMMISSIONER ENG:**  Sure.  You can just go

4  ahead and give the date in general, if it's a general support

5  or whatever.

6       **DEPUTY COMMISSIONER LUSHBOUGH:**  It is certainly a

7  support letter.  And he joins with his brother, Daniel, in

8  pleading for release and for favorable consideration of the

9  meritorious parole petition.  He feels that he's fulfilled

10 every requirement.  He's a man honestly faced his guilt.  He's

11 driven to make himself better and succeeded.  It doesn't offer

12 employment or a place to live.  But it most certainly does

13 discuss how he's been doing in prison and the support of the

14 family.  And that's from East Laverde Carolina.  It's in Puerto

15 Rico?

16      **INMATE GUTIERREZ:**  East Laverde Carolina is a suburb of

17 San Juan.

18      **DEPUTY COMMISSIONER LUSHBOUGH:**  Thank you.

19      **PRESIDING COMMISSIONER ENG:**  Okay, okay.  Mr.

20 Gutierrez, this is your opportunity, you don't have to, to make

21 a final statement regarding parole suitability to the Panel.

22      **INMATE GUTIERREZ:**  Thank you very much.  This has been

23 one of my best Panels.  To be honest with you.  Believe it.  I

24 do have a specific job offer from my wife.  She's always done

25 that.  We're going to go to work together.  And she's even

*Capitol Electronic Reporting*

1  given the Boards in the past how much money she's going to pay

2  me. Which has caused argument between us. Because I don't

3  like working for minimum wage. That's a joke. I work for her.

4        So, I have a specific job offer. I would cut off my

5  right arm if I could take back what happened to Ms. Stalmastr

6  and Mr. Selton that night. As a matter of fact, for the other

7  people in Hollywood also in North Hollywood. Although what

8  happened to those two persons was exponentially worse. I know

9  she was frightened to death. And he was very brave but he was

10  also frightened. They didn't deserve that.

11        In addition to what I've already covered here about my

12  spiritual growth and change, I don't think you could possibly

13  have someone with as many vocational skills before you, you

14  know. That comes in front of you at any given time with the

15  kind of skills that I bring forth. I  mean, I was an

16  artilleryman for 17 years. I'm a surveyor, expert surveyor.  I

17  do dental prosthetics and I'm a programmer. And I've graduated

18  from dry cleaning.

19        So, I can do that blue collar work in printing shops.

20  I'm a geologist. That's what I studied in school. I studied

21  special education and the history of the world. I had two

22  majors. I'm a linguist. I speak three and a half languages.

23  And I write poetry. And I write books. I don't know what else

24  to tell you.

25        This place is full of hate for America. It almost gets

1   me in trouble sometimes.  Because I get sick and tired of
2   hearing people, you know, belly aching about how much they hate
3   the United States of America.  You've got a patriot in front of
4   you.  And although I screwed up really bad, I made sure nobody
5   ever got hurt.  I'm emotional but not for me.

6       Doing time is easy for me, believe this.  I go to my
7   little job.  I go to church.  I'm athletic.  If I get
8   frustrated, I get in the ring with somebody and poke them in
9   the eye, you know.  You're not suppose to do that around here
10  but we do have our little sparring matches to keep things on an
11  even keel.  I have friends here.  I get along with staff.  But
12  my wife deserves better.  And my kids deserve better.  They
13  didn't put me here.  I put me here.  And I've served this time
14  with malice towards none.

15      But I'm not the criminal anymore.  And I was sentenced
16  by a court of law for a specific period of time.  Although, I
17  understand what you're saying about the indeterminate of term.
18  There are limits to indeterminate of terms.  There's life
19  without, and there's death, and there's first degree, and
20  second degree, and 15 to life.  I don't have any of that.
21  That's simple life.  And I've done that time.  And if this is
22  going to continue to be a democracy, I'm just going to continue
23  to be America.  And not Ameri-KKK.  Then I think it's time you
24  give me some serious consideration on spending eight years with
25  my wife.  Thank you.

1          **PRESIDING COMMISSIONER ENG:**  Okay.  We'll now recess

2     for deliberation.  The time is 1:38.

3                              R E C E S S

4                              --o0o--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3      **PRESIDING COMMISSIONER ENG:**  Okay.  Ready to go on.

4      **ATTORNEY TARDIFF:**  Yeah, we're ready.

5      **DEPUTY COMMISSIONER LUSHBOUGH:**  We're on record.

6      **PRESIDING COMMISSIONER ENG:**  Okay.  The time is 2:02.

7      And everyone who was here previously has since returned with

8      the exception of Mr. Bushling, who had to leave to catch a

9      flight.  So, in the matter of Joseph Gutierrez, CDC D02765, the

10     Panel has reviewed all the information received from the

11     public.  And relied on the following circumstances in

12     concluding that the prison is not suitable for parole and would

13     pose an unreasonable risk of danger to society or a threat to

14     public safety if released from prison.

15          We go back to the commitment offense that we find it

16     was carried out in a very callous, rather cold and callous

17     manner.  We had multiple victims involved in two separate

18     incidents on the same day.  We find that it was carried out, at

19     least the kidnap for robbery, the initial one was carried out

20     in a very calculated manner.

21          In that, the inmate and his crime partner had targeted

22     this particular place and this particular woman to basically

23     rob.  And they went to the hair solon, basically, to get money.

24     I'm sorry.  Yeah, that was the first crime.  And apparently,

25     **JOSEPH GUTIERREZ    D-02765    DECISION PAGE 1    7/13/07**

1   not having been able to obtain the few thousand dollars that

2   they were hoping to, they ended up going on and committing the

3   second crime, which happened to be the life crime.   I'm sorry.

4   Because the second one that happened at 10 p.m. that same

5   evening, on November 26th, 1983, was the kidnap for robbery,

6   which was the life offense.   And they proceeded to basically

7   jump into a vehicle and commandeer this Mr. Sultan and this Ms.

8   Stalmastr at gun point.

9        Again, you know, the initial one was very, very

10  calculated.   Both of these crimes were really carried out in a

11  manner that shows total disregard for human suffering.   All of

12  the people that were in the hair design shop, basically, were

13  being victimized by Mr. Gutierrez and his crime partner.   Mr.

14  Gutierrez, holding a loaded weapon at them.   And same thing,

15  holding a gun to the victims in the kidnap for robbery.

16       The motive for this crime, for both of the these

17  crimes, occurring was basically robbery and greed.   In any

18  event, very trivial in relation to this offense.   These

19  conclusions are drawn from the Statement of Facts where it does

20  state that on November 26th, 1983, at approximately 16:20

21  hours, Mr. Gutierrez and his crime partner, McCord, went into

22  the hair design shop on Vineland Boulevard.

23       Where Mr. Gutierrez pointed a handgun at the victim and

24  let them know that it was a hold up, he wasn't kidding.

25  **JOSEPH GUTIERREZ    D-02765    DECISION PAGE 2    7/13/07**

1  Basically he said, she's a dead woman if you don't listen to
2  me.  And there, he requested all of their money.  And I'm
3  sorry, I correct that because Mr. Gutierrez said that his crime
4  partner, McCord, was not in the store with him.  He was waiting
5  in the get away car.  So, it was Mr. Gutierrez alone.  So he
6  basically held them up, ended up receiving 94 dollars in
7  currency.  And when one of the victims fled the store, Mr.
8  Gutierrez then left.

9       Then later on that evening, about 10 p.m., Mr.
10  Gutierrez and Mr. McCord approached Mr. Selton and Ms.
11  Stalmastr as they were seated in a vehicle.  Mr. Gutierrez,
12  again, produced a handgun, entered the rear seat of the
13  vehicle, and Mr. McCord got into the driver's seat.  Mr.
14  Gutierrez placed a handgun to the victim's head.  And then,
15  they drove off with the victims in the vehicle and stated that
16  we just want your jewelry and money.  And they did let them go.

17       This prisoner does have a prior record of violence.  In
18  that, he had been arrested for explosives, unlawful possession
19  of explosives.  And whereby, he ended up blowing up a trailer
20  at a trailer park.  And he was also arrested.  Again, this was
21  a federal.  Parole records show that he was paid to set fire to
22  a furniture store.

23       He does have an escalating pattern of criminal conduct.
24  It goes back to 1975, when he was first arrested for possession
25  **JOSEPH GUTIERREZ    D-02765    DECISION PAGE 3    7/13/07**

1  of marijuana.  He was also arrested for disorderly conduct,

2  petty theft, possession of explosives.  He ended up being

3  convicted of conspiracy and ended up doing his first term in

4  federal prison.  All leading up to this life crime.  And it was

5  actually in federal prison where he met his crime partner for

6  the life crime, Mr. McCord.

7        We find that his misconduct, while incarcerated for

8  this life term, he has seven 128A counseling chronos.  The last

9  one being in January '97 for storage of food.  And he has five

10 more serious 115 disciplinary, the last one being July 1993 for

11 a positive urinalysis.  We find that the psychological report

12 dated January 31, 2005 and authored by Dr. Terrini, T-E-R-R-I-

13 N-I, I was going to find something, is basically adequate.

14 Even though Dr. Terrini does state that this inmate presents a

15 low to moderate risk of future violence within the historical

16 domain.

17       Regarding parole plans.  This inmate did present us

18 with, it seems, viable residential plans.  It's not in his

19 county of legal residence or where the life crime occurred.

20 But his wife has been residing in, I believe it's, Stockton,

21 California for well over 10 years and owns a home there.

22       So he does have a place to reside, but he did not

23 provide this Panel with any documented evidence of acceptable

24 employment plans.  And he does have several vocations.  But

25 **JOSEPH GUTIERREZ    D-02765    DECISION PAGE 4    7/13/07**

1   again, we didn't see any documented evidence that he is

2   inquired into positions within any one of those vocations.

3        Regarding 3042 responses.  The Panel notes that the

4   representative from the District Attorney's Office of Los

5   Angeles County was present and did state their opposition to

6   parole.  The Panel makes the following findings that the

7   prisoner does need additional documented self-help in order to

8   face, discuss, understand, and cope with stress, anger, and

9   control issues in an nondestructive manner.  Until progress is

10   made, this Panel believes the prisoner continues to be

11   unpredictable and a threat to others.

12        However, we feel the prisoner should be commended for

13   obtaining, what we think is, approximately three vocations.

14   One in dry cleaning, one in, I believe it's, information

15   technology, and then possibly he's very near completion of the

16   print shop.  However, these positive aspects of his behavior do

17   not out weigh the factors of unsuitability.

18        This is a one year denial.  The Panel makes the

19   following recommendations.  That the prisoner remain

20   disciplinary-free.  He's been doing a pretty good job at that,

21   not having any serious 115s since 1993 and 128s since '97.  And

22   that, if available, he continues to participate in any and all

23   types of self-help.  And we also ask that he cooperate with

24   Commissions in completing an amended clinical evaluation.

25   **JOSEPH GUTIERREZ    D-02765    DECISION PAGE 5    7/13/07**

1    Sir, you know, I have to tell you that basically

2   concludes the reading of the decision.  But I've got to tell

3   you.  I'm going to be brutally honest with you.  You were doing

4   very, very well and then we saw you turn.  And I called you on

5   the carpet with it.  I got to a point where I got fed up and I

6   said it doesn't do you any good to be argumentative.

7        You started getting very aggressive and very

8   argumentative.  And all the tables turned.  And what concerns

9   us is, I went back and I started digging more.  And there were

10  indications in prior psych evaluations that they stated that

11  you had improved in terms of control issues.

12       But it made me pause.  And my fellow Commissioner and I

13  sat and discussed it during our deliberations to compare notes

14  to see if we both experience the same thing with you.  And we

15  did.  And for some reason, I'm not sure what it is, you left us

16  feeling that you can explode at any time.

17       And you could take it for what it's worth.  The choice

18  is yours.  You can sit back after you finish in here.  And

19  after you get this transcript.  And take a look back and try to

20  put things together and figure out why you gave this Panel that

21  impression.  That you could explode for any given reason.  That

22  feeling that you gave us is a threat to public safety because

23  we have no idea what you would be capable of doing should

24  things not go right for you on the outside.  And it is a

25  **JOSEPH GUTIERREZ   D-02765    DECISION PAGE 6    7/13/07**

1  tremendous concern.

2       You're a very, very bright man.  And you have the

3  capability to do a lot of great things.  But there is

4  a real major piece here that really is holding you back.  It

5  holds us back from moving forward with you.  I don't know if I

6  put that right.  I'm going to ask my fellow Commissioner if she

7  has anything to add.

8       **DEPUTY COMMISSIONER LUSHBOUGH:**  No, just that I agree.

9  I think that you started out really well in this hearing,

10  truly.  But then as things went along, you started to get more

11  confrontive, more aggressive, interrupting.  I'm not sure what

12  was going on with you.  And I'm certainly in no position to try

13  to analyze it.  But it was like a change in your demeanor.  And

14  you started out great when you first came in.

15       We only see what we see on paper, initially.  And the

16  paper didn't look so good.  But then you came in and you had a

17  really great demeanor.  And I thought, well now we're going to

18  see the rest of the story, the real person.  Only it didn't

19  last.  I do want to wish you well.  I think you're bright.  I

20  think you know what to do.  I just think maybe you need to give

21  some thought to how you present yourself.  And with that, I'll

22  wish you well and conclude.

23       **PRESIDING COMMISSIONER ENG:**  Before I sign off here, I

24  hope that you do take a look at the analogy that I threw out to

25  **JOSEPH GUTIERREZ    D-02765    DECISION PAGE 7    7/13/07**

1    you.   Because it all of sudden became clear that you do -- It
2    seems like you do well in very structured environments.   And
3    maybe not so well or questionable in terms of unstructured
4    environments.   And you may want to take a look at that.

5         In terms of your parole plans.   You may want to adjust
6    those or change them around.   Because if and when you do get a
7    date, you want to be sure that you set yourself up for success,
8    period.   Period.   And that might mean that you need to be
9    selfish.   You may want to be able to do one thing but it may
10   not make sense.   It may not be the best scenario for your
11   success in terms of adjusting.

12        I don't want to spoon feed you but we see a lot, you
13   know, we sit across from prisoners everyday.   And we see a lot
14   of different personalities and dealt with different scenarios.
15   And I've seen some prisoners come in here that have great
16   family support.   And they've chosen not to parole directly back
17   to their families knowing what they could be faced with in the
18   stresses, alone, of being free after being incarcerated for so
19   long.   Then sometimes the families aren't ready for that,
20   etcetera.

21        So, you may want to think about that.   And about being
22   selfish in thinking that you're going to need something very
23   different when you parole.   And it doesn't mean it's forever.
24   It just means that transitional period.   And that transitional
25   **JOSEPH GUTIERREZ     D-02765       DECISION PAGE 8      7/13/07**

```
 1   period could be a year.  It could be six months.  It might be

 2   two years.  But it has to be what's right for you for success.

 3   So take it for what it's worth.  I wish you luck, sir.  That

 4   concludes this hearing.  The time is 2:15.

 5                              --o0o--

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21   PAROLE DENIED ONE YEAR

22   THIS DECISION WILL BE FINAL ON:  NOV 1 0 2007

23   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE,

24   THE DECISION IS MODIFIED.

25   JOSEPH GUTIERREZ   D-02765      DECISION PAGE 9      7/13/07
```

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Linda Esquivel, as the Official Transcriber, hereby certify that the attached proceedings:

In the matter of the Life        )        CDC Number:    D-02765
Term Parole Consideration        )
Hearing of:                      )
                                 )
JOSEPH GUTIERREZ                 )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JULY 13, 2007

11:45 A.M.

Were held as herein appears.  Further, this transcript is a true, complete and accurate record, to the best of my ability, of the recorded material provided for transcription.

_____
Linda Esquivel
August 19, 2007
Capitol Electronic Reporting

EXHIBIT  B

EXHIBIT  B

California Home                                                          Thursday



**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
  **Adult Operations**
  **Adult Programs**
  Board Of Parole Hearings
  **Juvenile Justice**
  **Prison Industry Authority**
  **Corrections Standards Authority**
  **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource Directory**
**Contact Us**

### Commissioners

#### Sandra Bryson

Sandra Bryson, 60, of Markleeville, most recently served as a support services and reserve deputy for the Alpine County Sheriff's Department. Since 1986, Bryson has served as director of Bryson and Associates, a law enforcement and canine consulting company that includes among its clients the Office of Emergency Services and the Federal Emergency Management Agency. She is also an instructor for California Peace Officer Standards and Training. Bryson is a member of the California Narcotics Officers Association and the National Association of Search and Rescue. This position requires Senate confirmation and the compensation is $99,693. Bryson is a Democrat. She will hear adult matters.



**BOPH Links**

- **Home**
- **Chairman**
- **Commissic**
- **Deputy Co**
- **Divisions &**
- **En Banc Do**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In**
  **Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

California Home                                                          Thursday



CDCR Home
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
About CDCR
**Divisions & Boards**
  Adult Operations
  Adult Programs
  Board Of Parole Hearings
  **Juvenile Justice**
  **Prison Industry Authority**
  **Corrections Standards Authority**
  Office of Legal Affairs
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource Directory**
**Contact Us**

California Department of Corrections and Rehabilitation

**My CA**


Schw

Commissioners

**Philip S. Inglee**

Philip S. Inglee, 68, of Orange County, has served on the Board of Prison Terms since 2005. Prior to that, he served as a commissioner on the Orange County Parole Board from 2001 to 2005. Inglee worked as a banking executive for 33 years, serving as president and chief executive officer of Liberty National Bank from 1982 to 1998. In addition, he has served as chair of the Huntington Beach Planning Commission and as foreman of the Orange County Grand Jury from 1999 to 2000. He served as an officer in the United States Marine Corps from 1959 to 1962 on active duty and as a member of the reserves from 1962 until his retirement as a colonel in 1989. Inglee is a Republican. He will hear adult matters.



**BOPH Links**

- **Home**
- **Chairman**
- **Commissic**
- **Deputy Co**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California.  Conditions of Use  Privacy Policy

California Home                                                                              Thursday



**Commissioners**

**Darcel Woods**

Darcel Woods, 47, of La Verne, has served as a professor in the correctional
science department at Chaffey College since 1995 and currently serves as
department co-chair. From 1994 to 2003, Woods served as a project specialist
for the Baldy View Regional Occupational Program, where she coordinated The
Success Project, a correctional reintegration program. Prior to that, she was a
parole agent for the California Youth Authority, now the Division of Juvenile
Justice, from 1989 to 1994. Woods began her career as a deputy sheriff with
the Los Angeles County Sheriff's Department in 1982. This position requires
Senate confirmation and the compensation is $108,167. Woods is a Democrat.
She will hear adult matters.

CDCR Home
Victims
Visitors
Offenders
Rehabilitation
News
About CDCR
Divisions & Boards
 Adult Operations
 Adult Programs
 Board Of Parole Hearings
 Juvenile Justice
 Prison Industry
 Authority
 Corrections Standards
 Authority
 Office of Legal Affairs
 Career Opportunities
Reports & Research
Budget & Regulations
Community Resource
Directory
Contact Us



My CA

**BOPH Links**

- Home
- Chairman
- Commissic
- Deputy Cor
- Divisions &
- En Banc D
- Regulatory
- Legislative
- Parole Hea
- Attorney/In
  Services

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

California Home                                                              Thursday



**CDCR Home**

**Victims**

**Visitors**

**Offenders**

**Rehabilitation**

**News**

**About CDCR**

**Divisions & Boards**

  **Adult Operations**

  **Adult Programs**

  Board Of Parole Hearings

  **Juvenile Justice**

  **Prison Industry Authority**

  **Corrections Standards Authority**

  **Office of Legal Affairs**

**Career Opportunities**

**Reports & Research**

**Budget & Regulations**

**Community Resource Directory**

**Contact Us**

California
Department *of* Corrections
*and* Rehabilitation



○ My CA

Commissioners

**Michael Prizmich**

Michael Prizmich, 61, of Plymouth, retired from the Amador County Sheriff's Department in 2006, where he served since 1976, starting as a deputy before moving through the ranks and eventually reaching the position of sheriff in 1995. Prizmich also served as the director of personnel and risk management for Amador County from 1984 to1990. He began his career in law enforcement with the Oakland Police Department in 1971. Prizmich has been a member of the Board of Corrections and the Off-Highway Vehicle Commission. This position requires Senate confirmation and the compensation is $108,167. Prizmich is a Republican. He will hear adult matters.

**BOPH Links**

- **Home**
- **Chairman**
- **Commissi(**
- **Deputy Co**
- **Divisions &**
- **En Banc D(**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/I**
  **Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California.  Conditions of Use  Privacy Policy

California Home

Thursday



Welcome to *California*

**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
 **Adult Operations**

 **Adult Programs**

 Board Of Parole Hearings

 **Juvenile Justice**

 **Prison Industry
 Authority**
 **Corrections Standards
 Authority**
 **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource
Directory**
**Contact Us**



*California*
**Department *of* Corrections**
*and* **Rehabilitation**



○ My CA

Sch

**BOPH Links**

● **Home**
● **Chairman**
● **Commissio**
● **Deputy Co**
● **Divisions &**
● **En Banc De**
● **Regulatory**
● **Legislative**
● **Parole Hea**
● **Attorney/In**
  **Services**

Commissioners

**Linda Shelton**

Linda Shelton, 55, of Redding, has served as chief probation officer for Glenn
County since 1999. Shelton was a division director responsible for the Shasta
County Juvenile Hall from 1990 to 1999. She joined the Shasta County
Probation Department as a deputy probation officer in 1980. Shelton is past
president of the Chief Probation Officers of California and was a faculty
member for the Shasta College Administration of Justice Department from 1992
to 1998. The compensation is $99,693. Shelton is a Democrat. She will hear
adult matters.

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

California Home                                                                Thursday



**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
  **Adult Operations**

  **Adult Programs**

  Board Of Parole Hearings

  **Juvenile Justice**

  **Prison Industry**
  **Authority**
  **Corrections Standards**
  **Authority**
  **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource**
**Directory**
**Contact Us**

### Commissioners

**Edward Martinez**

Edward Martinez, 48, of Modesto, has been self-employed as a private investigator with EM Investigations since 2005. Martinez previously was a field investigator with the workers' compensation firm Freese & Gianelli from 2000 to 2005, deputy sheriff and detective for the Stanislaus County Sheriff's Department from 1992 to 2000 and deputy sheriff for the Orange County Sheriff's Department from 1982 to 1992. This position requires Senate confirmation and the compensation is $99,693. Martinez is a Republican. He will hear adult matters.



**BOPH Links**

- **Home**
- **Chairman**
- **Commissic**
- **Deputy Co**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In**
  **Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

California Home

Thursday



# California
# Department *of* Corrections
# *and* Rehabilitation

**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
  **Adult Operations**
  **Adult Programs**
  Board Of Parole Hearings
  **Juvenile Justice**
  **Prison Industry
  Authority**
  **Corrections Standards
  Authority**
  **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource
Directory**
**Contact Us**

C  My CA



Sch
Cl

Commissioners

**A. Stanley Kubochi**

A. Stanley Kubochi, 59, of Sacramento, has served as principal district attorney
for the Sacramento County District Attorney's Office since 2004. Kubochi has
served as a deputy district attorney for the Sacramento County District
Attorney's Office since 1985, where he has held assignments in the prison
crimes unit, public assistance fraud unit, misdemeanor unit and felony trails.
Previously, he served as an assistant public defender for the Sacramento
County Public Defender's Office from 1973 to 1985. This position requires
Senate confirmation and the compensation is $108,167. Kubochi is a
Republican. Kubochi will hear adult matters.

**BOPH Links**

- **Home**
- **Chairman**
- **Commissic**
- **Deputy Co**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In**
  **Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use Privacy Policy

California Home                                                                                          Thursday



## Commissioners

### James Davis

James Davis, 53, of El Cajon, has served on the Board since February 2006 and is currently a consultant for Civilian Police International and Citygate Associates. Davis previously served for 30 years in the El Cajon Police Department, beginning as a patrol officer in 1974 and retiring in 2004 after four years as chief of police. He is the co-founder, past president and a board member of the El Cajon Youth Development Advisory Council and a former chair of the Automated Regional Justice Information System Management Committee. This position requires Senate confirmation and the compensation is $103,317. Davis is a Republican. He will hear adult matters

**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
  **Adult Operations**
  **Adult Programs**
  Board Of Parole Hearings
  **Juvenile Justice**
  **Prison Industry Authority**
  **Corrections Standards Authority**
  **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource Directory**
**Contact Us**


My CA

Sch

**BOPH Links**

- Home
- Chairman
- Commissic
- Deputy Co
- Divisions &
- En Banc D
- Regulatory
- Legislative
- Parole Hea
- Attorney/In
  Services

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

**California Home**                                                                                    Thursday



**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
  **Adult Operations**
  **Adult Programs**
  Board Of Parole Hearings
  **Juvenile Justice**
  **Prison Industry Authority**
  **Corrections Standards Authority**
  **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource Directory**
**Contact Us**





○ My CA

Schw

### Commissioners

#### Janice Eng

Janice Eng has served as director of operations for the marketing and advertisement firm Trade Management Group since 2003. Prior to that, Eng was managing partner of HealthStar from 2001 to 2002, executive director of Intriguard, a division of California Medical Review from 1998 to 2001, principal of the consulting firm Eng Enterprises from 1995 to 1998 and director of quality and customer satisfaction for the Baxtor Healthcare Corporation from 1989 to 1995. This position requires Senate confirmation and the compensation is $99,693. Eng is a Democrat. She will hear adult matters.

**BOPH Links**

- **Home**
- **Chairman**
- **Commissic**
- **Deputy Co**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

The Board is composed of 17 Commissioners, and a Executive Director who is appointed by the Governor. They conduct parole consideration hearings for inmates sentenced to life terms with the possibility of parole. The Commissioners, as voting members of the BPH, establish terms and conditions of parole for all persons released on parole and may make recommendations to the Governor for pardons and executive clemency.

**For full biographical information, please click below:**

- Joyce Arredondo
- Archie "Joe" Biggers
- Sandra Bryson
- Terry Farmer
- Jack Garner
- Philip S. Inglee
- Stephen Lee
- Margarita Esabel Perez
- Chuck J. Supple
- Thomas Sawyer
- Tracey L. St. Julien

**Susan L. Fisher**

Susan L. Fisher, 52, of Sacramento County, has been appointed chair of the Board of Parole Hearings. She was appointed to the Board in July 2005 and previously served as a commissioner on the Board of Prison Terms from January 2004. From 1999 to 2004 she served as executive director of the Doris Tate Crime Victims Bureau and, before that, served on the Bureau's board of directors for seven years. She also served as president of Citizens for Law and Order. This position requires Senate confirmation and the compensation is $99,693. Fisher is a Republican.



since 2005. Prior to that, he was a Los Angeles Superior Court Referee for seven years, where he handled all matters assigned in the Dependency and Juvenile Delinquency Court. Lee was a senior trial litigator for Lee & Associates from 1991 to 1995 and prior to that was a senior deputy district attorney for Los Angeles County from 1986 to 1991. Lee's experience also includes one year as senior misdemeanor trial deputy for the San Joaquin District Attorney's Office and three years as a general civil and immigration attorney. Lee is a Republican. He will hear adult matters.

### Margarita Esabel Perez



Margarita Esabel Perez, 42, of El Dorado County, has served as chairperson of the Board of Prison Terms since January 2004. From 2001 to 2004 she served as a senior investigator and parole agent in the investigations division. Perez served from 1996 to 2001 as a parole agent at the Department of Corrections. She began her career in law enforcement as a correctional officer, first at Avenal State Prison and later as a correctional sergeant at the Transportation Unit Based at Folsom State Prison. Perez is a former captain with the California Army National Guard. She served on active duty during Operation Desert Storm and volunteered for active duty following the terrorist attacks of September 11th. Perez is a Democrat. She will hear adult matters.

### Chuck J. Supple

Chuck J. Supple, 46, of Sacramento County, has served on the Youth Authority Board since 2003. Previously, he was director of the then-Governor's Office of Service and Volunteerism, now the California Service Corps. Prior to that, Supple served for five years as president and chief executive officer of Public Allies, Inc., a non-profit organization that develops community leadership skills among young adults. He is also currently a board member of the Tavis Smiley Foundation. Supple is a Democrat. He will hear juvenile matters.

### Thomas C. Sawyer

Thomas C. Sawyer, 61, of San Joaquin County, served as a California Highway Patrol officer for more than 20 years before being elected the Sheriff-Coroner of Merced County in 1990. He served as sheriff for 11 years before his retirement in 2001. Most recently, he has been a consultant for Advanced Interactive Systems where he performed airport security training around the United States and with the Facility Group on project management and criminal justice planning. Sawyer is a member of the California State Sheriffs' Association, the National Sheriffs' Association and the International Police Chiefs' Association. Sawyer is a Republican. He will hear adult matters.

### Tracey L. St. Julien

Tracey L. St. Julien, 46, of Sacramento County, has been executive director of the American College of Obstetricians and Gynecologists, a nonprofit organization founded to promote advances in women's healthcare, since 2001. Previously, she was a consultant for Glaxo Wellcome, Incorporated and, from 1997 to 2000, owned and operated Gilded Age Tours, an international travel tour company. St. Julien served on the staff of California State Assemblymembers Curtis Tucker, Sr. and Curtis Tucker, Jr., first as a legislative assistant and then as chief of staff. In this capacity she oversaw the 1992 Assembly Task Force on the Los Angeles Riots. St. Julien is a Democrat. She will hear adult matters.

### Dennis Kenneally

Dennis Kenneally, 59, of San Diego County, most recently served as advisor to the president and chief executive officer of Maxim Systems, Inc. and staff for Forfeiture Support Associates. Previously, he served for three years as commanding general and assistant adjutant general of the California National Guard. From 1995 to 2001 Kenneally was vice president of Pedus Services, where he was responsible for mergers, acquisitions and management and administrative services. Kenneally served for three years with the San Diego Sheriff's Department first as a special assistant and later as chief deputy and assistant sheriff. His experience also includes six years as deputy assistant secretary for the United States Department of the Air Force. Kenneally joined the armed forces in 1963 serving for a total of 42 years. This position requires Senate confirmation and the compensation is $111,768. Kenneally is a Republican.

January 2004. Prior to that, Arredondo was the executive director of the North Area Youth Center.
organization that provides after-school opportunities for tutoring, employment development, sports activities, cultural of 76
opportunities and field trips for junior and senior high school students, from 1997 to 2004. She has also served as a
member of the Building Bridges Initiative Advisory Board for the San Juan Unified School District. Arredondo is a
Republican. She will hear juvenile matters.

### Archie "Joe" Biggers

Archie "Joe" Biggers, 61, of San Diego County, has served on the Youth Authority Board since 2005. Prior to that,
he served as executive director of the Greater San Diego Inner-City Games. Biggers served for 24 years in the
United States Marine Corps, retiring in 1991 as a lieutenant colonel. From 1992 to 1994 he was operations director
for the San Diego Police Athletic League and from 1994 to 1996 was executive director of the S.T.A.R. program
(Sports Training, Academic & Recreation). Biggers is active in many community organizations including the San
Diego Unified School Interscholastic Athletics Council and the San Diego Marine Corps Historical Society Board. He
is also a past member of the San Diego Crime Commission, the Social Service Advisory Board of San Diego
County and the Girl Scouts Council of San Diego and Imperial Counties. Biggers is a Republican. He will hear
juvenile matters.

### Sandra Bryson

Sandra Bryson, 60, of Markleeville, most recently served as a support services and reserve deputy for the Alpine
County Sheriff's Department. Since 1986, Bryson has served as director of Bryson and Associates, a law
enforcement and canine consulting company that includes among its clients the Office of Emergency Services and
the Federal Emergency Management Agency. She is also an instructor for California Peace Officer Standards and
Training. Bryson is a member of the California Narcotics Officers Association and the National Association of
Search and Rescue. This position requires Senate confirmation and the compensation is $99,693. Bryson is a
Democrat. She will hear adult matters.

### Terry R. Farmer

Terry R. Farmer, 61, of Sacramento County, has been chief counsel to the Board of Prison Terms since June 2003.
From 1983 to 2003 he served as Humboldt County district attorney. Farmer served as a partner in the law firm of
Stokes, Steeves, Warren, Farmer and Jensen from 1978 to 1982 and as a Humboldt County deputy district attorney
from 1975 to 1978. He is a member of the California State Bar. Farmer is a Democrat. He will hear adult matters.

### Jack Garner

Jack Garner, 61, of Gold River, has been appointed to the Board of Parole Hearings to hear Adult matters. He is
currently the bureau chief for the Commission on Peace Officer Standards and Training. Garner has served with the
Commission since 1990, beginning his tenure as senior law enforcement consultant. He was previously the city
manager and chief of police for the City of Martinez. Garner is a member of the FBI National Academy of Graduates
Association, the California Police Chiefs Association and the California Peace Officers Association. This position
requires Senate confirmation and the compensation is $99,693. Garner is a Republican.

### Philip S. Inglee

Philip S. Inglee, 68, of Orange County, has served on the Board of Prison Terms
since 2005. Prior to that, he served as a commissioner on the Orange County Parole
Board from 2001 to 2005. Inglee worked as a banking executive for 33 years,
serving as president and chief executive officer of Liberty National Bank from 1982
to 1998. In addition, he has served as chair of the Huntington Beach Planning
Commission and as foreman of the Orange County Grand Jury from 1999 to 2000.
He served as an officer in the United States Marine Corps from 1959 to 1962 on
active duty and as a member of the reserves from 1962 until his retirement as a
colonel in 1989. Inglee is a Republican. He will hear adult matters.



EXHIBIT   C

**From:** Santos N Yvonne Chavez [saintsgirl97@hotmail.com]

**Sent:** Tuesday, December 11, 2007 4:14 PM

**To:** jonnan@gv.net; tina.blach@aon.at; dewlin@att.net; jennew212@aol.com; daddysangel4life@hotmail.com; sassyten2@yahoo.com; desireef1966@sbcglobal.net; kcussinsdoyle@sbcglobal.net; shortcake672004@yahoo.com; lyndwyer@earthlink.net; krugerjeanne@yahoo.com; hochinmoon@hotmail.com; kittygutierrez@comcast.net; jojo4richie01@att.net

**Subject:** <POD> Lifers seek court allies in fight with state for parole

I apologize if there are any duplicates, I sometimes lose track as I look through each groups e-mails.

## Have a wonderful day...Love, Yvonne

### A Few Words of Wisdom:

**DON'T LET SOMEONE BECOME A PRIORITY IN YOUR LIFE WHEN YOU ARE JUST AN OPTION IN THEIR LIFE...**

**NEVER EXPLAIN YOURSELF TO ANYONE, BECAUSE THE PERSON THAT LIKES YOU DOESN'T NEED IT, AND THE PERSON THAT DISLIKES YOU WON'T BELIEVE IT...**

---

To: prisonersofdavis@yahoogroups.com; politicalinjustice@yahoogroups.com
From: christinam222@sbcglobal.net
Date: Mon, 10 Dec 2007 13:49:25 -0800
Subject: <POD> Lifers seek court allies in fight with state for parole

### Lifers seek court allies in fight with state for parole

### Judges have overruled governor

### By Andy Furillo – afurillo@sacbee.com

Monday, December 10, 2007

Frustrated by Gov. Arnold Schwarzenegger and his parole board, more California life-term prisoners are turning to the courts for another shot at freedom – and winning enough cases to put the state on edge.
In the past two years, at least seven convicts sentenced to life imprisonment have been freed on court-issued writs of habeas corpus, after the governor or his appointees on the Board of Parole Hearings had denied them release dates. About two dozen more have persuaded judges to order the governor or the board to review their decisions.
Those numbers pale compared with the thousands of lifers eligible for release dates whose parole applications have been rejected – 99.5 percent of them last year. But the state believes some judges are overstepping their authority, and the state attorney general's office has appealed three cases, which the state Supreme Court agreed to hear.
Senior Assistant Attorney General Julie Garland contends that in the past two years some lower courts have infringed on the

Recent Activity

4
New Members

Visit Your Group
Green Y! Groups
Environment Groups
Find them here
connect with others.
Cat Fanatics
on Yahoo! Groups
Find people who are
crazy about cats.
Yahoo! Groups
Wellness Spot
A resource for Curves
and weight loss.

executive authority of the governor and the board to decide which
lifers get out and when, with the judges deciding on their own
whether life-term inmates no longer are a danger to society and
can be released.

"Some of these recent cases have opened the door, and attorneys
might feel that by going to court, they might have another bite at
the apple," Garland said.

At issue in the cases under appeal is the "standard of review" the
state Supreme Court established in 2002 in the so-called
Rosenkrantz case for lifers seeking parole. The dispute doesn't
apply to the 3,500-plus prisoners sentenced to life without
possibility of parole.

State law says the parole board "shall normally set" a release date
for lifers who have a possibility of parole – more than 29,000 of
whom are now behind bars – unless the "timing" or "gravity" of the
current or past convictions "is such that consideration of the public
safety requires a more lengthy period of incarceration."

The court's decision in the Rosenkrantz case set a precedent for
lifers to seek judicial review of their parole decisions but restricted
it to questioning whether there was "some evidence" to support the
board or the governor's findings. It also established that the facts
of the original crime were sufficient for a judge to make the call.
But in the case of convicted murderer Sandra Davis Lawrence, the
2nd District Court of Appeal in Los Angeles ruled earlier this year
that the "ultimate test" of the law is whether the evidence could
determine if the offender posed an unreasonable safety risk. The
appellate panel ruled the evidence fell short and ordered Lawrence
released. Her case is one of the three being appealed.

Garland characterized the courts' rulings on inmates' "suitability"
for release as "a pretty big shift" from their established role of
reviewing only the evidence on which the governor and the board
based their decisions.

But law professor Michael Brennan, of the University of Southern
California's Post-Conviction Justice Project and also one of
Lawrence's lawyers, said the inmates filing writs have usually
served more than 20 years, have compiled exemplary disciplinary
records and are entitled by law to parole.

"They have done everything possible inside the institution to
rehabilitate themselves," Brennan said. "They have secure parole
plans. They have a place to go and live. They have plans on how
they are going to support themselves."

Before Lawrence turned to the courts, she had served 25 years in
prison on a first-degree murder conviction for shooting and
stabbing her lover's wife to death. Now 60, she earned a master's
degree in business administration while in prison. Court papers
filed on her behalf described her as a model prisoner.

The parole board granted Lawrence a release date, but
Schwarzenegger reversed the decision last year, saying the
callousness of her crime suggested she still posed an
unreasonable risk. The appellate court disagreed with the governor
and ordered her released in May.

Louis Mauro, the governor's chief deputy legal affairs secretary,
said Schwarzenegger has "broad discretion" to reverse parole
grants. The courts, Mauro said, "should not be usurping the
executive's discretionary determination on whether an inmate
poses a risk of danger to society when released."

"That's a separation-of-powers problem," Mauro said.

In his first year in office, the Republican governor, ironically, laid down a record on lifer paroles that sharply contrasted with the more restrictive stance of his Democratic predecessor, Gray Davis. From his November 2003 inauguration through December 2004, Schwarzenegger allowed 79 lifers to go free, compared with the six releases that Davis approved in nearly five years in office. Schwarzenegger signaled when he approved two releases during his first two weeks in office that he would view lifer paroles differently than Davis did. Schwarzenegger's office distributed a prepared statement that it would let the parole board "do its job" unless he believed it made a "clear error" in releasing a prisoner. Davis operated on a virtual no-parole policy for lifers. "If you take someone else's life, forget it," he said in his first months in office in 1999. "I see no reason to parole people who have committed an act of murder."

Victims' rights groups harshly criticized Schwarzenegger over his releases, even airing television advertisements – funded by the governor's political antagonists in the California Correctional Peace Officers Association – criticizing his parole policies.

Shortly after the ads began to run in mid-2005, the governor, then embroiled in a special election campaign, changed course and approved only 35 lifer releases for the year. Last year, he signed off on 23 paroles, or 0.5 percent of the 4,657 lifers who had hearings. So far this year, he has allowed 35 lifer paroles; the number of hearings was unavailable.

Christine Ward, director of the Doris Tate Crime Victims Bureau, thinks Schwarzenegger is still allowing too many lifer releases. But she called the recent judicial decisions "a little scary" and hopes the state Supreme Court reaffirms the previous standard of review. "I may not be happy with the decisions the governor is making, but the bottom line is that he's supposed to be the last word," Ward said.

Advocates for lifers who had been heartened by Schwarzenegger's earlier expressions of leniency are equally discouraged by the governor's turnaround. They're saying if the state doesn't want to let any lifers out, it ought to pass a law to that effect.

"Let's debate it honestly and openly and see if it passes constitutional muster," said Michael Beckman, a Santa Monica attorney who represents lifers at their parole board hearings. "The way we're doing it now, it's intellectually dishonest to everybody." As of the end of November, there were 29,607 life-term inmates doing time with a possibility of parole, according to the California Department of Corrections and Rehabilitation.

One was James Stockman, 49, a Washington man who has been in prison for 24 years on a 25-to-life, first-degree murder conviction for stabbing a man to death during a fight in Humboldt County. In January, the parole board approved Stockman for a release date. In June, the governor took it away.

"I was obviously very disappointed," said Stockman, in an interview at California State Prison, Solano. "I've worked very hard for this." Stockman said he has earned a bachelor's degree in computer science and has never been disciplined in prison. He also said he is married and, if released, has an opportunity to get a computer-related job in Vacaville. He also claimed close ties to a Vacaville church.

12/16/2007

George Rounds, 44, who has done 26 years on a 15-to-life conviction for the second-degree murder of his step-uncle, said the courts represent the last and best hope for lifers.

"So they're filing writs and petitions and starting to participate in the rule-making," he said.

Garland, the senior assistant attorney general, said lifers have been filing writs "for years," but it's only been in the past two years that they've enjoyed success.

If the state doesn't move to stop it now, she said, "more inmates would seek release in habeas corpus and would continue to be more successful."

—·—·—·—
Messages in this topic (1) Reply (via web post) | Start a new topic
Messages | Files | Photos | Links | Database | Polls | Calendar
MARKETPLACE

Earn your degree in as few as 2 years - Advance your career with an AS, BS, MS degree - College-Finder.net.
YAHOO! GROUPS

Change settings via the Web (Yahoo! ID required)
Change settings via email: Switch delivery to Daily Digest | Switch format to Traditional
Visit Your Group | Yahoo! Groups Terms of Use | Unsubscribe

—·—·—·—

Share life as it happens with the new Windows Live. Share now!

# EXHIBIT – D

THE MONTEREY COUNTY HERALD, SUNDAY, OCTOBER 14, 2007

# Commentary

www.montereyherald.com

## Inside

**On the Opinion page:**
Today's college students are Quiet Americans. —
Thomas Friedman

**E**



# Judge weighs in on Herald series

### POLICIES CONTRIBUTE TO PAROLE SHAM

**By ROBERT F. MOODY**
*Guest commentary*

I enjoyed The Herald's series "Down for Life," regarding the California Board of Parole Hearings and the gubernatorial handling

of life crime inmates, and I commend Julia Reynolds for her thorough treatment of the subject. I thought I would chime in with a couple of observations.

I became deeply concerned about the extent of dysfunctional situation when I pulled the three-year pie wts of Monterey County a few years ago. It became obvious to me that not only were inmates

sentenced to life with the possibility of parole never being released, but also that inmates convicted of the most heinous crimes with a minimum term of a certain number of years and a maximum term of life — 25 to life, 16½ years, as a second degree murder kidnapping — re

Please see **Moody page E3**

Robert F. Moody was a Monterey County judge from 1982 to 2003, serving mostly in the Municipal Court in 1984. He was appointed to the Superior Court...

**Down for Life**

# Moody

*From* page E1

ransom, etc. — were not being released either, even though they may be entitled to be released under the applicable rules. In one such case, a man who had been convicted of second-degree murder and sentenced to 15 years to life and who had been a model prisoner and was not a public safety risk was denied parole after having served 27 years in prison.

This failure to release inmates according to the rules, coupled with the fact that death sentences imposed in California are rarely carried out — there are only a handful of exceptions in the past 45 years — results in the surprising reality that the vast majority of the time, in spite of the strenuous and often extremely expensive efforts of the trial courts to determine whether a sentence should be death, life without parole, life with parole, or a term of years with a life top, the sentences ultimately turn out to be the same: life without any realistic possibility of parole.

I think the problem stems in part from the Willie Horton situation, where former Massachusetts Gov. Michael Dukakis, in the midst of his 1988 campaign for president, was shown to have been involved in the release of a life-with-possibility-of-parole inmate who later raped a Maryland woman and beat her boyfriend. This was politically devastating to Dukakis, regardless of whether he was personally culpable.

Since then, all governors who bear parole responsibilities have been heavily scrutinized by their political opponents to

see if they could be blamed for the criminal acts of any lifer parolee who did something awful after receiving a grant of parole that the governor could have prevented or overturned.

All the governors of California of all political stripes since then, and the parole boards they have appointed, have been increasingly unwilling to permit release of life crime inmates, regardless of the merits of individual cases. That is understandable in a way because in practical terms, the system makes the governor politically responsible for everything the released inmates may do. This is unfair, and it is not my intention to criticize the individual governors. This approach, however, is having a devastating impact upon the integrity of the justice system and upon the administration of the prisons themselves.

We have laws and rules that require, absent a showing of unacceptable risk to public safety, the release of inmates on parole after service of the "matrix" number of years, a formula established by the Department of Corrections, and then we fail to follow them. It is a deception, one could even say a sham, to accept a plea bargain or to impose a sentence involving some form of life with parole term only to find out years later that the reality was straight life because the parole board refused to grant parole under any circumstances, or if it did grant parole, the governor overturned the grant.

These practices have often made the trial courts unwittingly complicit in the perpetration of a deception of both the sentenced inmates and the public.

From the standpoint of the administration of the prisons,

while the public may not be aware of the realities described above, the inmates most certainly are. The question for them is why, if they are never getting out anyway, should they work, or attend classes, or seek counseling, or abstain from gang activities or stabbings. The mirage of an earned release, followed by the reality of perpetual denials of parole, leaves them hopeless and extremely embittered. The correctional officers must then face the behavioral consequences.

It is true that the great majority of "lifers" are too dangerous to release, but this is not true of all of them, and the justice system has a moral obligation to honor its commitments to those who have served their time and proved themselves worthy of release.

Our state constitution places the responsibility for parole releases upon the executive, meaning the governor, and recent California Supreme Court rulings have held that if there is any evidentiary basis (and there is just about always some such basis) for a governor's reversal of a grant of parole by the parole board for a life inmate, the reversal will stand, which effectively limits judicial review of the governor's action to the vanishing point.

It therefore may well be that the most promising path out of this totally unacceptable situation is a constitutional amendment to take the governor's office out of the equation, leaving parole decisions to some form of independent body, perhaps composed of retired judges or some other suitably neutral but knowledgeable professionals. It might be better for everybody, including the governors.

State of California                                                                          Board of Prison Terms

# Memorandum

Date  :   January 26, 2006

To    :   Commissioners
          Deputy Commissioners

Subject:   **Psychological Reports**

Psychological reports have traditionally been considered by hearing panels in evaluating suitability for parole during the lifer hearing process. The result of this is that these reports have been used for purposes for which they were not intended. This is especially true for those inmates who are not part of the Mental Health Services Delivery System (MHSDS). Effective immediately psychological reports, using a new format, will be provided during the lifer hearing process only for those inmates who are assigned to MHSDS. Inmates who are not a part of the MHSDS will have initial psychological reports generated upon entry into the Department of Corrections and Rehabilitation. Psychological Reports for subsequent lifer hearings for non-MHSDS inmates will not be generated thereafter. This policy is in effect notwithstanding Department of Corrections and Rehabilitation Department Operations Manual section 62090.13.

For inmates not assigned to the MHSDS, the following procedures are to be used:

- In cases where a psychological report has been ordered by a previous panel but not provided by the institution, the current panel shall not postpone a current hearing. The panel shall proceed with the hearing in the absence of the report.

- In cases where the latest psychological report contains a risk assessment, the hearing panel shall articulate to the inmate and his counsel that the panel has read and considered the section of the report regarding risk assessment, and is not assigning any weight to it in the panel's decision.

- As to aspects of the psychological report other than a risk assessment, in determining what weight to give to any opinion expressed by the clinician, you should consider the facts and materials upon which each opinion is based, and the reasons for the opinion. An opinion is only as good as the facts and reasons on which it is based. If you find that any fact has not been proved, or has been disproved, or is inconsistent with other information you have read and considered in preparation for or during the course of the parole suitability hearing, you must consider that in determining the value of the opinion. Likewise, you must consider the strengths and weaknesses of the reasons on which it is based.

- You are not bound by the clinicians opinion. Give each opinion the weight you find it deserves. You may disregard any opinion if you find it to be unreasonable.

- Psychological reports shall not be ordered for the purposes of evaluating parole suitability of non-MHSDS inmates. The one exception to this directive is that if a previous psychological report was cited by the Governor as grounds for a reversal of a grant of parole, then a follow-up report shall be ordered.

- The panel may request a follow-up psychological report using the new format for MHSDS inmates only.

DENNIS KENNEALLY
Executive Director
Board of Parole Hearings

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

ORIGINAL

CHAIRMAN JAMES W. NIELSEN, PRESIDING

SPECIAL BOARD OF PRISON TERMS MEETING

Monday, October 5, 1998

Board of Prison Term
428 J Street, 6ᵗʰ Floor
Sacramento, California 95814

EXHIBIT A

1

PROCEEDINGS

2
         -o0o-

3
    CHAIRMAN NIELSEN: Opened the teleconferenced Board of

4
Prison Terms emergency meeting at 3:00 p.m.

5

6
    CHAIRMAN NIELSEN: Agency Secretary Quintin

7
Villanueva is in attendance at our emergency meeting. First

8
item on the agenda is the roll call:

9
    CHAIRMAN NIELSEN: Commissioner Giaquinto.

10
    CHAIRMAN NIELSEN: Commissioner Giaquinto on vacation.

11

12
    CHAIRMAN NIELSEN: Commissioner Guaderrama.

13
    COMMISSIONER GUADERRAMA: Here.

14
    CHAIRMAN NIELSEN: Here.

15
    CHAIRMAN NIELSEN: Commissioner Gillis.

16
    COMMISSIONER GILLIS: Here.

17

18
    CHAIRMAN NIELSEN: Ms. Bentley.

19
    VICE CHAIRMAN BENTLEY: Here.

20
    CHAIRMAN NIELSEN: Commissioner Van Court.

21
    CHAIRMAN NIELSEN: Van Court. Not present.

22

23
    CHAIRMAN NIELSEN: Commissioner Ortega.

24
    COMMISSIONER ORTEGA: Here.

25
    CHAIRMAN NIELSEN: Commissioner Shelton.

1    CHAIRMAN NIELSEN: Commissioner Shelton not present.

2    CHAIRMAN NIELSEN: Commissioner Williams.

3    COMMISSIONER WILLIAMS: Here.

4    CHAIRMAN NIELSEN: We do have a quorum here present. We

5    do not have minutes of our previous meeting; this is a special meeting to address only

6

7    the emergency regulation.

8    The first item on the agenda would be to have a declaration of the

9    emergency.

10

11    EXECUTIVE OFFICER: Jenny Willis will read the regulation.

12    CHAIRMAN NIELSEN: After reading of the text we can entertain

13    a motion on the emergency.

14    MS. WILLIS: Good afternoon, Commissioners. I'm proposing

15    that the Board adopt emergency regulations to implement the Board's policy regarding

16    foreign prisoner transfers. This regulation is Administrative Directive 98-11.

17

18    The first step requires that the Board declares that an emergency

19    exists regarding the adoption of the regulation and that it is necessary to preserve the

20    public peace and general welfare of the citizens of the State of California.

21    The emergency adoption of the regulation is necessary to

22    implement the authority given to the Chairman of the Board of Prison Terms through

23    Government Code Section 12012.1 in the convention on the transfer of sentenced

24    persons.

25

3

1          At this point, I am requesting that a Commissioner make a motion

2     to declare that an emergency exists based on my prior comments.

3          COMMISSIONER GUADERRAMA:  Commissioner Guaderrama

4     so moves.

5

6          CHAIRMAN NIELSEN:  Any second?

7          COMMISSIONER ORTEGA:  Ortega seconds.

8          CHAIRMAN NIELSEN:  Is there any discussion on the motion,

9     Commissioners?  The declaration of the emergency is the purpose of this motion.

10          COMMISSIONER GUADERRAMA:  I do have a question.

11

12          CHAIRMAN NIELSEN:  Yes?

13          COMMISSIONER GUADERRAMA:  In the past, before we

14     transferred a prisoner to another country, he had to have a parole date.  I don't see

15     where that's addressed anywhere on this write up.

16

17          CHAIRMAN NIELSEN:  That has, indeed, been our policy in the

18     past.  Let's see if we've got it addressed in here in any way.

19          MS. WILLIS:  Actually, the convention and the Government Code

20     doesn't give the Board of Prison Terms the authority to set that policy.  We've

21     interpreted the convention and we've added the language of the convention into the

22     regulation.

23

24          CHAIRMAN NIELSEN:  Manny, your point is well taken.  I can't

25     recall an occasion where we have ever transferred without having found suitability.

4

1    But your point is, Jenny, we need to be silent on that in the regulations.

2    MS. WILLIS: Exactly. And what you'll see is that the factors

3    considered for deciding whether or not to transfer the prisoner are very similar to the

4    factors we consider when we decide whether or not a prisoner is suitable for a parole.

5    CHAIRMAN NIELSEN: We want to have an indication of the

6    receiving nation's intentions regarding incarceration. This has always been a sensitive

7    issue and an important issue. That's why we are quicker to approve a transfer with the

8    European Convention countries because they are more willing to give us those

9    assurances than Mexico has been and, hence, it's a much easier decision to make

10    because of a higher degree of assurance on how much time they're going to serve. So

11    we wanted that indication in here, but I think you're right. You're reminding me when

12    we discussed it how we would word the emergency regulation. We couldn't put that

13    in.

14    COMMISSIONER ORTEGA: Then this will not affect our right to

15    not transfer somebody if we decide that they need a parole date.

16    CHAIRMAN NIELSEN: That's correct, we can make that

17    determination.

18    CHIEF COUNSEL: The emphasis in this regulation is on an

19    individual consideration of each case and you retain all your discretion with regard to

20    any particular decision.

21    CHAIRMAN NIELSEN: In this regulation there's an actual

5

1    additional burden that we're imposing and that is an acknowledgment of the host

2    country, meaning that the inmate has got to get them to write us -- the burden is on the

3    inmate. So, we've actually toughened up our own policy a little bit by virtue of this

4    emergency regulation.

5

6           COMMISSIONER ORTEGA: Thank you very much.

7           CHAIRMAN NIELSEN: Any other discussion?

8           COMMISSIONER GILLIS: I'm not sure what the problem is that

9    we're trying to correct.

10          CHAIRMAN NIELSEN: The problem is the Office of

11   Administrative Law (OAL) got into a fair amount of trouble earlier this year for the

12   

13   amount of regulations they had not examined or looked at and that there might be

14   agencies with what they've called underground regulations. And, in fact, over the

15   years we have never put forth a regulation relating to the Foreign Prisoner Transfer

16   Program since the Governor delegated his authority to the Chairman of the Board of

17   Prison Terms to deal with this Foreign Prisoner Transfer Program. What the OAL will

18   

19   find is that we do need to have a regulation.

20          COMMISSIONER GILLIS: Thank you. I just recall in the past

21   that this was not something on which the Board had discretion . It was strictly

22   between you and the Governor and the Board had no say so in that. I thought that was

23   why we never had any regulation.

24          MR. CHARTRAND: Whenever we have a rule of general

25

6

1    applicability to everyone in a certain class, we're going to have to have a regulation

2    that's adopted and approved through the Office of Administrative Law. OAL has

3    determined we've been operating a program and making decisions of general

4    applicability, but not having any regulations to support it; this is why we have to do

5    this regulation.

6

7                   COMMISSIONER GILLIS: It was my understanding that it was

8    not something that the Board had any discretion with or that we made any decision on.

9    Communication was strictly between the Chairman and the Governor.

10                  MR. CHARTRAND: Yes, but the two of them have been operating

11   a program in the state in regards to a specific class of people. And so even though it's

12   only the Governor and the Chairman of the Board of Prison Terms, because they apply

13   this program to everybody in this class, we need to have a regulation.

14

15                  CHAIRMAN NIELSEN: Any further discussion on the motion for

16   Declaration of Emergency?

17

18                  Roll Call:

19                  COMMISSIONER GUADERRAMA: In favor.

20                  CHAIRMAN NIELSEN: Nielsen, in favor.

21                  COMMISSIONER GILLIS: Aye.

22                  VICE CHAIRMAN BENTLEY: Aye.

23                  COMMISSIONER ORTEGA: Aye.

24

25                  COMMISSIONER WILLIAMS: Aye.

7

1          CHAIRMAN NIELSEN: We now have declared the emergency.

2   The next motion would be to adopt the regulation as an emergency.

3          MS. WILLIS: I'm requesting that a Commissioner make a motion

4   to adopt AD 98-11 that contains the specific text of the emergency regulation and

5   other findings required by the Office of Administrative Law.

6

7          COMMISSIONER GUADERRAMA: Guaderrama so moves.

8          CHAIRMAN NIELSEN: Moved by Guaderrama. Is there a

9   second?

10         VICE CHAIRMAN BENTLEY: Second.

11

12         CHAIRMAN NIELSEN: Bentley seconded it. Any discussion on

13  the motion? No further discussion

14         CHAIRMAN NIELSEN: We will do the roll call.

15         COMMISSIONER GUADERRAMA: Aye.

16         CHAIRMAN NIELSEN: Nielsen, aye.

17         COMMISSIONER GILLIS: Aye.

18

19         VICE CHAIRMAN BENTLEY: Aye.

20         COMMISSIONER ORTEGA: Aye.

21         COMMISSIONER WILLIAMS: Aye.

22         CHAIRMAN NIELSEN: Motion unanimously passed. Is there

23  any further business to come before us? None. Then we will stand in adjournment.

24

25         Gentlemen, I thank you for affecting this special call. We do have

8

1   some additional news on Mr. Siripongs. I'll let Mr. Ching report on this death row

2   inmate's status.

3           MR. CHING: The Attorney General has informed us that

4   Siripongs' last appeal in the United States Supreme Court was denied today.

5   Consequently, the District Attorney in Orange County will go forward and obtain a

6   death warrant from the Superior Court by the middle of the month. The Governor's

7   Office is planning to ask the Defense Attorney to submit a clemency petition if, at all,

8   by a date nearer the first week of November.

9           CHAIRMAN NIELSEN: We do not have any clemency request

10  properly before us, but remember we talked about the rolling notice date to keep

11  ourselves current if we have to call a Board meeting on a moment's notice. We'll keep

12  you apprised of it, but that's all the update for now.

13          Quintin, would you mind saying something to the Commissioners?

14          MR. VILLANEUVA: I was a little disappointed that you're all not

15  here; you're all out working and doing the good Governor's work; but I'll try to make

16  one of your future meetings.

17          I had the pleasure of being with the Governor, as did John Gillis,

18  the other night and we talked about the work you're all doing under the leadership of

19  Jim Nielsen and our concern that it carries on at the end of this administration. The

20  Governor, as it was expressed to me, thinks all of you are doing a hell of a job — have

21  done a hell of a job for the past eight years and hopes that it continues on.

1    The other reason I am here today is that I have a particular int

2    in this issue that you've dealt with today on foreign nationals and, hopefully, we

3    going to get something rolling and when the new administration comes in, they

4    pick up the ball and carry it a little further. I had a meeting with, I think it was f

5    consul generals -- it might have been four -- and a deputy last week on this very

6    and they seem inclined to work it out and try to cut through the red tape and see i

7    can't get things moving again to get the foreign nationals out of our prisons and i

8    theirs.

9    

10    CHAIRMAN NIELSEN:  Carol and Gentlemen, thank you very

11    much for piping in this way. Have a good week out there. We'll talk to you later

12    through the week.

13    

14    -o0o-

15    [Whereupon the proceedings in the above matter were concluded.

16    

17    

18    

19    *James W. Nielse*

20    JAMES W. NIELSEN, CHAIRMAN

21    

22    

23    

24    

25

# Memorandum

Date   :   January 26, 2006

To   :   Commissioners
        Deputy Commissioners

Subject:   **Psychological Reports**

Psychological reports have traditionally been considered by hearing panels in evaluating suitability for parole during the lifer hearing process. The result of this is that these reports have been used for purposes for which they were not intended. This is especially true for those inmates who are not part of the Mental Health Services Delivery System (MHSDS). Effective immediately psychological reports, using a new format, will be provided during the lifer hearing process only for those inmates who are assigned to MHSDS. Inmates who are not a part of the MHSDS will have initial psychological reports generated upon entry into the Department of Corrections and Rehabilitation. Psychological Reports for subsequent lifer hearings for non-MHSDS inmates will not be generated thereafter. This policy is in effect notwithstanding Department of Corrections and Rehabilitation Department Operations Manual section 62090.13.

For inmates not assigned to the MHSDS, the following procedures are to be used:

- In cases where a psychological report has been ordered by a previous panel but not provided by the institution, the current panel shall not postpone a current hearing. The panel shall proceed with the hearing in the absence of the report.

- In cases where the latest psychological report contains a risk assessment, the hearing panel shall articulate to the inmate and his counsel that the panel has read and considered the section of the report regarding risk assessment, and is not assigning any weight to it in the panel's decision.

- As to aspects of the psychological report other than a risk assessment, in determining what weight to give to any opinion expressed by the clinician, you should consider the facts and materials upon which each opinion is based, and the reasons for the opinion. An opinion is only as good as the facts and reasons on which it is based. If you find that any fact has not been proved, or has been disproved, or is inconsistent with other information you have read and considered in preparation for or during the course of the parole suitability hearing, you must consider that in determining the value of the opinion. Likewise, you must consider the strengths and weaknesses of the reasons on which it is based.

- You are not bound by the clinicians opinion. Give each opinion the weight you find it deserves. You may disregard any opinion if you find it to be unreasonable.

- Psychological reports shall not be ordered for the purposes of evaluating parole suitability of non-MHSDS inmates. The one exception to this directive is that if a previous psychological report was cited by the Governor as grounds for a reversal of a grant of parole, then a follow-up report shall be ordered.

- The panel may request a follow-up psychological report using the new format for MHSDS inmates only.



**DENNIS KENNEALLY**
Executive Director
Board of Parole Hearings

STATE OF CALIFORNIA
COUNTY OF SAN LUIS OBISPO

## DECLARATION OF ALBERT M. LEDDY

I, ALBERT M. LEDDY, hereby declare:

1) I was an attorney at law, currently retired. After graduating from Boalt Hall, University of California at Berkeley, I practiced law until 1983 including serving as Deputy District Attorney and then District Attorney of Kern County, California, from 1952 to 1965 and again from 1970 to 1983.

2) Between 1983 to 1992 I served as a Commissioner and then as Chairman of the Board of Prison Terms (BPT) pursuant to my appointment and re-appointments to those positions by Governor George Deukmejian.

3) During approximately 9 years of service as BPT Chairman and Commissioner, parole hearings were conducted as now for "life" prisoners (with a maximum prison term of life and a minimum of between 7 and 25 years, reduced for work and good behavior), by 3-member BPT panels at intervals prescribed by the California Penal Code statutes and the parole regulations in the Code of Regulations, Title 15, Division 2, Board of Prison Terms, §§ 2000 et seq.

4) From 1983 to 1990 BPT panels became more reluctant to grant paroles in accordance with Penal Code § 3041(a) (which requires that at the initial hearing a parole date "shall normally" be set), resulting in a substantial, steady decline in the percentage of parole dates granted at hearings. This decline was caused by increasing political pressure and new BPT Commissioner appointees who disfavored paroling life prisoners.

5) After Governor Wilson's election in 1990, he substantially intervened to reduce parole grants; in actual effect his policy practically eliminated paroles. He accomplished this, first, by appointing and re-appointing BPT Commissioners known to disfavor parole or to favor a "no-parole" policy. These appointees were all crime victims, former law enforcement personnel or Republican legislators who had been defeated in elections and needed a job.

6) Governor Wilson made his "no-parole" policy known in several ways including, I believe, through statements quoted by the media and possibly through the Youth and Adult Correctional Agency Secretary, although I can't say I know this to be fact. I am aware that he wanted previously set parole dates rescinded.

(247)



Leddy
EXHIBIT NO. A

103

7) The new BPT appointments by Governor Wilson violated Penal Code § 5075 which required that "[t]he selection of persons and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross-section of the racial, sexual, economic, and geographical features of the population of the state." Governor Wilson's appointments have been mostly from his home area of San Diego. Most are not qualified by training or experience for the position of BPT Commissioner, and they do not fulfill the statutory cross-section requirements of racial, sexual, economic or geographical proportion.

8) My knowledge of these facts is based on publication and by awareness of said appointments, my daily dealings with them as panel members at BPT hearings at which paroles were denied contrary to the laws and regulations, and Mr. Wilson's public statements disavowing parole policy as set forth in the statutes and regulations, and proclaiming during his campaigns that he would not have "another Willie Horton episode." On one occasion Joe Sandoval, former Secretary of YACA (a cabinet level appointment) personally warned the Commissioners to be careful about granting paroles. Chairman John Gillis told two Commissioners, "Stop giving these dates."

9) Governor Wilson also accomplished his "no-parole" policy by having the BPT use a previously unused law to void practically all grants of parole by BPT's panels, while not using it to overturn any decision denying parole. This law was Penal Code § 3041.2.

10) Governor Wilson also had the BPT use a seldom-used regulation, 15 CCR § 2451(c), to rescind nearly all of its previous grants of parole to prisoners awaiting their release. This regulation, known as the "improvident grant" clause, became routinely used to rescind those previously set dates. On one occasion, after I refused to recommend rescission on a panel, I was told by Ted Rich, BPT's Executive Officer, to recommend rescission when it is the Governor's desire. It was obvious to myself and other Commissioners that we would not be re-appointed if we did not comply.

11) At one point I became concerned enough about the "no-parole" policy that I wrote a 9-page brief about how we were not complying with the laws. I gave a copy to each Board member, pointing out that we could be sued. I asked that this brief be a topic on the Board's agenda. Ted Rich, as Executive Officer, said, "That's not going to be on the agenda. You can't have it on the agenda."



104

Declaration of Bert M. Lern

Inasmuch as I expressed my dissatisfaction verbally and
in my brief, I'm sure that my objections helped me not to
get re-appointed.

12) Accordingly, the effect that Governor Wilson has exerted
upon BPT personally, through his politically-based
policy, by his EPT appointments, and by his intervention
to rescind and reverse parole grants, has been to remove
any reasonable possibility of parole for practically all
of the thousands of California prisoners serving terms of
life with the possibility of parole.

13) Such a "no-parole" policy is contrary to Penal Code §
3041 which requires that BPT "shall normally" set a
parole date in most cases, i.e., unless the prisoner is
shown to pose a threat to public safety, and that BPT
panels shall declare prisoners "suitable" for a future
release date and set that release date unless a
preponderance of the evidence presented at the hearing
demonstrates that the prisoner "will pose an unreasonable
risk of danger to society if released from prison."

14) Although the reluctance to grant parole began in the
early 80's, under Governor Wilson's regime BPT panels
denied parole in over 99% of cases by employing
procedures that violate the parole statutes and
regulations. Primarily used are offense factors. BPT
panels find prisoners "unsuitable" for parole based
mainly or entirely on the facts and circumstances of
their offense instead of their level of dangerousness, as
reflected by performance, rehabilitation and expert
evaluation in their prison records. Because the facts
and circumstances of crimes do not change, the procedure
effectively increases all such sentences from life with
possibility of parole to life without any possibility of
parole. Despite contrary regulations and statutes, BPT's
chief counsel and Executive Officer urged me and the
other Commissioners to deny paroles based on the
prisoners' offenses.

15) The procedure also eliminates BPT's duty to set parole
dates because parole can't be granted for those found
"unsuitable." This renders illusory BPT's term-setting
obligation and lifers' opportunity to parole. Even the
most deserving prisoners shown overwhelmingly not to pose
an unreasonable risk (or any) risk of danger to the
public if released have not, cannot and will never
receive parole under such a policy.

16) After 1992, when my final term as BPT Commissioner
expired, I re-entered the private practice of law. I
represented an inmate at his BPT hearing. Although the
inmate had a statutory right to call witnesses, who could
have refuted the allegations the panel used to deny



105

Declaration of Albert M. Leddy

parole, the BPT denied the witness. Additionally, the BPT substituted Commissioner Carol Bentley, a former Assemblyperson who was appointed after she was not re-elected. I had never known Ms. Bentley to grant parole to any lifer. She was the panel chairperson. She was rude, her hostility was obvious and it was evident she was pre-determined to oppose parole.

17) Prior to the commencement of his parole hearing, I personally heard Ron Koenig, a Commissioner on the hearing panel and former BPT Chairman, inform Rick Ervood, the Riverside County District Attorney attending the hearing, 'don't worry' because "we won't parole this guy," in those approximate words. This is consistent with my experience described above in which BPT's hearing panels often made decisions to deny parole prior to the hearings.

18) It has been clear to me that there is a general conspiracy to prevent life prisoners from paroling, especially those whose offenses include murder. Obviously, such a 'no-parole' policy means that no murder offender can get a fair hearing as the law requires. If you can deny a prisoner "suitability" solely on the basis of the crime, you can deny him forever. The crime won't change. The parole law is based on the idea that prisoners do change, and become no danger to public safety—statistically the murder offender—rarely repeats at crime once released.

19) As a taxpayer, I believe it is a waste of perhaps millions of dollars each year to incarcerate those life prisoners whose prison records adequately demonstrate they are no longer a threat to public safety. The correctional system spends millions on programs to teach them trades and marketable skills, to give them a general education, and until its discontinuation, psychological therapy to help them change their lives. I believe the law must be followed, that the Governor cannot create his own set of punishments in defiance of the clear legislative intent. Every man is entitled to a fair hearing where the burden of proof is set and adhered to, and the results are not just what is politically expedient for one person, the sitting governor.

20) I am informed that Governor Gray Davis has expressed his policy that no murder offender will be paroled on his watch. As a former Commissioner and as a lawyer, such a policy is clearly contrary to the statutes and


(250)

106

AUG-25-2000  12:58     BFT/LEGAL
Case 3:08-cv-03906-SI     Document 1-3     Filed 08/15/2008     Page 66 of 76     P. 06/06
Declaration of Albert M. Leddy                                          Page 5 of 5

regulations governing the parole process.  Such a policy
will exacerbate an already unacceptable situation which
is backlogging hundreds, perhaps more, of life prisoners
who are already beyond the term they would normally have
served but for the "no-parole" policy.

I declare, under penalty of perjury, that the facts I
have stated are true and correct.  My expressions of belief as
to each specified facts are based on the reasons I have given
as to each such fact.  I would be willing to testify to same
in a court of law.  I so swear, this ___ day of
_____ March _____ 1999, at Los Osos, California.

Albert M. Leddy
Declarant

251

I, MONICA KNOX. declare as follows:

1. I am a Deputy Federal Public Defender and, together with Deputy Federal Public Defender Guy Iversen. I represent petitioner in this matter.

2. The factual disputes underlying petitioner's claims center on whether there is a policy and/or practice of the Board of Prison Terms to deny findings of suitability and parole dates to prisoners serving life terms: petitioner claims there is such a policy and/or practice and that is the reason he has been denied parole; respondent claims there is no such policy and/or practice.

3. Earlier discovery orders by this court gave us access to. among other things. the transcripts of parole suitability hearings held between 1995 and 2000 as well as the "lifer packets." i.e.. the accompanying material the Board relies on to determine suitability. We have read. by random selection. over 300 of those transcripts and reviewed the accompanying lifer packets. We have tabulated the results of 284 of those cases (the others not being tabulated because they were stipulated findings of unsuitability. usually in exchange for a shorter denial period). The tabulated results appear as Exhibit A.

4. The tabulated results. we believe. are strong evidence that there is in fact a policy and/or practice by the Board of finding all lifers unsuitable for parole. Some of the significant findings in the 284 cases are as follows:

A. 283 were found unsuitable for parole

B. All 283 were found unsuitable based. first and primarily. on the offense

C. 277 were found unsuitable because their offenses were considered cruel and/or callous or for no reason at all as specified in the regulations

D. Although the Board found each and every offense to be cause to find the lifer unsuitable. the offenses ranged from planned. premeditated murders and torture or execution murders to accidental killings or kidnaps without any injury at all.

E. Although the Board almost always gave secondary reasons for the findings of unsuitability. those reasons were often not supported by the facts or were so questionable given the facts that they suggested the Board was simply reaching for anything less than positive about

6

the lifer. For example, the Board would cite the lifer's disciplinary record in prison as a reason for finding him unsuitable despite the fact that the lifer may not have had any disciplinary action in many years or may have had disciplinary actions for only trivial matters (such as using a bed sheet for a clothesline or being late to work). The Board would cite the lifer's "escalating pattern of criminal history" as a reason for finding him unsuitable despite the fact that the lifer may have no prior convictions or only minor (non-violent misdemeanor) convictions. The Board would cite an unfavorable psychological report as a concern regarding suitability despite the fact that the lifer's psych report would assess him as an average or below average risk of danger.

F. Of the 283 lifers found unsuitable

12 had no prior record at all, no disciplinaries of any kind in prison, psych reports of average or low risk of danger, programming (self-help programs and work) in prison and release plans

4 had no prior record at all, no disciplinary actions in the last 10 years, a psych report of average or low risk, programming (self-help programs and work) in prison and release plans

18 had only minor prior record (just arrests or just non-violent juvenile actions), no disciplinary actions in the last 10 years, a psych report of average or low risk, programming (self-help programs and work) in prison and release plans

11 had more serious prior records (felony convictions) but had been disciplinary free for at least 10 years, had a psych report of low risk of danger, had programmed (self-help and work) and had release plans

5. Although we are continuing to review transcripts, we believe, based on the data we already have, that information held by current and former commissioners, current and former deputy commissioners and current and former executive directors is critical. In particular, we need to explore with these person how they understood their jobs relative to suitability hearings for lifers. We have reason to believe that many, if not all, of them have understood their jobs in the last ten years to be to find all lifers unsuitable for parole.

7

pending in San Diego Superior Court. In re Fortin, Sheets, Zych, Barrientos, Jackson and Slaman., HSC 10279, 10270, 10329, 10336, 10375, 10325. Those cases raise issues similar to those pending in this matter, and we have worked closely with the attorney in the San Diego cases, Deputy Public Defender Matthew Braner. A copy of Mr. Leddy's deposition is attached as Exhibit B.

7. Mr. Leddy was a BPT Commissioner from August, 1983, until May, 1992. He noticed a significant change in how hearings were conducted after Pete Wilson became governor in January, 1991. Specifically, he noticed that the findings of suitability dropped significantly, the number of recissions increased dramatically, and yet the lifers and their factors (background, offense, and prison programming) had not changed.

8. Mr. Leddy testified that Governor Wilson' Secretary of Youth and Adult Corrections, Joe Sandoval, met with the BPT commissioners, told them to "be more careful" about finding lifers suitable for parole, and explained that Governor Wilson did not want a "Willie Horton." (Exhibit B at 34-35.) He provided specific examples of how things changed and of suitability hearings and recision decisions that were conducted pursuant to political agendas and not the regulations. (See, e.g., Exhibit B at 50, 59-60, 65, 89.)

9. Mr. Leddy testified that the governor's public statements regarding lifers not being paroled had a direct effect on the commissioners, explaining that they were political appointees and understood the need to please the governor in order the keep their jobs. (Exhibit B at 61, 70.)

10. Mr. Leddy testified to conversations he had with other commissioners and deputy commissioners about the changes in the process. He indicated, for example, that former Commissioner O'Connell told him that certain commissioners would be "hand picked" for recision hearings because they were known to always rescind the finding of suitability and the grant of parole. (Exhibit B at 68.) He noted that former Commissioners O'Connell and Aceto told him that former Commissioner and Chairman Gillis had told them not to give parole dates to lifers. (Exhibit B at 71, 73-75.)

ε

Mr. Leddy, explained that he was chastised by former executive officer Patterson for
giving "too many" parole dates to lifers. (Exhibit B at 71-72.)

12. Based on the foregoing, we have reason to believe that the current and former
commissioners have relevant and critical information regarding the practices and unwritten
policies of the Board in making parole determinations for lifers. However, it appears that they
are unwilling to voluntarily provide the information.

13. When I spoke with Mr. Leddy last year, he indicated that he believed a few of the
former or current commissioners and deputy commissioners would be willing to talk with me.
He later advised me, however, that he had checked with them and they had told him they would
be willing to talk and answer questions only if subpoenaed and required to do so.

14. Respondent's counsel herein, Deputy Attorney General Barbara Spiegel, has advised
us that she will "not agree to allow" the deposition of the former or current commissioners,
deputy commissioners or others we want to speak with.

15. There is a proceeding pending in the Eastern District of California, a habeas petition
filed by a lifer, raising the same claims as raised in this proceeding regarding the Board's
practice and/or policy of refusing to find suitable for parole any lifer. Melvin Coleman v.
California Board of Prison Terms, CV-S-96-783 LKK PAN P. A request to depose some
current and former commissioners and deputy commissioners is pending in that action. At a
hearing on February 28, 2001, counsel for the Board in that case indicated that the Board
Chairman had sent a letter to current and former commissioners and deputy commissioners
advising them to contact the Board and/or the Attorney General's office if they were contacted
by any defense attorney seeking to speak with them about lifer hearings. The Attorney General's
office, in the Eastern District case, in the San Diego Superior Court case and apparently in this
case, has instructed current and former commissioners and deputy commissioners not to speak
with defense counsel (although recently, after a ruling by the magistrate in the Eastern District
case, that deputy attorney general agreed that she would no longer instruct former
commissioners and deputy commissioners not to speak).

9

to deposition the current and former commissioners and deputy commissioners and others we need to interview in order to get the relevant information we have reason to believe they hold.

17. We have not filed a Joint Stipulation re: Discovery relative to depositions at this point because we believed that we should first seek permission under Rule 6 for leave to conduct depositions. As soon as we receive that leave, we will serve on respondent's counsel our portion of a Joint Stipulation. obtain her portion and file it with the Court (assuming there are any disagreements about depositions).

I declare the foregoing is true and correct.

Executed under penalty of perjury this 24th day of April. 2001. at Los Angeles. California.

MONICA KNOX
Deputy Federal Public Defender

10

exhibit  ε

Exh.  ε

S160039

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re JOSEPH P. GUTIERREZ on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
**FILED**

JUL – 9 2008

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**

Chief Justice

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

I, JOSEPH P. GUTIERREZ _____, declare:

I am over 18 years of age and I am party to this action. I am a resident of CORRECTIONAL TRAINING FACILITY prison, in the County of Monterrey, State of California. My prison address is:

JOSEPH P. GUTIERREZ, CDCR #: D-02765
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: Z-138L
SOLEDAD, CA 93960-0689.

On AUGUST 5, 2008 _____, I served the attached:

PETITION FOR WRIT OF HABEAS CORPUS

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope (verified by prison staff), with postage thereon fully paid, in the United States Mail in a deposit box so provided at the above-named institution in which I am presently confined. The envelope was addressed as follows:

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CA.
ATTN: CLERK OF THE COURT
UNITED STATES COURTHOUSE
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483

HON. EDMUND G. BROWN, JR.
ATTORNEY GENERAL OF CALIFORNIA
HABEAS CORPUS DESK (B.P.H.)
POST OFFICE BOX 83266
SAN DIEGO, CA 92186-5266

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on AUGUST 5, 2008 .

JOSEPH P. GUTIERREZ
Declarant



JOSEPH P. GUTIERREZ -
D-63765, 2-238 L
CTF-II (C), P.O. Box 689
Soledad, CA 93960-0689

Confidential Legal Mail !

RECEIVED

AUG 7 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

pro se

United States District Court
Northern District of California
Attn: Clerk of The Court
United States Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102-3483

c/o T. France 8/5/1·

Confidential Legal Mail !